AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Missouri

| | |
|---|---|
| Suzanne Glisson, Lewis Vollmar, M.D., Northwest Investments, Inc., Mark Bernstein, et. al. | ) |
| *Plaintiff* | ) |
| v. | ) |
| Paul Vogel and Argos Partners LLC, | ) |
| *Defendant* | ) |

Civil Action No.   14-cv-1472

## 4:14-cv-01472-LLR

### SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)* ARGOS PARTNERS LLC
7733 Forsyth, Suite 1375
Clayton, MO 63105

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Green Jacobson, P.C.
Attn: Jonathan Andres
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Date:  09/03/14

_____
*Signature of Clerk or Deputy Clerk*

/s/ Deborah L. Tichy



EXHIBIT
3

AO 440 (Rev. 12/09) Summons in a Civil Action (Page 2)

Civil Action No.  14-cv-1472

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____

☐ I personally served the summons on the individual at *(place)* _____

_____  on *(date)* _____  ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____  on *(date)* _____  ; or

☐ I returned the summons unexecuted because _____  ; or

☐ Other *(specify):*



My fees are $ _____  for travel and $ _____  for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                   *Server's signature*

                               _____
                                   *Printed name and title*


                               _____
                                   *Server's address*

Additional information regarding attempted service, etc:


/s/ Deborah L. Tichy

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

SUZANNE GLISSON, LEWIS VOLLMAR, )
M.D., NORTHWEST INVESTMENTS, INC., )
MARK BERNSTEIN, LEWIS BERNSTEIN, )
MARJORIE BERNSTEIN, NORTHWEST )
PROPERTIES (1973) LTD., BRAD )
WERNER, Trustee of J. H. Werner Revocable )
Trust, and PHILLIP ROSEMANN, )
                                          )    Case No. 4:14-cv-01472
      Plaintiffs, )
                                            )
vs. )
                                            )
PAUL VOGEL and ARGOS PARTNERS )
LLC, )
                                            )    JURY TRIAL DEMANDED
      Defendants. )

## FIRST AMENDED COMPLAINT

### TABLE OF CONTENTS

NATURE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

JURISDICTION AND VENUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

PLAINTIFFS AND DEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

THE BRITISH LENDING PROGRAM (PONZI SCHEME). . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

PAUL VOGEL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

VOGEL, ARGOS, AND ENTERPRISE FINANCIAL ENTER INTO AN AGREEMENT. . . . . . . . . . . 8

VOGEL'S CLIENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

THE BERNSTEINS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

THE HAMPTONS CONDOMINIUM PROJECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

VOGEL LEARNS ABOUT THE BLP. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VOGEL FORMS TWO COMPANIES
  TO FACILITATE HIS PARTICIPATION IN THE FRAUD. . . . . . . . . . . . . . . . . . . . . . . . . 15

VOGEL ADOPTS SIGILLITO'S EXIT STRATEGY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VOGEL'S EXIT STRATEGY HAS SUCCEEDED THUS FAR. . . . . . . . . . . . . . . . . . . . . . . 18

FAR FROM A VICTIM, VOGEL'S CONDUCT WAS CRIMINAL. . . . . . . . . . . . . . . . . . . . 19

VOGEL ADVISES THE BERNSTEINS TO INVEST IN THE BLP.. . . . . . . . . . . . . . . . . . . . 23

VOGEL ADVISES THE BERNSTEINS TO INVEST IN THE HAMPTONS. . . . . . . . . . . . . . . . 26

A. VOGEL HELPS SIGILLITO FIND A HOME FOR THE PONZI SCHEME. . . . . . . . . . . . . . . 27

B. VOGEL AND SIGILLITO COMPLETE THEIR *QUID PRO QUO.* . . . . . . . . . . . . . . . . . . 28

C. CLARIFICATION OF CRYPTIC EMAIL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

VOGEL CONVINCES CHARLOTTE GARRETT TO INVEST IN THE BLP. . . . . . . . . . . . . . . 29

VOGEL USES HIS DUE DILIGENCE REPORT TO
  LULL THE BERNSTEINS AND MISLEAD POTENTIAL INVESTORS. . . . . . . . . . . . . . . 33

SMITH AND DISTINCTIVE PROPERTIES DEFAULT
  ON THEIR LOAN AGREEMENTS WITH NORTHWEST 1973. . . . . . . . . . . . . . . . . . . 40

VOGEL STEALS HIS DAD'S MONEY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VOGEL DECEIVES THE BERNSTEINS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

VOGEL DECEIVES MR. WERNER.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

VOGEL CONVERTS DR. VOLLMAR'S IRA FOR BENEFIT OF THE HAMPTONS PROJECT. . . . 50

SIGILLITO REPAYS CRANMER'S $1 MILLION LINE OF CREDIT. . . . . . . . . . . . . . . . . . 54

VOGEL AND SIGILLITO'S RELATIONS WITH ROSEMANN. . . . . . . . . . . . . . . . . . . . . . 54

VOGEL TRIES TO BORROW MONEY FROM ENTERPRISE AND ST. LOUIS BANK. . . . . . . . . 61

ENTERPRISE AND ENTERPRISE FINANCIAL REFUSE TO LOAN MONEY TO VOGEL. . . . . . . 64

KNOWING THE BLP WAS A SCAM, ARGOS REFUSES TO INVEST IN THE BLP. . . . . . . . . . 68

VOGEL HAS ONLY HIS EXPENDABLE CLIENTS INVEST IN THE BLP. . . . . . . . . . . . . . . . . 70

VOGEL ENGAGES IN RACKETEERING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

$1 MILLION OF ROSEMANN'S MONEY IS TAKEN AS INVESTMENT IN THE HAMPTONS. . . . 77

MRS. GLISSON INVESTS IN A PONZI SCHEME. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

MR. WERNER INVESTS IN A PONZI SCHEME. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

COUNT I - (AIDING AND ABETTING FRAUD). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

COUNT II - (NEGLIGENCE). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

COUNT III - (NEGLIGENCE). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

COUNT IV - (BREACH OF FIDUCIARY DUTY). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

COUNT V - (BREACH OF FIDUCIARY DUTY). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

COUNT VI - (FRAUDULENT INDUCEMENT TO CONTRACT). . . . . . . . . . . . . . . . . . . . . . 91

COUNT VII - (FRAUDULENT MISREPRESENTATION). . . . . . . . . . . . . . . . . . . . . . . . . . . 94

COUNT VIII - (VIOLATION OF MISSOURI MERCHANDISING
    PRACTICES ACT, REV. STAT. MO. § 407.010). . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

COUNT IX - (CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED
    AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)). . . . . . . . . . . . . . . . . 98

CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d). . . . . . . . . . . . . . . . . . . . . . . . . . 98

ASSOCIATION-IN-FACT RICO ENTERPRISE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

RICO ENTERPRISE HAD THE OPERATION OF THE BLP AS ITS COMMON PURPOSE. . . . . . 102

RICO ENTERPRISE HAD WELL-DEFINED STRUCTURE. . . . . . . . . . . . . . . . . . . . . . . . . . 103

RICO ENTERPRISE HAD CONTINUITY OF PERSONNEL. . . . . . . . . . . . . . . . . . . . . . . . . . 104

RICO ENTERPRISE HAS ASCERTAINABLE STRUCTURE
    WHICH FUNCTIONED SEPARATE AND APART FROM THE
    PATTERN OF RACKETEERING ACTIVITY RELATED TO THE BLP. . . . . . . . . . . . . 104

NEXUS BETWEEN RICO ENTERPRISE AND INTERSTATE COMMERCE. . . . . . . . . . . . . . . . 106

RICO Conspiracy. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

Vogel and Argos Associated with the RICO Enterprise
    and Agreed to Participate in the Affairs of the Enterprise. . . . . . . . . 108

Plaintiffs' RICO Injury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

COUNT X - (Conspiracy). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

COUNT XI - (Fraud). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

COUNT XII - (Fraudulent Misrepresentation). . . . . . . . . . . . . . . . . . . . . . . . 113

## FIRST AMENDED COMPLAINT

Plaintiffs Suzanne Glisson, Lewis Vollmar, M.D., Northwest Investments, Inc., Mark Bernstein, Lewis Bernstein, Marjorie Bernstein, Northwest Properties (1973) Ltd., Brad Werner, Trustee of J.H. Werner Revocable Trust, and Phillip Rosemann, for their First Amended Complaint against Defendants Paul Vogel and Argos Partners, LLC, allege:

### NATURE OF ACTION

1.      On April 13, 2012, Martin T. Sigillito ("Sigillito"), a St. Louis lawyer and American Anglican Bishop, was convicted of twenty counts of fraud for bilking Plaintiffs and other victims out of more than $51 million in connection with a scam known as the British Lending Program. Sigillito is serving forty years in federal prison, and by this Complaint, Plaintiffs bring claims against Defendants Paul Vogel ("Vogel") and Argos Partners LLC ("Argos") for their participation in Sigillito's fraud.

2.      Sigillito operated one of the largest, if not the largest, Ponzi schemes in St. Louis history. None of the victims' money supposedly loaned to an overseas borrower was invested in real estate developments in England as promised. Rather, Sigillito stole victims' money to support an extravagant lifestyle and to assist his co-conspirators, and used other, later victims' money to sustain the Ponzi and embezzling scheme and pay purported interest payments to existing investors.

3.      Vogel, individually and as a member of and agent for Argos was an active and willing participant in the fraud and thoroughly complicit.

1

4.      Argos was controlled and influenced by Vogel and used to perpetrate and perpetuate the fraud.

5.      Plaintiffs Northwest Investments, Inc., Lewis Bernstein, Marjorie Bernstein, Mark Bernstein, and Northwest Properties (1973) Ltd., were clients of Vogel and Argos.

6.      Vogel had actual knowledge of, and participated in, Sigillito's Ponzi and embezzling scheme. When the scheme collapsed in 2010, Vogel denied any knowledge or involvement in Sigillito's criminal activities.

7.      Vogel acknowledged receiving approximately $150,000 in finders fees for referring investors to the BLP.

8.      After the Ponzi scheme came to light in 2010, Vogel claimed to be a victim of Sigillito's fraud just like everyone else. Vogel emphasized his family's $590,000 investment and loss in the BLP, but he actually made a net profit of over $2 million from the BLP.

9.      Vogel testified in June 2010 that he learned from the FBI and Plaintiff Phillip Rosemann that, contrary to what Sigillito had told him, not all the money given to Sigillito for investment in the BLP had been transferred to the borrower in England.

10.     Plaintiffs Northwest Investment, Inc., Mark Bernstein, Lewis Bernstein, Marjorie Bernstein, Northwest Properties (1973) Ltd., Suzanne Glisson, and Brad Werner, in a representative capacity, invested in the BLP at times when Vogel was participating in Sigillito's Ponzi and embezzling scheme and bring claims against Defendants to recover their investments and other damages.

2

11.     Plaintiff Lewis Vollmar, M.D., invested in the BLP and a portion of his investment was misappropriated by Vogel and Sigillito in connection with the Ponzi and embezzling scheme and to further Vogel's fraud. Dr. Vollmar brings claims against Defendants to recover those misappropriated funds and other damages.

12.     Plaintiff Phillip Rosemann brings a claim against Vogel for misconduct in connection with his investment in a residential real estate development at Lake of the Ozarks, Missouri.

13.     Between May 15, 2008 and May 24, 2010, Plaintiffs lost approximately $4,812,039 as a result of Defendants' misconduct. By this action, Plaintiffs seek recovery of these funds, plus at least seven times that amount in punitive damages for Defendants' reckless disregard for Plaintiffs' rights, with an exact amount of actual and punitive damages to be determined at trial.

14.     Sigillito preferred to have individuals with IRA accounts invest in the BLP. IRA accounts hold funds invested for retirement and account holders invested in the BLP typically renewed their loans annually. The continued rollovers allowed the BLP to avoid making cash distributions to the IRA account holders. The rollovers also allowed accrued interest to accumulate in the account. IRS rules require IRAs to have a custodian and banks such as Enterprise serve as custodians to administer the IRA account and make sure that IRA funds are invested in permissible investments. Enterprise served as custodian for most of the IRA accounts invested in the BLP from June 2008 until the Ponzi scheme blew up in 2010.

3

15.     Vogel participated in the Ponzi scheme and obtained funds for the BLP by making various misrepresentations to some of the Plaintiffs. He represented that Plaintiffs' investment funds would be sent to Smith. He also represented that Smith and his English development company had a long track record of success and had repaid every loan, and had not defaulted on any loan he had obtained in the last ten years. Vogel misrepresented the listed values of Smith's assets and understated the amount of Smith's liabilities. Not only did Vogel make various misrepresentations to convince people to invest, he concealed that he and Sigillito were receiving substantial fees.

### JURISDICTION AND VENUE

16.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

17.     Plaintiffs' state law claims are "so related to claims in the action" that "they form part of the same case or controversy" giving this Court supplemental jurisdiction over those claims pursuant to 28 U.S.C. §1367(a).

18.     Venue is proper in the Eastern District of Missouri pursuant to 28 U.S.C. § 1391(a)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in St. Louis County, Missouri, which is located in this district. *See* 28 U.S.C. § 105(a)(1).

### PLAINTIFFS AND DEFENDANTS

19.     Plaintiff Suzanne Glisson ("Glisson") is an individual residing in the State of Florida.

4

20.     Plaintiff Lewis Vollmar, M.D. ("Dr. Vollmar"), is an individual residing in the State of Missouri.

21.     Northwest is a Missouri corporation in good standing, with its principal place of business located in St. Louis County, Missouri at 12100 Monter Drive, Bridgeton, MO 63044. Northwest is a wholly owned subsidiary of Plaintiff Northwest Properties (1973) Ltd. ("Northwest 1973").

22.     Plaintiff Mark Bernstein is an individual residing in the State of Missouri. He is also a Director of Plaintiff Northwest Investments, Inc. ("Northwest").

23.     Plaintiff Lewis Bernstein ("Mr. Bernstein") is an individual residing in the State of Missouri. He is also President of Northwest 1973.

24.     Plaintiff Marjorie Bernstein ("Mrs. Bernstein") is an individual residing in the State of Missouri. She is also Secretary of Northwest 1973.

25.     Northwest 1973 is a Canadian corporation in good standing, with its principal place of business located at 101 10025 115 St., Edmonton, Alberta T5K 1S9.

26.     Plaintiff Brad Werner ("Werner") is an individual residing in the State of Missouri and trustee of the J.H. Werner Revocable Trust.

27.     Plaintiff Phillip Rosemann ("Rosemann") is an individual residing in the State of Nevada.

28.     Vogel is an individual residing in St. Louis County at 25 Deerfield Road in Ladue.

5

29.     Argos is a Missouri limited liability company in good standing, with its principal place of business located in St. Louis County, Missouri at 7733 Forsyth Blvd., Suite 1375, Clayton, Missouri.

### THE BRITISH LENDING PROGRAM (PONZI SCHEME)

30.     From 1999 to 2010, Sigillito organized and operated a fraudulent loan program which marketed one year loans for an English developer, Derek Smith ("Smith") and his English companies, Bradgreen Properties Limited ("Bradgreen") and Distinctive Properties (UK) Ltd. ("Distinctive Properties") for purported investments in real estate development in England. The loan program, known as the British Lending Program ("BLP"), operated as a classic Ponzi scheme in which loan payments on existing loans were paid with money from new loans.

31.     Sigillito deposited and directed lenders to transfer money for loans in the BLP into his Interest on Lawyers Trust Account ("IOLTA account"). An IOLTA account is a fiduciary account where an attorney as fiduciary holds money for the benefit of others. Plaintiffs' money deposited into the IOLTA account was supposed to be held by Sigillito, in a fiduciary capacity, in the account for their benefit. The IOLTA account created the false appearance that fiduciary funds transferred in and out of the account were being used for legitimate purposes.

32.     Instead of sending Plaintiffs' funds intended for investment in the BLP in England, Sigillito laundered the money by manipulating his IOLTA account. He made it appear as if those funds were invested in the BLP and accruing interest, when actually, Sigillito was fraudulently siphoning the funds out of his IOLTA account for distribution to himself and his co-conspirators.

6

33.     Sigillito's Ponzi and embezzlement scheme required access to the banking system and an IOLTA account was vital to his ability to defraud the Plaintiffs. One marketing brochure for the BLP stated that the process to initiate a loan starts when "money is either deposited via check or wire into Martin Sigillito's trust account, that is set up for this sort of purpose" and the "money is then dispensed to Derek Smith for permitted purposes."

34.     A federal grand jury in St. Louis indicted Sigillito on April 28, 2011 and he was charged with money laundering, mail fraud, and wire fraud. The indictment alleged in part that Sigillito as an attorney "maintained an attorney trust bank account" and that "loan funds were usually sent by wire communication to . . . Sigillito's attorney trust account."

35.     At Sigillito's month-long trial, thirty-eight witnesses testified and over 1,000 exhibits were admitted into evidence, including 1,750 pages of bank records.

36.     The jury found Sigillito guilty of money laundering, mail fraud, and wire fraud and he was sentenced to forty years in federal prison and ordered to forfeit $51.5 million. Sigillito's co-conspirator, J. Scott Brown ("Brown") earlier plead guilty and was sentenced to three years in federal prison.

### Paul Vogel

37.     Vogel is a St. Louis lawyer like Sigillito and a member of the bar in Missouri and Illinois.

38.     Vogel earned a Bachelor's degree in Accounting, as well as a Master's degree in Accounting with an emphasis in tax, from the University of Missouri in Columbia. Vogel earned his law degree from the University of Missouri in Columbia and his Master of Law in taxation from Washington University in St. Louis. Vogel is a Certified Public Accountant.

7

39.   Vogel was 32 years old when he accepted Enterprise's invitation to lead its new Trust Company. Reflecting on that decision in 2002, Vogel was quoted in the St. Louis Business Journal, "I was 32. If you're going to take a risk in life, that was the age to do it."

40.   Vogel is chairman and CEO of Argos, a private multi-family office created to address the professional, investment, and personal service needs of a limited number of ultra affluent, multi-generational families. The ultra wealthy members of Argos made Vogel a member of the company and they, along with the ultra wealthy clients of Argos, have decided to share the care and control of their fortunes with Vogel.

41.   Vogel also practices law at Vogel Law Firm which shares offices with Argos.

**VOGEL, ARGOS, AND ENTERPRISE FINANCIAL ENTER INTO AN AGREEMENT**

42.   In 2007, while Vogel was still President and CEO of the Trust Division at Enterprise, he and the bank discussed his plans to establish a new business to provide wealth management services and financial advice to high net-worth persons and families.

43.   In October 2007, Vogel told clients he would be leaving Enterprise to form his own new investment company serving very high net-worth families. That company was Argos.

44.   Vogel left Enterprise in 2007 to help found Argos as its president and CEO. Vogel at all relevant times acted as agent, employee, and servant of Argos and within the course and scope of his agency.

45.   Vogel founded Argos with two other professionals and three ultra high net worth families, two of whom – the Holekamp and Wetterau families – remain members of Argos.

8

46.     Paul Tice is a director of Argos and serves as Chief Financial Officer of Argos

Investment Advisors, LLC. He has experience in evaluating direct investment in real estate.

47.     On or about December 31, 2007, Vogel, Argos and third party Enterprise

Financial Services Corporation ("Enterprise Financial") entered into a consulting agreement.

Under the terms of the agreement, Vogel agreed to serve as a financial, wealth management,

and general business advisor to Enterprise Financial and its clients. Enterprise Financial

agreed to pay Vogel an annual consulting fee of $150,000.

48.     The consulting fee payable under the consulting agreement was paid to Argos

and did not go directly to Vogel personally.

49.     The consulting agreement provides in Paragraph 1.2 as follows:

SECTION 1. ENGAGEMENT OF VOGEL

    1.1     Engagement.  The Company hereby engages Vogel as an independent consultant,
and Vogel hereby accepts such engagement, upon the terms and conditions set forth in this
Agreement.  The engagement shall commence upon January 1, 2008 and continue until
terminated by Vogel or Enterprise in accordance with Section 4 (such period, the "Term"),
providing each of the services set forth in Exhibit A attached hereto and incorporated herein by
reference (collectively, the "Services").  The Services shall be provided by Vogel at such times
as Enterprise shall request, and Vogel shall devote such amount of time and resources necessary
to adequately provide the Services in accordance with each of the terms and conditions of this
Agreement; provided, however, that such Services are performed in the time allotted for such
performance, as will be mutually agreed upon by Vogel and Enterprise.  Vogel and the Entity
acknowledge agree that Enterprise may refer to Vogel as "of counsel" to Enterprise in its
communications to clients and disclosures to Enterprise's shareholders.

9

50.     The consulting agreement in Exhibit A provides as follows:

B.      Transition Clients.  With respect to all clients of Enterprise as of the Effective Date other than those listed in Part A above, Vogel shall (a) consult with Enterprise and/or any of its Affiliates with respect to each such client, including, as requested, reviews of such clients' cases with Enterprise and/or any of its Affiliates and (b) assist Enterprise and/or its Affiliates in retaining each such client and with the transition of the management of each such client's account to other personnel of Enterprise, including without limitation meeting with Enterprise and such clients as shall be necessary in connection therewith.

C.      New Clients.  With respect to potential new clients of Enterprise, Vogel shall consult with Enterprise as to strategies to be employed in Enterprise's provision of services to such prospective clients, provide consultation with respect to general financial and wealth management matters and assist in sales efforts as requested by Enterprise.  With respect to new clients of Millennium Brokerage Group, LLC, Vogel shall assist in developing life insurance strategies as requested by Enterprise and/or Millennium Brokerage Group.

51.     The term of the consulting agreement was indefinite but the agreement allowed Enterprise Financial or Vogel to terminate it for any reason or no reason upon proper written notice. Vogel, when asked by one of his clients how long he would continue to serve clients at Enterprise under this arrangement, replied, "as long as they continue to pay me."

52.     Vogel signed the consulting agreement individually and on behalf of Argos.

53.     The consulting agreement granted Vogel legal power to act on behalf of Argos, Enterprise Financial, and third party Enterprise Bank & Trust ("Enterprise") and the agreement gave him such power in his capacity as chairman and CEO of Argos.

## VOGEL'S CLIENTS

54.     Vogel, as their investment advisor, either recommended an investment in the BLP, or exercised his discretion in making an investment in the BLP, for his following advisory clients at Enterprise: Northwest of the Bernstein family; BJD, LLC of the Dunning family ("Dunning"); Garrett; Kent J. Sturhahn ("Sturhahn"); and Phyllis Middleton ("Middleton").

10

### THE BERNSTEINS

55.     Mark Bernstein's parents, Mr. and Mrs. Bernstein, are the shareholders of Northwest 1973. Northwest is a wholly owned subsidiary of Northwest 1973.

56.     Northwest signed an Investment Advisory Agreement (the "Northwest IAA") with Enterprise in 2002.

57.     Under the terms of the Northwest IAA, Enterprise agreed to act as an investment advisor to Northwest with discretionary authority to act on its behalf in related matters.

58.     Mr. and Mrs. Bernstein and Mark Bernstein (together, "the Bernsteins") signed a Financial Advisory Agreement (the "Bernstein FAA") with Enterprise in 2002.

59.     Under the terms of the Bernstein FAA, Enterprise agreed to act as a financial advisor to the Bernsteins with discretionary authority to act on their behalf in related matters.

60.     Among the individuals advising the Bernsteins and Northwest was Vogel, then president and CEO of the Trust Division of Enterprise.

61.     Vogel at all material times knew that Mr. and Mrs. Bernstein, through Northwest 1973 and Northwest, owned extensive and valuable real estate holdings. Sometime after the Bernsteins transferred their accounts to Enterprise, Vogel suggested to Mark Bernstein the possibility of doing a real estate deal together. Vogel later approached Mark about a commercial real estate project in Springfield, Missouri. Mark's third party consultants advised him against the project and Mark declined Vogel's proposal.

11

62.     After Vogel left Enterprise in 2007, Vogel, Argos, and Enterprise continued serving as financial advisors to the Bernsteins, Northwest, and Northwest 1973.

63.     As Northwest 1973's investment and financial advisors, Vogel and Argos had fiduciary relationships with the company.

64.     As Northwest's investment advisors, Vogel and Argos had fiduciary relationships with the company.

65.     As the Bernsteins' financial advisors, Vogel and Argos had fiduciary relationships with each of them.

### THE HAMPTONS CONDOMINIUM PROJECT

66.     The Hamptons Condominiums, LLC was organized as a Missouri limited liability company in December 2006. The original members of The Hamptons Condominiums, LLC, were Deerfield Investors, LLC ("Deerfield Investors"), a company owned or controlled by Vogel; Aspen Chase Investment Property 9, LLC ("Aspen Chase"), a company owned or controlled by Sturhahn; and Blake Properties, Inc. ("Blake Properties"), a company owned or controlled by Mark Kelly ("Kelly"), a condominium developer at Lake of the Ozarks.

67.     Beginning in or around 2006, The Hamptons Condominiums, LLC began developing luxury condominiums known as The Hamptons on the Lake located at 1184 Jeffries Road in Osage Beach, Missouri. Phase One and construction of the first building was completed in or around 2007, and the condominiums were publically listed for sale in June 2007.

12

68.     Upon information and belief, The Hamptons project was financed through Great Southern Bank and Corn Belt Bank. As of November 25, 2007, The Hamptons had project costs of approximately $15,647,564 which included $5,100,000 for land, $2,960,064 for development, $1,250,000 in interest, and $6,337,500 in construction of the first building.

69.     By early 2008, not a single condominium on the market at The Hamptons had sold. The soft real estate market and other factors forced Vogel and his partners to fund the project costs and debt service, and the lenders were demanding additional equity to renew the loan.

70.     Vogel had another problem in early 2008: He personally guaranteed some of The Hamptons debt. In 2008, Vogel was facing financial ruin.

### VOGEL LEARNS ABOUT THE BLP

71.     Vogel and Sigillito were introduced in or around 2005 and were well-acquainted by 2008. Each was a member of the exclusive Racquet Club in St. Louis where, beginning in January 2008, they sat together on the Club's board.

72.     Sigillito, in response to Vogel's inquiry in early 2008, told Vogel that he practiced international business law, primarily placing his clients' money abroad and predominantly in investments in the United Kingdom.

73.     Vogel recalled in June 2010 his reaction to Sigillito's description of what he did for a living: "I said, 'Okay. That's interesting.' We got to talking about that. And he [Sigillito] had inquired as to whether me or any of my clients might have an interest. I said, 'Well, possibly. I would have to know more about it, but certainly possibly.'"

13

74.     Vogel further testified in 2010, "[W]e began talking about Distinctive Properties, and Derek Smith, and how that worked. And he [Sigillito] explained the process to me."

75.     As far as investing in what Sigillito described about Smith and Distinctive Properties, Vogel testified, "I indicated I would have an interest, or our family would. And that, possibly, I knew a few clients who would have an interest, in essence, even though it's a mode of real estate style investment."

76.     In April 2008, Millennium Trust Company, the IRA custodian for victims invested in the BLP through their IRA account, knew or suspected the BLP was a fraud and was forcing Sigillito to find a new custodian. Without an IRA custodian, as well as new investors, the Ponzi scheme would collapse. Sigillito, like Vogel, was facing financial ruin, or worse.

77.     In 2008, Sigillito told Vogel he needed to find a successor custodian for the IRA accounts invested in the BLP. More importantly, Sigillito needed to find a person with connections who could introduce him to a successor custodian willing to accept IRA accounts with alternative investments, many of which were in default, and who would not ask too many questions.

78.     Sigillito found that person. Vogel, as former president and CEO, had unparalleled access to the Trust Company at Enterprise. Vogel also had connections to an impressive list of potential investors and he could easily introduce Sigillito to both Enterprise and potential investors, and Vogel knew it.

14

79.     Mindful of his problems at Lake of the Ozarks, Vogel realized in 2008 that the combination of his stellar connections and Sigillito's pressing problem might provide Vogel with a unique opportunity.

80.     When Sigillito explained the BLP and how it worked, Vogel saw a way to solve his financial problems. Vogel, with his extensive education, financial expertise, and banking experience, realized that the real estate style investment Sigillito described was really a Ponzi scheme and one that Vogel could manipulate to his advantage.

81.     On May 16, 2008, Sigillito gave Vogel check number 1161 for $30,000 from his IOLTA account. When asked about this check, Sigillito told his assistant Elizabeth Stajduhar ("Stajduhar") that he had entered into an agreement with Paul Vogel. Under the agreement, Sigillito explained, he would help Vogel with his problem and Vogel would help Sigillito with his.

### VOGEL FORMS TWO COMPANIES
### TO FACILITATE HIS PARTICIPATION IN THE FRAUD

82.     In May 2008, before his family or any of his clients invested in the BLP, Vogel formed two companies, Brad-Green Development LLC (**"Brad-Green"**) and Cranmer Associates LLC ("Cranmer"). These companies were the vehicles Vogel used to embezzle and divert investor money from the BLP to himself undetected. **Brad-Green** and Cranmer did not function as real companies. They existed simply to support Vogel's participation in Sigillito's fraud.

15

83.     Vogel carefully chose the name "**Brad-Green**" so that funds diverted from the BLP to **Brad-Green** would appear as if they were going to England when, in fact, the funds were going to Vogel. Bradgreen is a name associated with the BLP. Before Smith began operating as Distinctive Properties (UK) Ltd., in 2006, he did business as Bradgreen Properties, Ltd.

84.     Vogel's sophisticated fraud scheme rested on a hyphen. Vogel knew the association of the name Bradgreen with the BLP would make a money transfer to **Brad-Green** for his benefit appear to a casual observer like a money transfer to Bradgreen for Smith's benefit.

85.     Vogel's fraud scheme was sophisticated enough to fool the United States. The federal government when it investigated Sigillito never realized that funds transferred to **Brad-Green** went to Vogel for his benefit instead of to the BLP or investors in the BLP.

86.     Cranmer was created for the purpose of obtaining a $1 million line of credit at Enterprise for Vogel. Vogel at all material times managed and exercised control of Cranmer and had check writing authority for its bank accounts. The members of Cranmer — Sigillito and Dr. Vollmar — were merely straw members whose role was to guarantee the line of credit.

87.     The members of **Brad-Green** were Cranmer, Northwest, and Gorefield Management, LLC ("Gorefield"). Similar to his involvement with Cranmer, Vogel at all material times managed and exercised control over **Brad-Green** and had check writing authority for its bank accounts as well.

16

## VOGEL ADOPTS SIGILLITO'S EXIT STRATEGY

88.    Sigillito realized early in the scheme that victim status, or having a family member as a victim, would help him avoid suspicion and hopefully escape unscathed if the BLP ever collapsed. This exit strategy required Sigillito to invest his own money as well as his mother's money in the BLP. By appearing as much a potential victim as any other investor, Sigillito could minimize investor suspicion and deflect regulatory scrutiny.

89.    Co-conspirator Brown and his attorney tested this strategy in 2002 when Kansas securities regulators started asking serious questions about the BLP. Brown and his attorney simply pointed to Brown's personal and family investments in the alleged "scheme" as evidence that the BLP was not a fraud. The regulators bought it and went away.

90.    The strategy of appearing to be as much a potential victim as anyone else was key to both the longevity of the fraud and the protection of its knowing participants.

91.    As soon as Vogel agreed to participate materially in the Ponzi scheme, he adopted Sigillito's exit strategy. On or about June 6, 2008, Vogel invested $100,000 in the BLP from two gift trusts for his stepchildren's education.

92.    Vogel assumed that nothing could place him further above suspicion than investing his stepchildren's money.

93.    From May 2008 until the Ponzi scheme collapsed in 2010, Vogel invested a total of $590,000 of family money into the BLP as follows:

17

| Vogel's Investments of Family Money | Amount | Date |
|---|---|---|
| HAJ Irrevocable Gift Trust (stepdaughter) | $40,000 | June 6, 2008 |
| KJ Irrevocable Gift Trust (stepson) | $60,000 | June 6, 2008 |
| Lynn Ann Whaley Vogel IRA (wife) | $35,000 | July 17, 2008 |
| Ann I. Whaley Trust (mother-in-law) | $200,000 | March 10, 2009 |
| LeRoy Vogel SEP IRA (father) | $105,000 | May 29, 2009 |
| Ann I. Whaley Trust | $150,000 | June 8, 2009 |
| Paul L. Vogel IRA (self) | -----$0----- | -----xx----- |
| Argos Clients – (the ultra wealthy families) | -----$0----- | -----xx----- |
| **Total Vogel Family Money in BLP** | **$590,000** | |

## VOGEL'S EXIT STRATEGY HAS SUCCEEDED THUS FAR

94.     Vogel deployed his exit strategy as soon as the Ponzi scheme came to light. He publically and repeatedly emphasized that his family members had invested in the BLP and lost $590,000. He claimed not to know that his name and his wife's name appeared on the Loan Agreements. He claimed that the only benefit he received from any of the BLP loans were some "finders fees" which he stressed he never tried to hide.

95.     Vogel's exit strategy also involved talking behind closed doors with federal law enforcement about his limited knowledge and involvement in the BLP. Vogel never explained to federal investigators the subtle distinction between **Brad-Green** and Bradgreen or that the checks to **Brad-Green** went to pay his debt on The Hamptons instead of to the BLP or other investors. Vogel never explained to investigators why he formed **Brad-Green** and Cranmer or the role these companies played in his diverting over $2 million from the BLP for personal benefit. Vogel never explained to the FBI or the IRS the agreement he

18

reached with Sigillito or the *quid pro quo* between himself and Sigillito in or around May 2008.

96.     Federal authorities investigating Sigillito's Ponzi scheme had no idea after talking with Vogel that he received a greater benefit from the BLP than Brown or that he diverted funds to pay debts on a residential housing development at Lake of the Ozarks, Missouri.

97.     Recounting his meeting with federal investigators, Vogel – in what he intended to sound like contrition, but was actually bragging – told friends he met with the FBI and "cried like a baby."

98.     Vogel played the federal government for a fool and, unfortunately for the victims of the Ponzi scheme, the government was duped by Vogel.

### FAR FROM A VICTIM, VOGEL'S CONDUCT WAS CRIMINAL

99.     Vogel's investment of family money in the BLP tells just a fraction of the story.

100.    Middleton at all material times was an advisory client of Vogel, Enterprise and Argos. In 2009, Vogel knowingly used his discretionary investment authority to steal $250,000 from Middleton's account at Enterprise to pay, for his benefit, debts owed on The Hamptons.

101.    On June 5, 2009, Vogel emailed Rick Blume ("Blume") and Dana Muskopf ("Muskopf") at Enterprise, "As you know the Middleton accounts have been converted to custody and George's three accounts have been emptied and can be closed once final interest posts. As for Phyllis account that remains please wire $250,000 to Martin Sigillito's trust account as we have done in the past for a Distinctive properties note."

102. On June 5, 2009, Muskopf emailed Vogel and Stajduhar at 11:06 am: "Marty's trust account will receive $250,000 today from Enterprise for Phyllis H. Middleton Revocable Trust. Please send me a receipt at your earliest convenience with the interest rate and maturity date." At 11:39 that morning, Vogel emailed Sigillito: "If the Middleton money hits today can we send that to Hamptons today as well?" Sigillito replied by email, "No. Monday."

```
From: m.sigillito@sbcglobal.net <m.sigillito@sbcglobal.net>
To: Vogel, Paul
Sent: Fri Jun 05 12:51:10 2009
Subject: Re: Middleton

No.  Monday.
------Original Message------
From: Paul Vogel
To: MTS [new email]
Subject: Middleton
Sent: Jun 5, 2009 11:39 AM

If the Middleton money hits today can we send that to Hamptons today as well?

Paul
```

103. Vogel was up early and ready to go on Monday, June 8, 2009. That morning he emailed Sigillito at 7:07 am: "I plan on coming by about 8:15 am to get the 250k check so I can get the potential lien filers paid this morning." Sigillito promptly emailed back: "Very good." Later that morning, Sigillito gave Vogel check number 1274 from his IOLTA account for $250,000 payable to **Brad-Green**. The check memo reads "for Phil Rosemann."



#1274   $250,000.00   06/09/2009

20

104.    Vogel at all material times knew check number 1274 payable to **Brad-Green** for $250,000 was not for Phil Rosemann. After receiving Middleton's money by the check from Sigillito, Vogel sent an email to Great Southern Bank on June 8, 2009 at 9:06 am advising: "Just wired $250,000 to the Hamptons account at Great Southern. Final $282,000 to arrive later today or tomorrow."

105.    Vogel knowingly siphoned more than $2 million in net profit from the BLP but, upon information and belief, never reported the profit as income.

| Money to Vogel From the BLP | Amount | Date |
|---|---|---|
| Checks to **Brad-Green** from Fiduciary Funds: | | |
| Check No. 121 (Southwest Bank) | $50,000 | May 4, 2009 |
| Check No. 1237 (St. Louis Bank IOLTA) | $18,000 | May 5, 2009 |
| Check No. 1273 (St. Louis Bank IOLTA) | $100,000 | June 5, 2009 |
| Check No. 1274 (St. Louis Bank IOTLA) | $250,000 | June 8, 2009 |
| Check No. 1277 (St. Louis Bank IOLTA) | $240,000 | June 9, 2009 |
| Check No. 1043 (Southwest Bank) | $42,000 | July 29, 2009 |
| Bernstein Investment in **Brad-Green** | $500,000 | May 19, 2009 |
| Additional Investor Funds Diverted to Cranmer: | | |
| Check No. 1567 (St. Louis Bank) | $160,000 | March 2, 2009 |
| Check No. 1039 (St. Louis Bank) | $40,000 | March 2, 2009 |
| Investor Funds Diverted to Pay Cranmer Line of Credit | $1,000,000 | Various |
| Investor Funds Diverted to Pay Interest and Fees on Cranmer Line of Credit | $50,000 (approx.) | Various |
| Vogel "Finders Fees" | $150,000 (approx) | Various |
| Ann I. Whaley Trust – "Interest" paid | $81,072.06 | Various |
| Total Money to Vogel from BLP | $2,681,072.06 | |
| Total Vogel Family Money in BLP | ($590,000) | |
| **Net Amount to Vogel from BLP** | **$2,191,072.06** | |

21

106.    When the FBI and IRS agents looked at check number 1274, they concluded it, and others like it, went to the BLP for Rosemann's benefit. The government never suspected or understood that the funds transferred to **Brad-Green** in that check, and all the others like it, actually went to Vogel for his benefit.

107.    Vogel often used Rosemann as the straw lender in his fraud using the Brad-hyphen-Green chicanery to divert BLP funds to The Hamptons.

108.    Everyone investigating the BLP beginning in 2010 saw the name **Brad-Green** in the documents and financial records and assumed it referred or related to Smith in England. This oversight was strategic to Vogel's strategy. When it comes to the BLP and Vogel's involvement in the fraud, there is literally an ocean of difference between Bradgreen and **Brad-Green**. From the beginning, the hyphen was absolutely crucial to Vogel's scheme.

109.    Vogel purposely avoided being a member of Cranmer with Sigillito and Dr. Vollmar in case the BLP fell into trouble. Indicative of Cranmer's fraudulent setup, Sigillito and Dr. Vollmar each guaranteed $500,000 of Cranmer's debt but derived no benefits. Vogel, as manager, directed borrowed funds to The Hamptons, and the company existed solely for Vogel's benefit.

110.    The United States indicted Brown for taking $1.4 million out of the BLP, and this amount does not reflect credit for any money he invested in the scheme. Brown chose to plead guilty and appropriately is sitting in a federal prison somewhere serving a three year sentence.

111.   Not all Ponzi schemers are created equal. Vogel's skill set was uniquely well–suited for the BLP.

| Participant | Time in Program | Net Profit | Profit/Mo. |
|---|---|---|---|
| Sigillito | 132 months | $6 million | $46,212 |
| Brown | 132 months | $1.4 million | $10,606 |
| Vogel | 13 months | $2.2 million | $169,231 |

### VOGEL ADVISES THE BERNSTEINS TO INVEST IN THE BLP

112.   In early 2008, Vogel introduced the Bernsteins to a potential investment opportunity in England. Mr. Bernstein is English, and Vogel brought up the BLP after Lewis mentioned foreign currency exchange rates at a quarterly client meeting for Northwest.

113.   In or around May 2008, Vogel facilitated a meeting between Mr. Bernstein, Mark Bernstein and Sigillito. Over lunch at the Racquet Club, Sigillito explained to the Bernsteins how the BLP worked. He gave them an exemplar loan agreement and a marketing memo outlining important aspects of the BLP. Vogel intimated during that lunch that he was invested in the BLP.

114.   In May 2008, after the meeting with Sigillito, the Bernsteins met Vogel at Argos' offices to discuss investing in the BLP. The Bernsteins noted that Northwest 1973 had $1 million Canadian dollars in an account in Canada available for investment. Vogel on behalf of Argos, advised them to invest that money with Sigillito.

115.   During the meeting in May 2008 at Argos with the Bernsteins, Vogel explained that money invested in the BLP went into a pool of funds made available to middle level

23

borrowers in England. These borrowers, based on financial needs and timing of their real estate projects, would make arrangements to borrow what they needed from the pool of funds. This arrangement, Vogel explained, meant that lenders typically did not learn the borrower's identity until after the loan papers were prepared.

116.    Beginning in 2002, Vogel advised the Bernsteins on virtually all of their financial and investment matters. The Bernsteins understood and considered Vogel's recommendation of investing in the BLP in 2008 part of the overall financial and investment advisory services that Vogel and Argos were providing the Bernsteins, as well as the overall financial and investment advisory services that Vogel and Enterprise were providing the Bernsteins, as well as Northwest, under the Northwest IAA and Bernstein FAA.

117.    On May 15, 2008, based solely on the advice of Vogel, Northwest 1973 entered into two loan agreements with Smith and Distinctive Properties.

118.    Under the terms of the first Loan Agreement dated May 15, 2008, Northwest 1973 loaned $250,000 to Smith and Distinctive Properties, with repayment due May 14, 2009. The loan bore an interest rate of 16% per annum with interest payable at redemption.

119.    Under the terms of the second Loan Agreement dated May 15, 2008, Northwest 1973 loaned £381,291.31 to Smith and Distinctive Properties, with repayment due May 14, 2009. The loan bore an interest rate of 16% per annum with interest payable at redemption.

120.    No interest payments were made under the first or second Loan Agreement.

121.    After both Loan Agreements came due, Vogel represented to the Bernsteins and Northwest 1973 that he was communicating with Sigillito and the lenders, Smith and Distinctive, on their behalf.

24

122.     On September 9, 2009, based solely on the advice of Vogel, the Bernsteins and Northwest 1973 entered into a third Loan Agreement with Smith and Distinctive Properties.

123.     Under the terms of the third Loan Agreement dated September 9, 2009, the Bernsteins and Northwest 1973 loaned $1,300,000 to Smith and Distinctive Properties, with repayment due March 8, 2010. The loan bore an interest rate of 10% per annum with interest payable monthly.

124.     No interest payments were made on the third Loan Agreement after April 15, 2010.

125.     The BLP with Smith and Distinctive Properties was bogus, without the funding and assets or plans represented to the Bernsteins and Northwest 1973.

126.     All three Loans have come due, and the amounts due on the Loans have not been paid.

127.     There is no possibility of recovering the amounts due under the Loan Agreements because of the fraudulent nature of the scheme. Upon information and belief, Smith, Distinctive Properties and Sigillito are effectively insolvent.

128.     The Bernsteins at all times material believed the $1 million had been transferred from Northwest 1973 to Smith and Distinctive Properties.

129.     Vogel did not disclose to the Bernsteins, Northwest 1973 or any of the other Plaintiffs that he received a significant "finders fee" each time he brought money to the BLP.

### VOGEL ADVISES THE BERNSTEINS TO INVEST IN THE HAMPTONS

130.    In May 2008, Vogel told the Bernsteins about an investment opportunity in a condominium project at Lake of the Ozarks. Vogel disclosed his involvement in The Hamptons and described the opportunity as a loan secured by real estate with a 6% guaranteed rate of return and 25% of the profits as a preferred member of The Hamptons Condominiums LLC. Vogel failed to disclose to the Bernsteins that Sigillito was an investor in The Hamptons.

131.    Vogel assured Mark Bernstein that the project was not distressed or under any problems; instead, the lender had changed the equity parameters and was requiring additional equity funding to renew the financing.

132.    Vogel told Mark that because the condominiums were already constructed, The Hamptons was an opportunity to invest in a project ready to sell and to produce almost immediate profit with no risk.

133.    The Bernsteins understood and considered Vogel's recommendation to invest in **Brad-Green** and The Hamptons in 2008 part of the overall financial and investment advisory services that Vogel and Argos were providing the Bernsteins, as well as the overall financial and investment advisory services that Vogel and Enterprise were providing the Bernsteins, as well as Northwest, under the Northwest IAA and Bernstein FAA.

134.    Based solely on the advice of Vogel, and without knowledge of his false statements, the Bernsteins invested in The Hamptons through an investment in **Brad-Green**.

The Amended and Restated Operating Agreement of The Hamptons Condominiums, LLC dated May 9, 2008 identifies **Brad-Green** as a preferred member with an initial capital contribution of $1,500,000 and a one-third (1/3) ownership interest in the company.

135.    In May 2008, Vogel and Sigillito initiated a *quid pro quo*. Cranmer obtained a $1 million line of credit from Enterprise approved by John Meek ("Meek") and Michael Murphy at Enterprise transferred $500,000 from Northwest's account to **Brad–Green**.

| QUID PRO QUO | | |
|---|---|---|
| **Benefit to Vogel** | **Date** | **Benefit to Sigillito** |
| $1,000,000 Cranmer Line of Credit | May 15, 2008 | $1,000,000 Bernstein BLP Investment |
| $30,000 Finders Fee | May 16, 2008 | |
| $500,000 Investment in **Brad-Green** | May 19, 2008 | |
| | June 2, 2008 | Vogel Parks BLP at Enterprise |
| | June 6, 2009 | $100,000 Children BLP Investment |
| | June 9, 2008 | $435,000 Garrett BLP Investment |
| $17,100 Finders Fee | June 12, 2008 | |
| $1,547,100 | **Total Benefit** | $1,535,000 |

### A. VOGEL HELPS SIGILLITO FIND A HOME FOR THE PONZI SCHEME

136.    As part of his agreement with Sigillito, Vogel contacted Enterprise in May 2008 and arranged a meeting between Sigillito and a senior officer of the trust department on the pretext of discussing new business.

137.    On or about June 2, 2008, Vogel and Sigillito met with Marti Gurley ("Gurley"), Senior Vice President and Trust Counsel for Enterprise and discussed

27

transferring approximately fifty Individual Retirement Accounts ("IRAs") to Enterprise and having the Trust Division serve as successor custodian.

138.    Sigillito at this meeting explained that the IRAs held investments in the BLP, and he skimmed over the details of how the BLP worked.

139.    Vogel intended Enterprise to view his presence at the meeting as his vouching for Sigillito, and his presence and reputation were intended to allay, to Plaintiffs' detriment, any issues or concerns Enterprise might have about the BLP.

140.    Following Sigillito and Vogel's meeting with Gurley, and Sigillito's introduction to Blume, a relationship manager in the Trust Division, Enterprise welcomed Sigillito and his clients into the bank. The Trust Division at Enterprise agreed to become the successor IRA custodian to Millennium for approximately fifty individuals who had invested in the BLP through their IRA account.

## B. VOGEL AND SIGILLITO COMPLETE THEIR *QUID PRO QUO*

141.    Less than four weeks after the Bernsteins invested $500,000 in **Brad-Green**, Vogel and Sigillito completed their *quid pro quo*.

142.    Vogel had obtained $1.5 million in new equity for the Hamptons and Sigillito had found a home for the BLP and had received $1,535,000 of new money for the Ponzi scheme. Consistent with their agreement reached in May, as described to Stajduhar, each had helped the other solve his problem.

28

## C. CLARIFICATION OF CRYPTIC EMAIL

143.   Sigillito and Vogel's agreement and *quid pro quo* in 2008 help clarify Sigillito's cryptic message to Vogel in 2009. In July 2009, the Ponzi scheme was starving for new money and Sigillito was threatening litigation against Metis Insaat ve Ticret A.S ("Metis"), a company in Ankara, Turkey that owed money to Rosemann.

144.   On July 9, 2009, Sigillito emailed Vogel to remind him: "The threat of that possibility [of litigation against Metis] moved everyone into high gear this week! You and I are the only two people who know or who can know the whole story! Nor does anyone know of our relations with each other or with Phil [Rosemann]. None of their business! Any questions?"

| From: | m.sigillito@sbcglobal.net |
|---|---|
| Sent: | Thursday, July 09, 2009 2:20 PM |
| To: | Vogel, Paul |
| Subject: | Don't forget |

In speaking to Turkey or Brown, as far as they know we are ready to file suit anytime from tomorrow on.  The threat of that possibility moved everyone into high gear this week! You and I are the only two people who know or can know the whole story!  Nor does anyone know of our relations with each other or with Phil.  None of their business!  Any questions?
Sent via BlackBerry from T-Mobile

## VOGEL CONVINCES CHARLOTTE GARRETT TO INVEST IN THE BLP

145.   Garrett signed an undated Financial Advisory Agreement ("Garrett FAA") with Enterprise.

29

146.    Under the terms of the Garrett FAA, Enterprise and Vogel agreed to act as a financial advisor to Garrett with discretionary authority to act on her behalf in related matters.

147.    As Garrett's financial advisors, Vogel and Argos each had a fiduciary relationship with her.

148.    Vogel was among the individuals advising Garrett under the FAA. In 2008, Vogel advised Garrett to liquidate her entire IRA and invest the proceeds in the BLP.

149.    Based solely on the advice of Vogel, Garrett signed an authorization for Enterprise "to distribute assets out of its custody from the above referenced [IRA] account at the instruction of Paul L. Vogel – Argos Partners LLC."

150.    On June 6, 2008, Gurley advised the Trust Division staff that Vogel had instructed the bank to wire all of the cash out of Garrett's account and to "keep enough in the account to cover the fees." Gurley also instructed the staff to let her know when that was completed "so that we can let Paul and Marty know when the additional cash will be in Marty's account to purchase the note" in the BLP.

151.    In June 2008, based solely on the advice of Vogel, Garrett liquidated her IRA account at Enterprise and entered into a Loan Agreement dated June 9, 2008 between herself, Smith and Distinctive Properties.

152.    Under the terms of the Loan Agreement, Garrett loaned $435,000 to Distinctive Properties and Smith, with repayment due on June 8, 2009. The loan bore an interest rate of 17% per annum with interest payable at redemption.

30

153.   When Garrett invested in the BLP in June 2008, Vogel knew that Garrett had two minor children whose father, her husband, had been killed in a recent hunting accident. Vogel, despite this knowledge, advised Garrett to invest her entire IRA in a scheme he knew was fraudulent.

154.   Vogel intended Garrett's investment in the BLP to benefit himself and Sigillito and knew that he could siphon her money out of the BLP through transactions involving **Brad-Green**.

155.   After Vogel siphoned Garrett's money, she was of no more use to him, and Vogel could not be bothered having her as an advisory client. Vogel discarded Garrett by convincing her to sign a letter to Enterprise stating:

> I wish to discontinue investment advisory services for my above-mentioned IRA account with Enterprise Bank & Trust and use your custodial services only. In addition, Enterprise Trust is directed to accept and to rely fully upon all instructions with respect to the purchase or sale of, and other transactions in securities, given by Paul L. Vogel of Argos Partners LLC, and no further authorization shall be required from me. Therefore, Enterprise Trust shall have no liability as a result of these instructions.

156.   Vogel accepted check number 1164 for $17,000 from Sigillito's IOLTA account as a "finder's fee," for bringing Garrett's money into the BLP as well as bringing another $100,000 into the BLP on June 6, 2008.

157.   In June 2009, without notice, consent or direction from Garrett, Enterprise "reinvested" the principal sum due under the $435,000 June 2008 Loan Agreement into a new Loan Agreement with a maturity date of June 8, 2010 and bearing an interest rate of 17% per annum with interest payable at redemption.

31

158.    No interest payments were made on the Loan Agreement except $1,750 on September 25, 2009.

159.    The BLP with Smith and Distinctive Properties was bogus, without the funding and assets or plans represented to Garrett.

160.    The new Loan Agreement has come due, and the amounts due on the Loan have not been paid.

161.    There is no possibility of recovering the amounts due under the Loan Agreement because of the fraudulent nature of the scheme. Upon information and belief, Smith, Distinctive Properties and Sigillito are effectively insolvent.

### VOGEL EMBEZZLES MONEY

162.    On June 9, 2009, one day after he took Middleton's money, Vogel went to Sigillito's office to get checks for **Brad-Green**. That morning, Sigillito emailed Vogel: "Come by this morning for the next check." Vogel promptly emailed back, "On my way."

---

From: "Vogel, Paul" <PVogel@argos-partners.com>
To: m.sigillito@sbcglobal.net
Sent: Tuesday, June 9, 2009 7:36:58 AM
Subject: Re: Staenberg


On my way now

Paul

---

From: Martin Sigillito
To: Vogel, Paul
Sent: Tue Jun 09 07:20:16 2009
Subject: Re: Staenberg

Thanks.  I was so tired last night I had gone to bed just before you sent this.  Come by this morning for the next check.

---

163.    Later that day, June 9, 2009, Sigillito gave Vogel check number 1273 for $100,000 and check number 1277 for $240,000, both payable to **Brad-Green**, out of Sigillito's IOLTA account. The check memo of both checks, like the check the day before, stated they were for Rosemann. Vogel accepted those checks from Sigillito knowing that the checks were not for Rosemann.

164.    Sigillito's IOLTA account balance on Tuesday morning, June 9, 2009, was insufficient to cover check numbers 1273 and 1277. Sigillito earlier had received from Vogel and deposited in the IOLTA account a check for $150,000 from the Ann I. Whaley Trust. The Whaley check did not clear until late Tuesday morning. At 11:09 a.m. on June 9, 2009, Sigillito advised Vogel by email: "Your check for the Hamptons will be good at noon."

---

**Subject:** Re: Staenberg
**From:** Martin Sigillito <m.sigillito@sbcglobal.net>
**Date:** 6/9/2009 11:09 AM
**To:** "Vogel, Paul" <PVogel@argos-partners.com>

Your check for the Hamptons will be good at noon.  Look forward to speaking with you later.

---

### VOGEL USES HIS DUE DILIGENCE REPORT TO LULL THE BERNSTEINS AND MISLEAD POTENTIAL INVESTORS

165.    After Northwest 1973 invested in the BLP in 2008, the Bernsteins wanted to follow up on Smith and Distinctive Properties and conduct additional due diligence.

166.    Mr. Bernstein, while in England in November 2008, tried contacting Smith but without success. Mark Bernstein called Vogel about his father's concerns about not reaching Smith.

33

167.    On December 1, 2008, Vogel emailed Sigillito to advise, "I got a call from Mark today and Lewis returned from London and is panicked because things seem bad over there and he did not get to meet Derek. *I need to call Lewis to calm him down* but wanted to see if I could get some information first. Is it okay if I have Liz give me the number of notes Derek has through you and the interest and principal payments made in 2008? In retrospect, I should have had them to do quarterly interest so he could see the cash flow." (Emphasis added).

168.    In December 2008, Vogel met with Mark Bernstein and Mr. Bernstein at Argos. Mark suggested at the meeting arranging to have someone go to England and meet with Smith and examine the various properties. Vogel told Mark and Mr. Bernstein that there was no need for that because Vogel was already scheduled to go to England at the end of January 2009 to meet with Smith and examine the various properties.

169.    Vogel assured Mark and Mr. Bernstein in December 2008 that he would prepare a report after his meeting with Smith and his thorough inspection of the properties. Vogel suggested the Bernsteins wait until they read his report before deciding whether to pursue plans to meet with Smith.

170.    Relying on Vogel's representations and assurances, the Bernsteins in 2008 did not pursue efforts to meet with Smith or inspect the various properties in England.

171.    After returning from England, Vogel wrote a memorandum dated February 10, 2009 addressed to "Client Files" re: "Due Diligence Visit for Distinctive Properties UK, Ltd. and Derek Smith. ("Due Diligence Report") The top of the Due Diligence Report reads "Vogel Law Office, LLC."

34

172.   In February 2009, the Ponzi scheme needed money. On February 6, 2009, Sigillito emailed Brown to alert him that, "The late payment from Metis has put us in a terrible bind. . . I will have a very nice third-party authored report next week; on what day, I do not know. You/he can have it upon receipt."

173.   In 2009, Mr. and Mrs. Bernstein attended a social function at Enterprise at 8077 Maryland Avenue. Vogel, it appeared to Mr. and Mrs. Bernstein, was waiting for them and, with some flourish, greeted them warmly and with a copy of his Due Diligence Report in hand.

174.   Unbeknownst to the Bernsteins, Sigillito helped Vogel write the Due Diligence Report. Earlier, on February 10, 2009, Vogel emailed a draft of the Due Diligence Report to Sigillito. Sigillito responded: "Very nice. Spell check for Maidenhead (one word); cover letter from you to me authorizing distribution would be helpful; as would some oblique reference to Derek's contracts which will now allow him to purchase additional assets at very favorable prices." Vogel advised Sigillito by email: "Will revise as soon as I can."

175.   Vogel revised the report and on February 10, 2009 emailed Sigillito: "Per your request, I have attached hereto the due diligence report I prepared on Derek Smith and Distinctive Properties UK, Ltd 'scrubbed' so that none of my clients' identities would be revealed. As such, you may share this report with other individuals with whom you are speaking provided you do explain to them that I do not in fact represent them and I would encourage any lender to do his or her own individual investigation."

35

176. Vogel revised the Due Diligence Report on February 10, 2009 to include Sigillito's suggested paragraph under the heading "Additional Opportunities."

177. Sigillito was not finished editing the Due Diligence Report. The next day, February 11, 2009, he emailed Vogel and suggested adding a paragraph that read: "In addition to meeting with principals in the lending program in both countries, I have also had the opportunity to meet with several lenders in the program. Each of them (and they collectively account for loans in the program in the several millions of dollars) has been very pleased with both returns and the service they have been provided. One in particular stands out: a retired Oxford University academic (Brasenose College, law) who attributes his comfortable retirement to having placed the bulk of his retirement funds with this borrower more than six years ago. Over a long, relaxed dinner in London, he mentioned more than once that his retirement lifestyle had been greatly enhanced through his participation in this program. His one regret seems to be that he does not have more available cash to put into these notes. The fact that lenders seem to be so pleased over the course of many years (some as long as twelve years) affords me great additional comfort."

178. Vogel's trip to England in February 2009, upon information and belief, did not include any long, relaxed dinner in London discussing the comforts afforded by the BLP with any retired Oxford University academic. Sigillito, by his email of February 11, 2009, proposed adding fictional statements or embellished events to the Due Diligence Report intended to deceive the reader, lull investors, and allay concerns of potential investors about investing in the BLP.

36

179.    Vogel knowingly added Sigillito's deceptive narrative to his Due Diligence

Report and emailed a copy of his revised report to Sigillito with a request: "Please review

one more time."

180.    Vogel's Due Diligence Report, it seemed to Mark Bernstein when he read it,

was written for the Bernsteins. It addressed favorably many of the concerns Mark and his

father had raised at the meeting with Vogel in December.

181.    Sigillito and Vogel were both strapped for cash in February 2009 and intended

for the Due Diligence Report, in part, to attract new investors into the BLP. On February 14,

2009, Sigillito sent Mark Merlotti an email at 10:53 am stating, "Here is Paul's report."

182.    Later that day, February 14, 2009, Vogel emailed Sigillito at 4:35 pm asking,

"Any word on available cash?" On February 17, 2009 Vogel again emailed Sigillito, "Any

possibility of Phil [Rosemann] forward funding $100,000 of his million out of other cash?"

Sigillito replied by email, "No, Everything is tied up."

---

**Subject:** Re: Hamptons
**From:** m.sigillito@sbcglobal.net
**Date:** 2/17/2009 2:12 PM
**To:** "Paul Vogel" <PVogel@argos-partners.com>

No.  Everything is tied up.  Sorry.
------Original Message------
From: Paul Vogel
To: MTS [new email]
Subject: Hamptons
Sent: Feb 17, 2009 2:10 PM

Any possibility of Phil forward funding $100,000 of his million out of other cash?

 Paul

---

183.   Three days later, on February 20, 2009, Sigillito sent Vogel an email reporting, "Home run with Mark [Merlotti]. $500k or so within two weeks. You don't know this! Just got the call." Vogel's Due Diligence Report was working.

184.   Vogel personally benefitted from writing the Due Diligence Report. On February 20, 2009, Sigillito gave Vogel check number 1214 for $10,000 from his IOLTA account as a fee for authoring the report. The check memo simply reads "Smith/fees."

185.   Two days before receiving his fee for authoring the report, Vogel successfully lulled Sturhahn away from creating problems for the Ponzi scheme. On February 18, 2009, Vogel's advisory client and partner in The Hamptons, Kent Sturhahn emailed Vogel, "I also have about $90K that is invested with UK Properties from what is/was my Keough from years ago. Can that be sold and moved into the private stock as well? Is there a penalty for doing that?"

186.   Vogel sent Sturhahn a email advising him not to take his money out of the Ponzi scheme. On February 18, 2009, Vogel responded by email, "KJ, You want to leave the UK note as is. It can't be cashed in early and is paying you 17% per year." Vogel intended to deceive Sturhahn because he knew that Smith and Distinctive Properties were not paying interest under the Loan Agreements to anyone, including Sturhahn.

187.   Mark Bernstein had some questions after he read the Due Diligence Report. On February 26, 2009, Bernstein sent Vogel an email inquiring, "I have a few questions after review of your report. Derek Smith has had the three properties you discussed in length

38

dating back to his original financial sheet, but I am not sure I understand how our funds, supplied by M. Sigillito (Several million dollars) , are being put to use by Mr. Smith. Is Mr. Smith using the funds in other means and/or investments other than the properties you reference, or are these funds being used specifically for down payment, development, soft costs, etc? Are other funds collected by M. Sigillito being used for other developers like Derek Smith, and if so, did you know who are these other borrowers? I understand that our deal is with Mr. Smith alone, but it is hard to understand the actual usage that our funds are going towards and the continuing need to borrow by Mr. Smith going forward."

188.    Vogel promptly forwarded Mark Bernstein's email to Sigillito. On February 26, 2009, Vogel emailed Sigillito, "Marty. I am boarding plane. Will call from STL. I would like to respond to the below [email from Mark Bernstein] prior to your departure. *I think we need to take them out if we can.* Although with the pound decline they may not want to. Paul." (Emphasis added).

> **Subject:** Bernstein
> **From:** "Vogel, Paul" <PVogel@argos-partners.com>
> **Date:** 2/26/2009 2:01 PM
> **To:** <m.sigillito@sbcglobal.net>
>
> Marty
>
> I am boarding plane. Will call from STL. I would like to respond to the below prior to your departure. I think we need to take them out if we can. Although with the pound decline they may not want to.
>
> Paul

## SMITH AND DISTINCTIVE PROPERTIES DEFAULT
## ON THEIR LOAN AGREEMENTS WITH NORTHWEST 1973

189.    Vogel could not ignore Mark Bernstein's questions about the Due Diligence Report. On April 1, 2009, Vogel responded by email. "Mark, Sorry it has taken me so long to get back to you. As to your question of what Derek is using the cash for, the note states that the purpose of the loan is to fund ongoing operations. However, more specifically, *Derek has been using cash to pay the planning consultant to move the planning permission process along on Little Farm Nursery and to pay his share of the consultant on the larger Bracknell development.* I have the entire Bracknell development report to show you at our upcoming meeting. *Another use of fund has been to acquire additional ingress/egress easements/options on Little Farm Nursery to make that full 10 acres developable as residential property as opposed to only a portion of it.* When Derek's updated statement comes out you will see a higher value on Little Farm due to that additional option." (Emphasis added).

190.    Vogel's email on April 1, 2009 was intended to mislead Mark Bernstein. Vogel's statements that, "[M]ore specifically, Derek has been using cash to pay the planning consultant" and "Another use of fund has been to acquire additional ingress/egress easements/options" were intended to give Bernstein the false impression and belief that Derek was using cash invested in the BLP for those purposes.

191.    As the maturity date for the Bernsteins' loans approached, Vogel continued to believe that he and Sigillito needed to get the Bernsteins out of the BLP. On April 16,

40

2009, he emailed Sigillito, "Anything from Brown to confirm money on or before April 30? Talked to Bernstein and the best thing is still to take them out on May 15[th]."

192.   In addition to the $1 million needed to cash out the Bernsteins, Vogel also needed new equity to renew The Hamptons loan. On April 28, 2009, Vogel emailed Sigillito: "Any word from Brown? The Hamptons loan renews next week and they won't renew without the equity. They also held up the dock order ending the capital coming in. Paul."

193.   On May 13, 2009, Mark Bernstein emailed Vogel and Sigillito about Smith's loan repayment to Northwest 1973: "Tomorrow is the redemption date for the Derek Smith notes and I have yet to receive any confirmation requested from Marty. Paul has indicated his understanding that Marty is aware of our position and assured us that the transaction will go through as planned. While I understand that Marty may have been out of town, I too am out of town and check my email regularly. I would appreciate some response correspondence from Marty as to the wire transfer logistics tomorrow. A simple 'I have all that I need and I will email you when the transaction is forwarded to your bank.' would suffice. I don't think that is too much to ask when you lend someone a million dollars."

194.   On May 14, 2009, Smith and Distinctive Properties defaulted on the loans from Northwest 1973. The weeks following the default were filled with a series of emails from Sigillito to Mark Bernstein filled with a mix of excuses, promises of imminent payment, and false assurances of favorable developments.

41

195.   On May 18, 2009, Sigillito emailed Brown to tell him: "Things are on the verge of really turning ugly. We could even lose Enterprise if money does not come soon."

196.   On May 22, 2009, Sigillito sent an email to Bernstein and Vogel that said, "Mission Accomplished!" and read, "Have a great weekend. Will alert you the moment funds are in my account. Thank you for your patience; I know your dad will rest much easier when this is completely finished next week."

197.   Later that day, May 22, 2009, Mark Bernstein replied: "I do not consider this 'mission accomplished.' We are put on hold for another week. Mission accomplished would mean the funds are in your account and ready to transfer. I am starting to feel like some cheap prom date being led on here. We have gone from, 'there will be no problem,' to 'by the end of the week,' to 'no later than a week today.' This is VERY disappointing. My dad currently is in London and is considering legal action at this point. I am hopeful that it won't come to that, however you must understand that all we have are a bunch of promises at this point, and the track record on keeping earlier promises haven't been all that successful."

198.   On May 22, 2009, Vogel sent a lulling email to Mark Bernstein, "First off, want to apologize to you and your Dad for any issues this delay has caused. I want to assure you that Marty has updated me on the issues and the circumstances have been absolutely out of Marty and Smith's control. As for Lewis' consideration of legal action, I understand his concern but feel confident the funds will be here on or before the 29th as indicated so I don't

42

feel legal action is warranted at this time since the note plus penalty will be paid off by the

time the action is filed. I have worked with Marty and Smith on several clients and have

never had this issue before."

---

**From:** Vogel, Paul
**Sent:** Friday, May 22, 2009 11:47 AM
**To:** 'mbernsteinlaw@yahoo.com'
**Subject:** Smith Note

Mark,

I am en route back to my office after getting back from FL last night.  Marty copied me on
his email to you and your response.

First off, I want to apologize to you and your Dad for any issues this delay has caused.  I
want to assure you that Marty has updated me on the issues and the circumstances have been
absolutely out of Marty and Smith's control.  As for Lewis' consideration of legal action, I
understand his concern but feel confident the funds will be here on or before the 29th as
indicated so I don't feel legal action is warranted at this time since the note plus penalty
will be paid off by the time the action is filed.

I have worked with Marty and Smith on several clients and have never had this issue before.

As for your question about Smith's dealinh in Turkey, I can't answer that as I do not know
the facts.  However, it does not surprise me that nothing Turkish shows up on his statement
as many times he buys and sells options during the interim and for all I know he flipped an
option to a Turkish buyer that has had bank issues.

Again, my apologies and I will keep in touch with Marty over the next several days and report
back to you.

Paul

---

199.    Vogel intended to mislead Mark Bernstein with his email to Mark on May 22,

2009. Vogel's statements, "I want to assure you that Marty has updated me on the issues,"

and "I have worked with Marty and Smith on several clients and have never had this issue

before" were intended to give Mark Bernstein the false impression and belief that Vogel had

an arm's length relationship with Sigillito. Vogel's email was also materially misleading

because it failed to disclose Vogel's divided loyalties, involvement with the BLP, use of BLP

funds for personal benefit, or true relationship with Sigillito.

43

### VOGEL STEALS HIS DAD'S MONEY

200.   By May 29, 2009, Vogel knew Smith and Distinctive were in default on a $1 million loan from the Bernsteins. He was trying to keep an investor with a $90,000 investment from leaving the BLP while trying to get rid of an investor with $1 million invested. Despite clear indications against loaning more money to Smith and Distinctive, Vogel was in such dire financial straights that he stole his dad's money. Presumably, Vogel assured his father that putting $105,000 in the BLP was a good investment for his retirement funds.

201.   On May 29, 2009, Vogel sent Muskopf and Stajduhar an email advising, "Marty's trust account [IOLTA] will receive 105,000 today from Enterprise for my dad's SARSEP. Dan will give you proper titling. The rate is 16% with interest payable quarterly."

202.   A week later, on June 9, 2009, the day after he came and took the Middleton money, Vogel asked for and received check number 1273 from Sigillito's IOLTA account payable to **Brad-Green** for $100,000. The Middleton check was number 1274.

### VOGEL DECEIVES THE BERNSTEINS

203.   By July 2009, Smith and Distinctive were still in default and the Bernsteins still had not received their money back from the BLP. The Bernsteins contacted Vogel and demanded that he contact Smith and obtain a security interest in Smith's property in favor of Northwest 1973.

44

204.   On July 6, 2009, Vogel wrote a letter to Smith on behalf of Northwest 1973. The letter read: "In order to patiently await the resolution of the collection of the amount owing to you, my client desires a security interest in real estate owned by Distinctive Properties UK Limited or you personally in addition to the existing repayment obligations under the notes in question along with the penalty interest and currency conversion concessions previously agreed to by you. Upon review of the Statement of Assets and Liabilities provided by you, my client suggests that a second mortgage on either the Hinton Grange Hotel in Bath or Little Farm Nursery in Maidenhead should suffice to provide security on the loans in question. Please notify me immediately of your interest in accommodating my client's request so that they can determine how they should proceed with regards to this matter."

205.   On July 16, 2009, Vogel emailed Sigillito: *"Is Derek [Smith] up to speed on this if we need to actually grant a security interest?"* Sigillito emailed in reply: *"He will do whatever I tell him to!"* (Emphasis added).

---

**Subject:** Re: Bernstein
**From:** m.sigillito@sbcglobal.net
**Date:** 7/16/2009 7:25 PM
**To:** "Paul Vogel" <PVogel@argos-partners.com>

He will do whatever I tell him to! That is not an issue. I am taking tomorrow off and playing golf. See you Sunday!

Sent via BlackBerry from T-Mobile

---

**From:** "Vogel, Paul"
**Date:** Thu, 16 Jul 2009 19:22:11 -0500
**To:** <m.sigillito@sbcglobal.net>
**Subject:** Re: Bernstein

Maybe not too old, but too busy.  Is Derek up to speed on this if we need to actually grant a security interest?

Paul

---

45

206.    On September 8, 2009, Sigillito sent an email to Vogel advising: "I am having Liz fax you the mortgage document which has been signed in blank by Derek et al. We are authorized to fill in the details (which, of course, were still unknown when Derek signed). Once the details have been agree, I am authorized to forward the filled-in original to Mark or to anyone he designates."

207.    Vogel delayed until 2010 preparing what appears to be a Mortgage Deed on Smith's Hinton Grange Hotel dated January 5, 2010. Vogel never had the Mortgage Deed recorded.

208.    In October 2009, Vogel directed Stajduhar to prepare a Loan Agreement for Smith's signature between Northwest 1973 as lender and Smith and Distinctive as borrower. On October 8, 2009, Vogel sent Stajduhar an email at 4:50 am and told her: "Liz, Please prepare a note for Smith's signature. The Lender is the same Bernstein entity as their original note, Northwest, etc. The date of the note is 9-08-09 and it is due on 3-8-10 or 6 months. The interest rate is 10% annually, payable monthly. In this case we need to add a paragraph that the note will be secured by real [estate] of the borrower. The note needs to be FedExed to Marty at the Chesterfield for delivery on Mon or Tues, preferably Mon so he can make a change if he needs to. Also, I need you to call discuss a letter we need to send for Smith in the same Fed Ex package and discuss checks. Paul." The amount shown advanced in this Loan Agreement is $1,300,000.

209.    After he reviewed the Loan Agreement prepared by Stajduhar as he directed, Vogel instructed Stajduhar to prepare the "letter we need to send for Smith" mentioned in his October 8, 2009 email to Stajduhar at 4:50 am.

210.    Later that morning, October 8, 2009, Vogel emailed Sigillito at 5:04 am and told her: "Liz, please prepare the letter below for Fed Ex tomorrow. *Make up a letter head for Smith*, Marty any changes? Dear Mr. Bernstein: Please accept this letter as my written agreement that certain promissory note dated 9-08-09 between Distinctive Properties and you is due and payable on 3-08-2010, that said note will be paid at the earliest to occur (a) its due date (b) the date upon which my claim against Braithwaite and/or Metis is satisfied or (c) the successful sale of my property in Bracknell known as Amen Corner for an amount over and above the option payment due upon such a sale. I appreciate your patience in this matter. Sincerely, Derek Smith." (Emphasis added).

211.    The letter that Vogel instructed Stajduhar to prepare on or about October 8, 2009 reflects an agreement that Mark Bernstein asked Vogel to try to obtain from Smith.

### VOGEL DECEIVES MR. WERNER

212.    In or around August 2009, third party Roland Baer ("Baer") introduced Mr. Werner to Vogel. On or about August 4, 2009, Vogel, Werner, and Baer met at the St. Louis Club for a breakfast meeting. Baer introduced Vogel as, and Vogel acknowledged that he was, Vogel from Argos.

47

213.   Over breakfast, Vogel conveyed to Werner and Baer his confidence and due diligence findings in Sigillito, Smith, and the BLP.  Mr. Werner asked Vogel if Smith had ever defaulted on any of the loans received through the BLP.

214.   At their breakfast meeting on or about August 4, 2009, Vogel told Werner and Baer, and assured Werner, that Smith had never defaulted on any of the loans received through the BLP.

215.   Vogel never disclosed to Werner or Baer that Smith and Distinctive Properties had defaulted on their loan agreement with Northwest 1973 in May 2009.

216.   Vogel never disclosed to Werner or Baer that Vogel, in August 2009, was part of a scheme with Sigillito to string along and deceive the Bernsteins as alleged herein.

217.   Vogel never disclosed to Werner or Baer that a few months earlier Vogel had stolen Middleton's money and his dad's money intended for investment in the BLP and diverted it for use in The Hamptons.

218.   Vogel never disclosed to Werner or Baer that Vogel was engaged in acts of racketeering as alleged herein to improperly divert funds intended for the BLP to The Hamptons.

219.   Vogel never disclosed to Werner or Baer that Vogel had invested family money in the BLP as part of an exit strategy designed to make Vogel look like a victim of the BLP in case the Ponzi scheme collapsed.

220.   Vogel never disclosed to Werner or Baer that by August 2009, Vogel had received more than $700,000 from the BLP.

221.    Based upon Vogel's representations about Sigillito, Smith and the BLP, including Vogel's assurances that Smith had never defaulted on any loan received through the BLP, Mr. Werner invested in the BLP as alleged herein.

## VOGEL AGREES TO PUTTING HIS NAME AND HIS WIFE'S NAME ON LOAN AGREEMENTS BECAUSE PONZI SCHEME CANNOT AFFORD ENGLISH SOLICITORS

222.    In 2009, Sigillito could no longer afford to pay English solicitors, Swinburne & Jackson, the fees demanded for putting the firm's name on the Loan Agreements. The amount of money Vogel was diverting from the BLP was the primary reason Sigillito could no longer afford the English lawyers. Vogel offered to let Sigillito use Vogel Law Firm on the Loan Agreements instead in exchange for a nominal fee. This arrangement was expected to save the BLP hundreds of thousands of dollars.

223.    The name "Lynn Whaley Vogel Attorney at Law" is on the cover of the Loan Agreement dated September 9, 2009 that Stajduhar prepared at Vogel's direction on October 8, 2009.

224.    On November 13, 2009, Mark Bernstein sent an email to Sigillito and Vogel informing them: "I have a loan agreement prepared by Lynn W Vogel for the principal sum of 1.3 MM[.]" Vogel never corrected Bernstein's belief that the Loan Agreement Bernstein had for the principal sum of $1.3 million was prepared by Lynn W. Vogel.

225.    On January 23, 2010, Lynn Ann Whaley Vogel forwarded an email to Vogel that Don Horner ("Horner"), a victim of the Ponzi scheme, had sent to her on January 22, 2010. Horner, in Vogel's view, wanted to pursue Smith in connection with the BLP.

49

226.    Later that day, January 23, 2010, Vogel emailed Sigillito to advise: "Please see below the email Lynn Ann received. This is why we can[not] use she and I on the docs anymore as this guy wants to pursue Derek. Are you available to talk tomorrow or later this evening."

227.    Vogel at all relevant times was aware and knew that Lynn Ann Whaley Vogel's name and his name were being used from time to time on Loan Agreements in connection with the BLP. Homer's desire to pursue Smith is the reason Vogel gave Sigillito for why Vogel and Sigillito could no longer use Lynn Ann Whaley Vogel and Vogel's name on the Loan Agreements in connection with the BLP.

228.    When events in the BLP began focusing unwanted attention on Smith, Vogel saw potential problems with having his wife listed on the Loan Agreements. He sent instructions to Stajduhar by email on January 29, 2010 stating: "Just a reminder that we need to go back to using the UK firm for the notes and not Lynn Ann."

**VOGEL CONVERTS DR. VOLLMAR'S IRA FOR BENEFIT OF THE HAMPTONS PROJECT**

229.    Dr. Vollmar considered Sigillito one of his closest friends and he began investing in the BLP in 2000. By 2008, Dr. Vollmar had invested more than $1 million in the BLP through his IRA account.

230.    Dr. Vollmar's IRA account was among those transferred from Millennium Trust to Enterprise in 2008. Sigillito is the only investment advisor designated in Dr. Vollmar's Custody Agreement with Enterprise.

50

231.   By December 2008, Enterprise had not received Dr. Vollmar's BLP Loan Agreements from Millennium Trust. The November 2008 account statement from Enterprise shows zero assets in Dr. Vollmar's IRA. The December 2008 account statement does not list any BLP Loan Agreements in Enterprise's custody during that month either.

232.   Vogel contacted Enterprise in 2008 and began inquiring about Dr. Vollmar's IRA account. On December 29, 2008, Vogel emailed Blume and asked, "Marty Sigillito indicated that the Valmer IRA has or will have soon $500,000 in cash. Do you have it yet? If so, then I will get you a note for the next IRA investment."

233.   The next day, December 30, 2008, Blume replied by email at 2:52 pm, "Should this be for Dr. Vollmar? If it is, I do not have the cash yet. Also, I still have not received the notes from Millennium yet." Enterprise received the cash for Dr. Vollmar's account later that day.

234.   On December 30, 2008, Enterprise received check number 1256 from Sigillito's IOLTA account for $413,000 and check number 1037 from MTSA–XXX4828 for $87,000. Instead of accepting these checks as payment on Cranmer's line of credit, Enterprise transferred the funds to Cranmer which, in turn, sent the money back to Enterprise as payment on its line of credit. Enterprise designated the funds as early pay off of Cranmer's line of credit and released Dr. Vollmar from his personal guaranty.

235.   On December 31, 2008, Stajduhar emailed Blume to advise: "Rick, The $500,000 sent to you on behalf of Dr. Vollmar's IRA is an early payoff of his note which matures on January 23, 2009 and a partial payoff of his note which matures on February 23, 2009."

51

236.     Vogel continued inquiring about Dr. Vollmar's IRA account in 2009. On January 7, 2009, Vogel emailed Blume: "Touching base to see if Dr. Vollmar's IRA has received its cash yet? If so, I will have a new note prepared between Enterprise Trust as custodian and Cranmer Associates, LLC as maker for $500,000." Blume responded: "I will give you a call tomorrow."

237.     On January 9, 2009, Blume emailed Sigillito concerning Dr. Vollmar's IRA account: "Per the custody agreement that Dr. Vollmar signed, Enterprise Trust is directed to accept and to rely fully upon all instructions with respect to the purchase and sale of, and other transactions in securities given by your firm. Could you please send me your instructions for the $500,000 promissory note with Cranmer Associates."

238.     Later that day, January 9, 2009, Sigillito emailed Blume: "I am out of the office until Monday. Can you accept this as an interim instruction to transfer funds?" Blume within minutes replied "Marty: I can. Thanks and have a great weekend. Rich Blume."

239.     Vogel followed up with Blume by email: "Please find attached the executed note from Cranmer Associates, LLC in favor of the Lewis Vollmar, Jr., SEP IRA. Please deposit 500k in the Cranmer Associates checking account at Enterprise that is numbered 97674." Blume replied by email: "I will get this taken care of for you. Could you please forward the original note to me to be held in the vault."

240.     Later on January 9, 2009, Sigillito emailed Vogel to inquire: "Everything work all right with Rick?" Vogel responded by email the next morning: "Yes. Money was

52

transferred. It dawned on me this morning that we may need a little more than $500k to pay the interest and extinguish the debt [of Cranmer to Enterprise on the line of credit]. I will handle that when we do yours next week."

241. Enterprise discussed Dr. Vollmar's IRA account activity with Vogel in 2008 and 2009 even though Vogel was not on the account or designated as Dr. Vollmar's investment advisor. Similarly, Enterprise had nothing showing that Dr. Vollmar was Vogel's client.

242. In 2008, Vogel participated in the business and banking activities of Enterprise and directed the activities of Enterprise employees, who accepted and acted on his direction, all with the bank's knowledge and consent. During this time Vogel also sat on various committees and participated in decision making at the bank.

243. Vogel directed Enterprise to transfer $500,000 from Dr. Vollmar's IRA to pay Cranmer's debt to Enterprise in exchange for a promissory note from Cranmer. Enterprise at all material times acted on Vogel's direction knowing that Dr. Vollmar had a fifty percent (50%) interest in Cranmer and that the promissory note from Cranmer that Vogel gave the bank was essentially a promise by Dr. Vollmar to pay himself $250,000.

244. The line of credit Cranmer obtained from Enterprise benefitted Vogel because the money went to pay debts owed on The Hamptons. Similarly, Vogel benefitted from Enterprise's transfer at his direction of $500,000 from Dr. Vollmar's IRA account to pay down that line of credit.

### SIGILLITO REPAYS CRANMER'S $1 MILLION LINE OF CREDIT

245.   In January 2009, Sigillito sent a series of payments to Cranmer to repay Cranmer's $1 million line of credit at Enterprise on the dates and in the amounts shown below.

| Date | Amount | Source | Destination |
|------|--------|--------|-------------|
| January 9, 2009 | $500,000 | EBT Vollmar | Cranmer |
| January 16, 2009 | $215,000 | MTS Personal | Cranmer |
| January 16, 2009 | $15,000 | MTS Personal | Cranmer |
| January 16, 2009 | $20,000 | MTS Personal | Cranmer |
| January 16, 2009 | $250,000 | MTS cashier | Cranmer |

### VOGEL AND SIGILLITO'S RELATIONS WITH ROSEMANN

246.   Rosemann is one of the victims of Sigillito's Ponzi scheme. He considered Sigillito a friend and used him as his attorney and investment advisor. Rosemann, in addition to investing millions of dollars in the BLP, loaned $5 million to Metis in 2007.

247.   Rosemann loaned the $5 million to Metis through Braithwaite Consulting Limited ("Braithwaite"), a company that Sigillito organized in Belize for Rosemann. Sigillito negotiated the loan with Metis as Rosemann and Braithwaite's lawyer and the loan had a maturity date of January 19, 2009.

248.   In July 2008, Rosemann met Sigillito and Vogel for lunch to discuss investment in The Hamptons. Rosemann agreed to fund The Hamptons project through **Brad-Green** after he was repaid by Metis and to invest more money in the BLP.

54

249.   Vogel sent Sigillito an email on April 7, 2010 reminding him that, "When we met with Phil in July of 08 he signed an Irrevocable Commitment to fund at least 500,000 to the Hamptons project through Brad Green Development. The document was drafted that way due to the fact that we had not yet had a chance to meet with Phil to finalize the amount. At our lunch it was agreed that Phil would fund $1 million in the Hamptons and $1 million into the UK lending program from the proceeds of the $5 million note from Metis to be paid in January 09. Since the commitment had been drafted with the language of at least 500,000 we did not prepare a new commitment but merely communicated to Hampton's bank the agreed upon amount."

250.   Upon information and belief, Vogel used Rosemann's commitment as new equity and collateral with Great Southern Bank and Corn Belt Bank, the banks providing funding for The Hamptons.

251.   In or around November 2008, Rosemann became an investor in a condominium development project in Valley Park, Missouri known as Parkside Commons ("Parkside"). Rosemann made financial commitments to Parkside that he could meet if, but only if, Metis repaid in January 2009 the $5 million it owed (the "Metis Money").

252.   Sigillito knew the Metis Money was crucial to continuing the Ponzi scheme. In an email to Brown on January 14, 2009, Sigillito predicted, "I continue to receive inquiries . . concerning the expected Metis payment next week. . . Without these funds, the sky truly will fall."

55

253.   On January 19, 2009, the loan to Metis matured and Metis defaulted (the "Metis Default").

254.   The Metis Default had negative ripple effects. Until Metis cured the default, which in 2009 appeared by no means certain (and, in fact, never happened), Vogel would not have the $1 million he was expecting for use at The Hamptons. Similarly, Sigillito would not have the $1 million he was expecting for the BLP. The Metis Default created an even bigger problem: Without the Metis Money, Rosemann did not have the funds he needed for Parkside. For Vogel and Sigillito, that was bad news.

255.   By January 2009, Rosemann had all of his money tied up in the BLP or with Metis and his only funding alternatives were calling a Loan Agreement with the BLP or getting a bridge loan for use until Metis repaid its loan. As Sigillito explained to Brown in an email on January 27, 2009, "If Phil, for whatever reason, decides to pull a plug, we are out of business."

256.   While they waited to see what Rosemann would do, Vogel and Sigillito focused on adjusting lender expectations on The Hamptons. On January 23, 2009, Vogel emailed Sigillito: "I am sending a letter to you shortly that I need you to send Mike Stuck [at Great Southern Bank] today along with your memos."

257.   On January 23, 2009, Sigillito sent Vogel's letter regarding The Hamptons to advise the bank of "a brief delay in my client, Phillip Rosemann, receiving the $5 million principal amount on his note due from Metis. As you are aware, it is out of this $5 million

56

in proceeds from which Mr. Rosemann will fund his $1 million commitment to **Brad-Green** Development, which [is] the equity investor in the Hamptons. . . . the chairman of Metis has indicated that Metis is more than happy to issue an additional warrant that the note payment is forthcoming."

258.    On January 27, 2009, Vogel emailed Sigillito regarding Corn Belt Bank: "Here is the letter. Please email to Eileen Spratt at CornBelt Bank and mail the original." Vogel's letter to Spratt states: "I am writing to discuss the $1.5 million of equity already invested in The Hamptons and the additional $1 million due to be invested shortly."

259.    The Metis Default and prospect of Rosemann calling a BLP loan motivated Vogel and Sigillito to help Rosemann get a bridge loan for Parkside from Enterprise. The proposal was for Enterprise to give Rosemann a loan secured by his investment in the BLP. Della Moon ("Moon") was the commercial lending officer at Enterprise assigned to help Rosemann with the loan process.

260.    On February 1, 2009, Vogel and Sigillito flew to England.

261.    One reason Vogel went to England in February 2009 was to verify the assets on Smith's balance sheet.

262.    Vogel agreed to help Sigillito encourage Rosemann not to call any of his BLP loans. Sigillito and Vogel also agreed that Vogel should use his contacts and influence at Enterprise to help Rosemann get a bridge loan for the Parkside project.

263. On February 2, 2009, Vogel sent a lulling email to Rosemann at 11:50 am: "Just to update you. We [are] supposed to have a follow up mtg today from the one we had Friday re: Metis. However, London had unprecedented snow which closed all bus, most rail and most taxi service so we are now mtg tomorrow."

264. A little over an hour later, at 1:50 pm on February 2, 2009, Vogel contacted Enterprise CEO Steve Marsh ("Marsh") by email about "A favor" and wrote, "I have a friend, Phil Rosemann who is the equity behind a developer buying a development in Valley Park. . . Phil is worth $15 or $20 million and will close on this deal (approx $1.2 mil to Southwest), he just needs some time to liquidate a few things. If need be is there anybody you might be able to call?" Marsh replied within minutes and simply said, "Paul, happy to help in any way I can." Vogel forwarded his email exchange with Marsh to Rosemann at 5:41 pm that evening with the message: "See below for an email from the CEO at Enterprise."

265. On February 4, 2009, Vogel continued to lull Rosemann with an email stating: "We made significant progress last night. Marty and I are boarding plane now. Marty will update you tomorrow but it currently appears we should have around half of the money by 2-15 or earlier and the rest no later 2-28. Metis' advisor said he would attempt to confirm this today and let us know for sure tomorrow or Friday. I think you could get Marty on the phone with Southwest and get this resolved rather quickly."

58

266.   A month later, on March 4, 2009, Vogel emailed Rosemann about finding a solution to his Parkside funding issues: "I spoke to Marty and he suggested that maybe you offer them 'something' on a weekly basis in the way of a payment while we get this resolved. Say maybe $5,000. The other option is to just say that we are going to close it is just going to take some time and play poker with them as to whether they really have another opportunity or not. If Enterprise and Della are confident that they can provide bridge funding within 10 days, another option is to pay them an amount for a final 2 weeks extension knowing that Enterprise will need to close on the bridge in order to keep the deal. What do you think?"

267.   Later that day, March 4, 2009, Vogel sent Rosemann another lulling email to update him on Metis: "Based on meetings today with Metis' counsel, Mr. Sigillito feels the funds will be released very soon. I will forward to you the email from Metis' counsel explaining what is forthcoming."

268.   On March 23, 2009, Vogel emailed Moon to say: "Just looking for an update on the Rosemann 60 day bridge loan." Moon replied by email later that day: "We will be unable to extend bridge loan funds by Wednesday. We have several questions and issues. We understand that Distinctive Properties UK would guaranty payment via early partial payoff on one of the investments; however, we will not be able to take a guaranty of a foreign individual or company. We also do not believe we can attach the receivable. I understand from Phil that arrangements have been made to accommodate the closing even without the bridge loan. Please let me know if you have any questions."

59

269.    In or around April 2009, Brown suggested a way to steer Rosemann away from calling his BLP loans. Brown proposed assigning shares in Metis to Enterprise as collateral. On April 1, 2009, Sigillito forwarded Brown's suggestion to Vogel and asked, "Paul: Will this play with Enterprise?"

270.    Vogel considered Rosemann's money and the BLP a private source for funding beyond just The Hamptons project. In May 2009, Vogel also needed money for real estate dealings in Branson, Missouri. On May 21, 2009, Vogel emailed Sigillito rather than Rosemann: "Assuming Metis comes through, I would like to discuss $100k for the Springfield/Branson real estate as I have some needs there to be covered by month's end."

---

**Subject:** Lunch tomorrow
**From:** "Vogel, Paul" <PVogel@argos-partners.com>
**Date:** 5/21/2009 10:44 AM
**To:** <m.sigillito@sbcglobal.net>

Assuming Metis comes through, I would like to discuss $100k for the Springfield/Branson real estate as I have some needs there to be covered by month's end.

Paul

---

271.    In August 2009, there was indication that the Metis Money might arrive. On August 3, 2009, Vogel emailed Stajduhar: "Lets talk tomorrow about what to do with the Smith portion of the Metis funds once received. We need to pay the Bernstein's, the short-term Whaley and Garrett notes and I think something else." The phrase "the Smith portion of the Metis funds" in Vogel's email is a reference to the portion of Metis funds, once received, invested in the BLP.

272.    That same day, August 3, 2009, Sigillito drafted a letter to Metis stating: "I have been advised as the attorney for Braithwaite that updated interim financial statements

60

have been requested by J. Scott Brown, Esq. Upon my direction and as of this date such statements have not been provided." That afternoon, on August 3, 2009, Vogel emailed Stajduhar "Did the letter go to Metis?" Stajduhar emailed back, "No. Marty wanted me to get it okayed by Scott [Brown] and you."

273.    On August 6, 2009, Vogel emailed Rosemann with an update on Metis: "Just got off of the phone with Marty . . .there is one wrinkle. Metis has resisted in providing financial statements more recent than the last audit for obvious reason (defer the takeover of the Company). . . . Marty and I think that the best thing to do is . . . provide the guarantees the buyer seeks. The 'worst case' is you 'end up buying the Metis note back.' Are you available 'today' to sign the guarantee."

274.    Vogel was able to step back from his relationship with Rosemann after Sigillito hired a lawyer in or around October 2009 and the lawyer filed a lawsuit on October 27, 2009 to recover Rosemann's $5 million.

## VOGEL TRIES TO BORROW MONEY FROM ENTERPRISE AND ST. LOUIS BANK

275.    Cranmer's line of credit with Enterprise was important to Vogel's strategy for funding The Hamptons. Vogel directed the use of BLP funds to pay off the Cranmer line of credit early in January 2009. The early payoff was intentional. As a banker, Vogel knew he could use Cranmer's early payoff to establish a favorable credit history and use the credit history to convince Enterprise to increase Cranmer's credit line.

61

276. By early February 2009, the groundwork for increasing Cranmer's line of credit had been laid. Vogel had a letter from Enterprise dated February 2, 2009 advising that Cranmer's $1 million "loan has been paid in full. Therefore, please find enclosed your paid note."

277. The Metis Default disrupted Vogel's plans to fund the Hamptons with Metis Money and made his need for money more acute. The Metis Default forced Vogel to seek funding from a bank, first from St. Louis Bank and then from Enterprise.

278. In February 2009, Vogel contacted St. Louis Bank about borrowing money to invest in the BLP.

279. On February 9, 2009, Vogel emailed Craig Hingle, Sigillito's personal banker at St. Louis Bank, and stated: "[I] wanted to check in with you re: the borrowing of a million or 500k to put in Marty's investment program where interest from the program will pay interest and the promissory notes plus unencumbered real estate can serve as collateral." Hingle replied by email on February 13, 2009: "In this market it is awfully tough to get an unconventional loan like this one done. It doesn't look like I am going to be able to help you at this time."

---

**Subject:** RE: Follow up
**From:** "Hingle, Craig" <chingle@stlouisbank.com>
**Date:** 2/13/2009 5:18 PM
**To:** "Vogel, Paul" <PVogel@argos-partners.com>
**CC:** <m.sigillito@sbcglobal.net>

Paul,

Sorry for the slow response. I understand what you are doing, and it makes sense to me. However, in this market it is awfully tough to get an unconventional loan like this one done. It doesn't look like I am going to be able to help you at this time.

I enjoyed meeting you and appreciate the opportunity to take a look at this.

Craig

---

280.    During the third week of February 2009, Vogel contacted Meek at Enterprise about taking out two loans with Enterprise. The first loan was for The Hamptons. Vogel needed to borrow money to buy out a second mortgage on the project.

281.    The second loan Vogel wanted from Enterprise in February 2009 was a personal loan for $1 million. Vogel said he wanted to invest $1 million in the BLP. He proposed securing the second loan with the BLP Loan Agreement and his house.

282.    After speaking with Meek, Vogel took his lending request to the top man at the bank. Vogel spoke to Enterprise Financial President and CEO, Peter Benoist ("Benoist") about the two loans Vogel wanted from Enterprise.

283.    On February 24, 2009, Vogel emailed Meek at 10:55 am: "John. Just touching base to see if Peter [Benoist] has spoken with you on the 2 loans I mentioned to you last week. The one to buy out a 2nd mortgage on Hamptons is not quite as pressing and I will get you the deal detail by next Monday. The 2nd $1 million was to me personally to purchase Notes from a UK borrower to be secured by the note and my house. The Trust department holds a bunch of these so you can see the solid payment history. While we do not need to fund right away I was hoping to get some indication of willingness this week. Please let me know. Thanks. Paul."

---

**Subject:** Follow Up
**From:** "Vogel, Paul" <PVogel@argos-partners.com>
**Date:** 2/24/2009 10:55 AM
**To:** <jmeek@enterprisebank.com>

John

Just touching base to see if Peter has spoken with you on the 2 loans I mentioned to you last week.

The one to buy out a 2nd mortgage on Hamptons is not quite as pressing and I will get you the deal detail by next Monday.

The 2nd $1 million was to me personally to purchase Notes from a UK borrower to be secured by the note and my house.  The Trust department holds a bunch of these so you can see the solid payment history.  While we do not need to fund right away I was hoping to get some indication of willingness this week.

Please let me know.

Thanks

Paul

---

284.    Enterprise declined to loan Vogel money for The Hamptons or the BLP. Also, on May 5, 2009, Vogel emailed Sigillito to say, "Enterprise passed on lending to Cranmer again despite having done it last time. They cannot get comfortable with their ability to collect on the notes if it comes to that. This is the same issue they had with Phil."

### ENTERPRISE AND ENTERPRISE FINANCIAL REFUSE TO LOAN MONEY TO VOGEL

285.    By mid January 2009, Enterprise had received $1 million in early repayment from Cranmer and had earned approximately $50,000 in interest and fees from the loan.

286.    As of February 24, 2009, none of the BLP loans in any of the IRA accounts or advisory client accounts at Enterprise were in default.

287.    On February 24, 2009, as alleged herein, Vogel contacted Meek by email to see if Benoist had spoken to him about Vogel's loans that Vogel had mentioned to Meek the week before – one to buy out a 2nd mortgage on Hamptons and $1 million to purchase Notes from a UK borrower.

288. After he received Vogel's email on February 24, 2009, Meek did two things. First, at 11:09, he told Vogel: "I will have an opportunity to catch up with them both tomorrow." Next, at 11:12 am, he forwarded Vogel's email to Marsh and said: "Steve, Has Peter mentioned anything to you regarding these requests. *I would like to visit with you before this starts to build any momentum.* Thanks. John." (Emphasis added).

| | To | Steve Marsh |
|---|---|---|
| | cc | jlally@enterprisebank.com |
| John M. Meek/Enterprise Bank | bcc | |
| 02/24/2009 11:12 AM | Subject | Fw: Follow Up |
| Steve - Has Peter mentioned anything to you regarding these requests. I would like to visit with you before this starts to build any momentum. Thanks-John | | |

289. The word "this" in the phrase "before this starts to build any momentum" in Meek's email on February 24, 2009 is a reference to Sigillito, the BLP, and Vogel's proposed investment in the BLP.

290. The President of Enterprise's Trust Division, discussed the BLP with Patrick Schumann ("Schumann"), an investment officer at the bank in an email on July 9, 2009: "I am familiar [with the BLP] at a very high level, while not necessarily very comfortable with the risk involved. Marti, Christy, and I discussed briefly with regards to Christy's discussion with Michael Staenberg. I need you to be comfortable and would suggest that Paul Vogel is the best source."

291. Michael Staenberg is a prominent and successful St. Louis businessman whom Vogel knew and regarded as a potential investor in the BLP. On June 2, 2009, Vogel emailed

65

Sigillito about Staenberg: "Talked to Christy. Staenberg knew of me and wants to quiz me tomorrow. He is going to call me from Pittsburgh as he can." Later that day, on June 2, 2009, Vogel replied, "My guess is he will do $2 million on my reputation but will want me to know what is being bought." Vogel followed up with Sigillito by email later that day: "Talked to Michael. He is interested but wants to come see me on Monday to discuss further."

292.    A senior lending officer in Enterprise's Sunset Hills branch who was helping Rosemann with Parkside had heard about it. She told her boss in an email on July 20, 2009: "[Rosemann] is the guy who sold his interest in a national tool & die company. He invested his $25MM with a Martin Sigillito who invested abroad. Paul Vogel is familiar with investments.

293.    In August 2009, the Bernsteins attended a quarterly meeting with their financial advisor and another banker at Enterprise. The President of the Trust Division, joined the meeting to say hello. Vogel was not in attendance but discussion turned to Vogel, and the Bernsteins made a comment about their investment in the BLP that Vogel had recommended. Mrs. Bernstein commented to the Enterprise bankers that she hoped the investment was not a Ponzi scheme. The bankers laughed and one of them replied, "Well, if it is, you want to get your money out first." Less than a month later, the bank fired Vogel from his consulting job.

294.    On September 4, 2009, Enterprise Financial sent Vogel a termination letter. The letter stated simply, "Section 4, 4.1.1 of the Consulting Agreement entered into by Enterprise Financial Services Corp. ("Enterprise"), Paul L. Vogel ("Vogel") and Argos

Partners. LLC ("Entity"), dated December 31, 2007, provides that "Vogel's engagement may be terminated at any time by Enterprise ... upon thirty (30) days prior written notice to Vogel for any reason or no reason ...' Pursuant to this Section, Enterprise hereby gives Vogel said thirty (30) days prior written notice as of the execution date of this letter. Payment of the consulting fee pursuant to the consulting agreement will continue through September 30, 2009. Upon prior verbal agreement between Enterprise and Vogel, Enterprise will pay Vogel a lump sum of nine thousand dollars ($9000) in consideration for Vogel continuing to consult with the Murphy family throughout the transition of their business."

295.   By early January 2009, Cranmer had a favorable credit history showing early pay off of a $1 million loan. Yet, when Vogel, the former President of Enterprise's Trust Division, tried to renew the line of credit for Cranmer, the bank said no. When Vogel tried to get a loan on the Hamptons and a loan to invest in the BLP, the bank said no again. By April 2009, Enterprise would not loan Vogel so much as a $1.

296.   On July 16, 2010, a banker at Enterprise sent an email to the President of Enterprise Trust to advise that an advisory client of Enterprise and Vogel had notified the bank she was leaving and taking her accounts elsewhere. The banker observed, "She has a complicated estate plan partially crafted by Paul Vogel. She has a messy investment plan created by Paul Vogel. She owns UK Notes sold to her by Paul Vogel."

297.   The President of Enterprise Trust responded later that day, on July 16, 2010, by email, "Thanks for your assessment, I believe it to be accurate. I placed a call to [her] last night and we spoke briefly. We discussed talking again early this afternoon. This relationship

67

has been at risk since Mike Murphy left and subsequently since we terminated our contract with Paul [Vogel]. *I don't see that there was anything that could have been done differently, Brendan.*" (Emphasis added).

### KNOWING THE BLP WAS A SCAM, ARGOS REFUSES TO INVEST IN THE BLP

298.    On December 11, 2009, Sigillito emailed Merlotti at 7:59 am regarding "UK wish lists" to give him an overview and summary description of bogus investment opportunities "on the table" in the BLP. Sigillito forwarded this email to Vogel at Argos at 8:01 am and wrote: "Would this provide something that perhaps we could get Paul [Tice] 2 to look at for your Argos clients? A couple of these are very attractive!! Could be a quick fix for several issues."

---

**Subject:** Fw: UK wish lists
**From:** Martin Sigillito <m.sigillito@sbcglobal.net>
**Date:** 12/11/2009 8:01 AM
**To:** Paul Vogel <PVogel@argos-partners.com>

Would this provide something that perhaps we could get Paul 2 to look at for your Argos clients?  A couple of these are very attractive!!  Could be a quick fix for several issues.

---

299.    Vogel was a member of Argos when he received Sigillito's email and Vogel knew that the investment opportunities in Sigillito's email and described as "very attractive" were a fiction.

300.    Vogel and Argos also knew when Vogel received Sigillito's email that the phrase "quick fix for several issues" referred to new money from Argos being used to meet cash flow problems in the BLP, which Vogel knew was a Ponzi and embezzlement scheme.

301.    Argos, by and through Vogel, responded on December 11, 2008 at 8:16 am to

Sigillito's email: "I will ask. Most of our guys are real estate heavy."

---

**Subject:** Re: UK wish lists
**From:** Martin Sigillito <m.sigillito@sbcglobal.net>
**Date:** 12/11/2009 8:18 AM
**To:** "Vogel, Paul" <PVogel@argos-partners.com>

Indeed, but not with the returns we could get them? Drinks later today or on the weekend? Do you have children this weekend?

---

**From:** "Vogel, Paul" <PVogel@argos-partners.com>
**To:** m.sigillito@sbcglobal.net
**Sent:** Fri, December 11, 2009 8:16:11 AM
**Subject:** Re: UK wish lists

I will ask. Most of our guys are real estate heavy

---

302.    Vogel's response on behalf of Argos was false and intended to mislead Sigillito

because most members of Argos were not real estate heavy. Vogel and Argos had no

intention of having or asking its ultra wealthy members to invest in the BLP, and Vogel told

Sigillito that most members of Argos were real estate heavy as an excuse for its members not

to invest in the BLP.

303.    Sigillito replied to Vogel by email on December 11, 2008 at 8:18 am: "Indeed,

but not with the returns we could get them?" Vogel knew that the word "returns" in

Sigillito's reply referred to the high interest rates found in bogus loan agreements used in the

BLP.

304.    Argos, by and through Vogel, continued resisting Sigillito's suggestion that

Argos invest in the BLP. At 8:31 am that day, Vogel asked Sigillito: "Are we at risk of losing

some options at Bracknell?" Sigillito responded by email with another pitch at 8:37 am: "No

69

risk of loss. Have a line on an additional million US within a few weeks via Hal in Arkansas."

305.    Argos never seriously considered investing in the BLP, and Vogel never presented the BLP as a serious investment opportunity to any of his ultra wealthy partners in Argos. Argos, by and through Vogel, at all relevant times knew the BLP was a Ponzi scheme. Vogel also knew he risked losing his lucrative position as CEO and President of Argos if he steered Argos' money into the BLP and the Ponzi scheme was discovered or collapsed.

### VOGEL HAS ONLY HIS EXPENDABLE CLIENTS INVEST IN THE BLP

306.    The files Vogel turned over to the federal government in *United States v. Sigillito, et al.*, No. 4:11-CR-168 LRR included the following chart:

| Vogel Client Funds Invested through Martin Sigillito into Distinctive Properties UK | | |
|---|---|---|
| **Name** | **Amount** | **Date** |
| Client A  Bernstein | $1,000,000 | 5-15-08 |
| Client B  Garrett / Spears | $435,000 | 6-9-08 |
| Client C  Sturhahn | $85,000 | 9-17-08 |
| Client D  Dunning | $500,000 | Oct 2008 |
| | $250,000 | 12-11-08 |
| Client E  Middleton | $250,000 | 6-5-09 |
| | 2,520,000 | |

307.    As their financial advisor, Vogel had a fiduciary relationship with each of his clients who invested in the BLP. As a lawyer, Vogel had a grasp of his fiduciary obligations

to each of them. The facts lead to the inescapable conclusion: Vogel, as lawyer and investment advisor, intentionally recommended to each of them investing in a Ponzi scheme with knowledge they would almost certainly lose their money.

308.    Vogel only recommended an investment in the BLP to some of his clients. Those were the clients that Vogel believed he could take advantage of, or who could afford to lose the money if the BLP collapsed, or both. Vogel put his self interests ahead of those clients' best interests and allowed greed and deceit to become substitutes for loyalty and fair dealing.

309.    Vogel treated the Bernsteins as expendable by:

(a).    recommending that they invest in the BLP knowing it was a Ponzi scheme;

(b).    sacrificing their financial well-being as part of a *quid pro quo* with Sigillito and agreement to engage in fraud and money laundering for Vogel and Sigillito's mutual benefit;

(c).    Failing as the Bernsteins' financial advisor to inform them of the risks and true nature of the BLP and The Hamptons;

(d).    Lulling them with a false and misleading Due Diligence Report and failing as their investment advisor to disclose that deception;

(e).    Providing them with a false and misleading response to their questions about the Due Diligence Report and failing as their investment advisor to disclose that deception;

71

(f).   Fabricating a letter from Smith and failing as their investment advisor to disclose that deception; and

(g).   Failing as their investment advisor to disclose the true nature and full extent of his relationship with Sigillito.

310.   Vogel treated Garrett as expendable by:

(a).   recommending that she invest in the BLP knowing it was a Ponzi scheme;

(b).   sacrificing her financial well-being as part of a *quid pro quo* with Sigillito and agreement to engage in fraud and money laundering for Vogel and Sigillito's mutual benefit;

(c).   Failing as Garrett's financial advisor to inform her of the risks and true nature of the BLP; and

(d).   Dumping her as an advisory client after draining the cash out of her IRA account.

311.   Vogel treated third party advisory client Dunning as expendable by:

(a).   recommending that she invest in the BLP knowing it was a Ponzi scheme;

(b).   Denying that the BLP was a Ponzi scheme when Dunning asked Vogel before investing whether the investment was a Ponzi scheme and falsely telling her that it was not a Ponzi scheme;

(c).   Failing as Dunning's financial advisor to follow her instructions in 2009 to liquidate her investment in the BLP; and

72

(d).   Lulling Dunning in 2010 by telling her "my family has significant UK notes as well and I am comfortable with our investment at this time."

312.   Vogel treated third party advisory client Middleton as expendable by:

(a).   recommending that she invest in the BLP knowing it was a Ponzi scheme; and

(b).   Stealing her money within a week of it being transferred at Vogel's direction to Sigillito's IOLTA account.

## VOGEL ENGAGES IN RACKETEERING

313.   Vogel engaged in wire fraud and money laundering by making transfers from Cranmer accounts funded by BLP investor monies to pay the debts of Cranmer and The Hamptons as follows:

| Date | BLP Investor Money Taken From | Deposited into Cranmer XXX-97674 | Withdrawn from Cranmer XXX-97674 | Destination of Laundered Money | Use of Laundered Money |
|------|------|------|------|------|------|
| 12/31/08 | IOLTA | $413,000 | | | |
| 01/15/09 | | | $413,000 | Enterprise | paid Cranmer line of credit |
| 12/31/08 | MTSA-XXX4828 | $87,000 | | | |
| 12/31/08 | | | $87,000 | Enterprise | paid Cranmer line of credit |
| 03/02/09 | MTSA-XXX4828 | $40,000 | | | |
| 03/02/09 | | | $40,000 | Brad-Green | paid debt of The Hamptons |
| 03/02/09 | MTSA-XXX5739 | $160,000 | | | |
| 03/02/09 | | | $160,000 | Brad-Green | paid debt of The Hamptons |

73

314.     Vogel engaged in further acts of wire fraud and money laundering by making

additional transfers from **Brad-Green** accounts funded by BLP investor monies to pay the

debts of Cranmer and The Hamptons as follows:

| Date | BLP Investor Money Taken From | Deposited into Brad-Green XXX-7666 | Withdrawn from Brad-Green XXX-7666 | Destination of Laundered Money | Use of Laundered Money |
|---|---|---|---|---|---|
| 05/04/09 | Southwest XX0793 | $50,000 | | | |
| 05/04/09 | | | $50,000 | Brad-Green | paid debt of The Hamptons |
| 05/05/09 | IOLTA | $18,000 | | | |
| 05/05/09 | | | $18,000 | Brad-Green | paid debt of The Hamptons |
| 06/05/09 | IOLTA | $100,000 | | | |
| 06/05/09 | | | $100,000 | Brad-Green | paid debt of The Hamptons |
| 06/08/09 | IOLTA | $250,000 | | | |
| 06/08/09 | | | $250,000 | Brad-Green | paid debt of The Hamptons |
| 06/09/09 | IOLTA | $240,000 | | | |
| 06/09/09 | | | $240,000 | Brad-Green | paid debt of The Hamptons |
| 07/29/09 | Southwest XX0793 | $42,000 | | | |
| 07/29/09 | | | $42,000 | Brad-Green | paid debt of The Hamptons |

315.     Count 17 of Sigillito's Indictment alleged in paragraph 2 that Sigillito engaged

in wire fraud by withdrawing $347,089.67 from his account number XXX-6385 at St. Louis

Bank to fund cashier's check 103512 payable to Commonwealth Title to purchase a country

home in Marthasville, Missouri using funds belonging to investors of the BLP.

74

316.    Similarly, Vogel engaged in wire fraud with funds from the BLP as follows:

(a).    Withdrawing $447,710.14 from Cranmer account number XXX-9757 at Enterprise to fund an unnumbered check payable to Enterprise to pay Cranmer's debt owed on loan number XXX-9757 at the bank using funds belonging to investors of the BLP;

(b).    Depositing $250,000 into Cranmer account number XXX-9757 at Enterprise by a cashier's check funded with money in Sigillito's IOLTA account at St. Louis Bank that belonged to investors in the BLP;

(c).    Depositing $215,000 into Cranmer account number XXX-9757 at Enterprise by check number 1034 drawn on Sigillito's account number XXX-4828 at Enterprise that belonged to investors in the BLP;

(d).    Wire transfer in the amount of $250,000 to Great Southern Bank funded by **Brad-Green** with check number 1274 for $250,000 from Sigillito's IOLTA account, as part of an investment in a residential real estate project at Lake of the Ozarks, Missouri; and

(e).    Wire transfer in the amount of $340,000 to Great Southern Bank funded by **Brad-Green** with check number 1273 for $100,000 and check number 1277 for $240,000 from Sigillito's IOLTA account as part of an investment in a residential real estate project at Lake of the Ozarks, Missouri.

317. Vogel engaged in the following money laundering transactions with funds from the BLP obtained by wire fraud described as:

   (a). Unnumbered check in the amount of $447,710.14 payable to Enterprise funded by Cranmer with a cashiers check for $250,000 from Sigillito's IOLTA account, check number 1034 for $215,000 from Sigillito's IOLTA account; check number 1045 for $20,000 from Sigillito's account XXX-3930 at Southwest Bank, and check number 1212 for $15,000 from Sigillito's account at Southwest Bank, as repayment on a $1 million line of credit with Enterprise; and

   (b). Unnumbered check for $500,000 from Cranmer's account number XXX-9767 to Enterprise funded by BLP funds as repayment of the portion of the $1 million line of credit with Enterprise guaranteed by Dr. Vollmar.

318. Defendants' conduct as alleged herein constitutes a pattern of racketeering. Vogel engaged in two or more related acts of wire and mail fraud and money laundering that amount to a pattern of continued criminal activity.

319. Vogel and Argos' pattern of racketeering activity as alleged herein had the same or similar purposes, results, participants, victims, methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events.

76

320.    Defendants' conduct of racketeering as alleged herein was a series of related predicate acts and offenses extended from May 2008 when Vogel formed **Brad-Green** and Cranmer to the summer of 2010 when Vogel met with federal regulators to discuss the BLP.

321.    Defendants' pattern of racketeering activity is, as alleged herein, specific to the time, place, and content of Vogel's false representations, as well as the details of Vogel's fraudulent acts, including when the acts occurred, who engaged in them, and what was obtained as a result. Plaintiffs have alleged herein the "who, what, where, when, and how" of Defendants' fraud.

### $1 MILLION OF ROSEMANN'S MONEY IS TAKEN AS INVESTMENT IN THE HAMPTONS

322.    In 2008, Rosemann signed an Irrevocable Commitment to Fund and agreed to provide The Hamptons Condominiums, LLC with "an equity infusion of at least Five Hundred Thousand Dollars ($500,000)." Rosemann invested in **Brad-Green** for the purpose of making this equity infusion.

323.    Rosemann finished investing $1 million in The Hamptons as promised by early October 2009. On October 6, 2009, Vogel sent an email to Stajduhar advising her: "[Sigillito gave me] "a check for $42k which was in fact Phil's final portion of his Hamptons pledge. When [new] cash comes in next week, Marty need[s] that back and Book as a loan from Phil to Smith."

77

### MRS. GLISSON INVESTS IN A PONZI SCHEME

324.   In September 2008, Mrs. Glisson entered into a loan agreement dated September 26, 2008 with Smith and Distinctive Properties as part of the BLP.

325.   Under the terms of the Loan Agreement, Mrs. Glisson loaned $250,000 to Smith and Distinctive Properties, with repayment due on September 25, 2009. The loan bore an interest rate of 6.5% per annum, with interest paid quarterly.

326.   Mrs. Glisson renewed the Loan Agreement on September 26, 2009.

327.   After January 25, 2010, no quarterly interest payments were made under the Loan Agreement.

328.   The BLP with Smith and Distinctive Properties was bogus, without the funding and assets or plans represented to Mrs. Glisson.

329.   The renewed Loan Agreement came due on September 25, 2010, and the amounts due on the Loans have not been paid.

330.   There is no possibility of recovering the amounts due under the Loan Agreement because of the fraudulent nature of the scheme. Upon information and belief, Smith, Distinctive Properties and Sigillito are effectively insolvent.

331.   Mrs. Glisson invested in a Ponzi scheme that Vogel and Argos knowingly directed, facilitated, and perpetuated.

78

## Mr. Werner Invests in a Ponzi Scheme

332.   In December 2009, Werner, as trustee of the J.H. Werner Revocable Trust, entered into a loan agreement dated December 4, 2009 between the Trust and Smith and Distinctive Properties as part of the BLP.

333.   Under the terms of the first Loan Agreement, the Trust loaned $500,000 to Smith and Distinctive Properties, with repayment due on March 3, 2010. The loan bore an interest rate of 2% per month, with interest paid at redemption.

334.   Mr. Werner renewed the first Loan Agreement on March 4, 2010 for three months with repayment due June 3, 2010.

335.   In March 2010, Werner, as trustee of the J.H. Werner Revocable Trust, entered into another loan agreement dated March 6, 2010 between the Trust and Smith and Distinctive Properties as part of the BLP.

336.   Under the terms of the second Loan Agreement, the Trust loaned $500,000 to Smith and Distinctive Properties, with repayment due on June 10, 2010. The loan bore an interest rate of 2% per month, with interest paid at redemption.

337.   No interest payments were made under the first or second Loan Agreement.

338.   The BLP with Smith and Distinctive Properties was bogus, without the funding and assets or plans represented to Werner.

339.   Both Loan Agreements have come due and the amounts due on the Loans have not been paid.

340.   There is no possibility of recovering the amounts due under the Loan Agreements because of the fraudulent nature of the scheme. Upon information and belief, Smith, Distinctive Properties and Sigillito are effectively insolvent.

341.   Mr. Werner invested in a Ponzi scheme that Vogel and Argos knowingly directed, facilitated, and perpetuated.

**COUNT I**
**(AIDING AND ABETTING FRAUD)**

Plaintiffs, as Count I of their Complaint against Defendants for aiding and abetting fraud, allege:

342.   Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

343.   Sigillito was operating a scheme to defraud Plaintiffs.

344.   Vogel and Argos, acting by and through Vogel, and others, knew of Sigillito's fraudulent scheme.

345.   Defendants actively provided substantial assistance to Sigillito in his scheme to defraud Plaintiffs. As more fully described throughout this Complaint, Defendants' assistance included finding a home for the Ponzi and embezzling scheme at Enterprise, facilitating the transfer and acceptance of IRA accounts invested in the BLP from Millennium Trust to Enterprise as successor custodian; recommending to advisory clients of Enterprise investment in the BLP with knowledge of the fraud; preparing a bogus Due

80

Diligence Report intended to lull existing investors and encourage additional investment in the scheme; failing to disclose the nature and extent of Vogel's involvement and relationship with Sigillito; making false and misleading statements as alleged; denying that the BLP was a Ponzi scheme with intent to conceal the true nature of the BLP when asked if the investment was a Ponzi scheme; directing the preparation of false documents and communications concerning the BLP with intent to conceal the BLP's true nature; directing the preparation of BLP loan agreements; placating and lulling investors into not calling their loans or believing their money was safe; and responding to concerns of existing investors in the BLP with false and misleading assurances.

346.    Defendants at all relevant times knew their conduct as alleged was enabling the Ponzi and embezzling scheme to continue and made it reasonably foreseeable that the Ponzi and embezzling scheme would continue and attract new investor victims.

347.    Defendants' actions aided and abetted Sigillito in causing injury and damages to Plaintiffs.

348.    As a direct and proximate cause of Defendants' actions, Plaintiffs have been damaged in an amount in excess of Four Million Three Hundred Thousand Dollars ($4,300,000).

349.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

81

(a). For an award of actual damages against Vogel and Argos, jointly and severally, in an amount to be proven at trial in excess of $75,000;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in an amount that equals at least seven times the amount of actual damages;

(d). For costs of this suit, including reasonable attorneys' fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT II
### (NEGLIGENCE)

Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, as Count II of their Complaint against Defendants for negligence, allege:

350. Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

351. Defendants, as financial advisors to Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, owed Plaintiffs an obligation to utilize the degree of care, skill and learning that an ordinarily careful and prudent person in that business would use under the same or similar circumstances. Instead Defendants were negligent and careless in the following respects:

(a). Defendants failed to utilize the degree of care, skill and learning that an ordinarily careful and prudent person in that business would use under

82

the same or similar circumstances in recommending to Plaintiffs that they loan a total of $1,000,000 to Smith and Distinctive Properties as part of the BLP.

(b).   Defendants failed to perform sufficient due diligence in investigating the true financial state of Smith and Distinctive Properties prior to recommending that Plaintiffs loan money to Distinctive Properties and prior to renewing the loans in 2009. Had Defendants investigated Smith and Distinctive Properties with the proper degree of care and diligence, it would have revealed the fraudulent nature of the enterprise.

(c).   Defendants failed to perform sufficient due diligence in investigating the background and involvement of Sigillito prior to transferring $1,000,000 in loan proceeds to him. Had Defendants investigated Sigillito with the proper degree of care and diligence, it would have revealed the fraudulent nature of the enterprise.

(d).   Enterprise negligently and carelessly mis-routed Plaintiffs' funds to Sigillito which were intended to be transferred directly to Distinctive Properties.

352.   Plaintiffs relied upon Defendants' representations regarding the details of the BLP and loan program to Smith and Distinctive.

353.    Plaintiffs had the right to rely upon Defendants' representations and advice, based upon their positions as financial advisors.

354.    Defendants' representations were material to the decision to make these loans, as Plaintiffs would never have entered into the Loan Agreements without Defendants' advice and statements.

355.    As a direct and proximate result of Defendants' negligence, Plaintiffs sustained damages in the amount of $1,000,000 in unpaid principal and $54,169 in unpaid interest.

WHEREFORE, Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, pray for judgment against Defendants as follows:

(a).    For an award against Vogel and Argos, jointly and severally, for actual damages in favor of Plaintiffs of $1,054,169;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For costs of this suit, including reasonable attorney's fees; and

(d).    For such other and further relief as this Court may deem just and proper.

## COUNT III
### (NEGLIGENCE)

Plaintiffs Northwest, Mr. and Mrs. Bernstein and Mark Bernstein, as Count III of their Complaint against Defendants for negligence, allege:

356.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

84

357.    Defendants, as financial advisors to Plaintiffs, owed them an obligation to utilize the degree of care, skill and learning that an ordinarily careful and prudent person in that business would use under the same or similar circumstances. Instead Defendants were negligent and careless in the following respects:

(a).    Defendants failed to utilize the degree of care, skill and learning that an ordinarily careful and prudent person in that business would use under the same or similar circumstances in recommending to Plaintiffs that they loan a total of $500,000 in **Brad-Green**.

(b).    Defendants failed to perform sufficient due diligence in investigating the true financial state and nature of **Brad-Green** prior to recommending that Plaintiffs invest money in **Brad-Green** as part of The Hamptons on the Lake residential condominium project. Had Defendants investigated **Brad-Green** and The Hamptons, with the proper degree of care and diligence, it would have revealed the intended fraudulent purpose of **Brad-Green** and funding of The Hamptons with stolen money diverted from the BLP and loan program with Smith and Distinctive Properties.

(c).    Defendants failed to perform sufficient due diligence in investigating the background and involvement of Sigillito and connection to the BLP prior to transferring $500,000 to The Hamptons of which he held an undisclosed equity interest. Had Defendants investigated Sigillito with

85

the proper degree of care and diligence, it would have revealed the fraudulent nature of **Brad-Green** and its connection to and reliance on the BLP and fraudulent loan program involving Sigillito, Smith and Distinctive Properties.

358. Plaintiffs relied upon Defendants' representations regarding the details of **Brad-Green** and The Hamptons.

359. Plaintiffs had the right to rely upon Defendants' representations and advice, based upon their positions as financial advisors.

360. Defendants' representations were material to the decision to invest in **Brad-Green** and the Hamptons, as Plaintiffs would never have invested in **Brad-Green** without Defendants' advice and statements.

361. As a direct and proximate result of Defendants' negligence, Plaintiffs sustained damages in the principal amount of $500,000.

WHEREFORE, Plaintiffs Northwest, Mr. and Mrs. Bernstein, and Mark Bernstein pray for judgment against Defendants as follows:

(a). For an award against Vogel and Argos, jointly and severally, for actual damages in favor of Plaintiffs of $500,000;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For costs of this suit, including reasonable attorney's fees; and

(d). For such other and further relief as this Court may deem just and proper.

## COUNT IV
### (BREACH OF FIDUCIARY DUTY)

Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, as Count IV of their Complaint against Defendants for breach of fiduciary duty, allege:

362.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

363.    As investment advisors to Plaintiffs, Defendants owed Plaintiffs a fiduciary duty to manage their financial affairs as dictated by Plaintiffs' needs and objectives, to inform them of risks in particular investments, to refrain from self-dealing, to disclose any self-interest, to stay abreast of market changes, and to maintain and explain strategies for Plaintiffs.

364.    Defendants negligently and carelessly breached their fiduciary duties to Plaintiffs in the following ways:

(a).    Defendants failed to adequately investigate the BLP loan scheme before recommending that Plaintiffs enter into the Loan Agreements.

(b).    Defendants failed to disclose to Plaintiffs their self-interest in receiving a "finders fee."

(c).    Defendants failed to inform Plaintiffs of the risks involved in these loans, and failed to use sufficient care and diligence in evaluating the BLP and loan scheme prior to recommending it to Plaintiffs.

    (d).    Defendants failed to use sufficient diligence in evaluating Smith and Distinctive Properties' operations during Vogel's January 2009 visit to England, which would have afforded the opportunity to get out before implementation of the September 2009 Loan Agreement.

    (e).    Defendant Vogel, in violation of Rule 4-8.4 of the Rules of Professional Conduct, engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation.

365.    These failures, alone and collectively, constitute a breach of Defendants' fiduciary obligations to Plaintiffs.

366.    As a direct and proximate result of these breaches of their fiduciary duties, Plaintiffs were damaged in an amount of at least $1,054,169.

367.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973 pray for judgment against Defendants as follows:

    (a).    For an award of actual damages against Defendants Vogel and Argos, jointly and severally, in an amount to be proven at trial in excess of $75,000;

    (b).    For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in an amount that equals at least seven times the amount of actual damages;

(d). For costs of this suit, including reasonable attorneys' fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT V
### (BREACH OF FIDUCIARY DUTY)

Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein and Northwest, as Count V of their Complaint against Defendants for breach of fiduciary duty, allege:

368. Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

369. As investment advisors to Plaintiffs, Defendants owed Plaintiffs a fiduciary duty to manage their financial affairs as dictated by Plaintiffs' needs and objectives, to inform them of risks in particular investments, to refrain from self-dealing, to disclose any self-interest, to stay abreast of market changes, and to maintain and explain strategies for Plaintiffs.

370. Defendants negligently and carelessly breached their fiduciary duties to Plaintiffs in the following ways:

(a). Defendants failed to adequately investigate **Brad-Green** and The Hamptons before recommending that Plaintiffs invest in **Brad-Green** and The Hamptons.

89

(b).    Defendants failed to disclose to Plaintiffs the true purpose of **Brad-Green** and their intent to use funds diverted from the BLP to fund The Hamptons.

(c).    Defendants failed to inform Plaintiffs of the risks involved in **Brad-Green** and The Hamptons, and failed to use sufficient care and diligence in evaluating **Brad-Green** and its participation in the loan scheme prior to recommending it to Plaintiffs.

(d).    Defendants failed to use sufficient diligence in evaluating the financial obligation of the original developers combined with the lack of any sales to date, which would have afforded the Bernsteins information sufficient to decide not to invest or transfer $500,000 to **Brad-Green**.

(e).    Defendant Vogel, in violation of Rule 4-8.4 of the Rules of Professional Conduct, engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation.

371.    These failures, alone and collectively, constitute a breach of Defendants' fiduciary obligations to Plaintiffs.

372.    As a direct and proximate result of these breaches of their fiduciary duties, Plaintiffs were damaged in an amount of at least $500,000.

373.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

90

WHEREFORE, Plaintiffs Northwest, Mr. and Mrs. Bernstein , Mark Bernstein, and Northwest pray for judgment against Defendants as follows:

(a). For an award of actual damages against Defendants Vogel and Argos, jointly and severally, in an amount to be proven at trial in excess of $75,000;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in an amount equal to at least seven times the amount of actual damages;

(d). For costs of this suit, including reasonable attorney's fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT VI
### (FRAUDULENT INDUCEMENT TO CONTRACT)

Plaintiff Phillip Rosemann, as Count VI of his Complaint against Vogel for fraudulent inducement to contract, alleges:

374. Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

375. In 2008, Vogel offered Rosemann an opportunity to invest in The Hamptons. In exchange for an investment of $500,000 or more in **Brad-Green** for the purpose of making an equity infusion in The Hamptons Condominiums, LLC, Rosemann would receive a six percent (6%) priority return and an equity position in The Hamptons Condominiums LLC.

91

376.   Rosemann told Vogel he could not invest any money until Metis repaid its $5 million loan but agreed to provide funds in the future.

377.   On July 1, 2008, Rosemann signed an Irrevocable Commitment to Fund as Maker to provide The Hamptons Condominiums LLC with an equity infusion of at least Five Hundred Thousand Dollars ($500,000).

378.   The Commitment provided that "the Maker shall on or before January 31, 2009, cause the sum of Five Hundred Thousand Dollars ($500,000) or more in cash to be funded into **Brad-Green Development, LLC** for the purposes described above, and This Commitment to Fund shall be Irrevocable but may be funded either by the Maker directly or through others; provided, however, that the Maker is ultimately responsible for said commitment to fund[.]" (Emphasis added).

379.   Rosemann signed the Commitment in reliance on Vogel's representations and description of **Brad-Green**, The Hamptons Condominiums LLC, and The Hamptons.

380.   Before Rosemann signed the Commitment, Vogel knew but failed to tell Rosemann that **Brad-Green** was a company he established to siphon money from the BLP to fund The Hamptons with embezzled money, that Vogel had established Cranmer to obtain a $1 million line of credit to fund The Hamptons, and that Vogel and Sigillito were involved in a Ponzi and embezzling scheme intended, in part, to fund The Hamptons.

381.   Vogel's representations to Rosemann about the opportunity to invest in The Hamptons were false because Vogel knowingly or recklessly failed to disclose material facts necessary to make the disclosed information about the opportunity to invest in The Hamptons not materially false or misleading.

382.   Vogel knew his representations were materially misleading and false and he intended that Rosemann should act on such false representations.

383.   Rosemann was entitled to rely on Vogel's representations and was ignorant of the falsity and misleading nature of the representations.

384.   The information Vogel failed to disclose was material because Rosemann would not have signed the Commitment if he had known that information.

385.   As a direct and proximate result of Vogel's conduct as alleged, Rosemann suffered injury and pecuniary loss in the amount of $1 million.

386.   Vogel's conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiff Rosemann pray for judgment against Defendant Vogel as follows:

(a).   For an award of actual damages against Vogel in an amount to be proven at trial in excess of $75,000;

(b).   For an award of prejudgment interest at the applicable statutory rate;

(c).   For an award of punitive damages in an amount that equals at least seven times the amount of actual damages;

(d).   For costs of this suit, including reasonable attorneys' fees; and

(e).   For such other and further relief as this Court may deem just and proper.

## COUNT VII
### (FRAUDULENT MISREPRESENTATION)

Rosemann, as Count VII of his Complaint against Vogel for fraudulent misrepresentation, states:

387.  Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

388.  Vogel at all times relevant had knowledge and information that:

    (a).  **Brad-Green** was a company Vogel established to siphon money from the BLP to fund The Hamptons with embezzled money;

    (b).  Vogel had established Cranmer to obtain a $1 million line of credit to fund The Hamptons; and

    (c).  Vogel and Sigillito were involved in a Ponzi and embezzling scheme intended, in part, to fund The Hamptons.

389.  Vogel's knowledge and information of the foregoing was superior to Rosemann's knowledge in that such knowledge and information was not reasonably available to Rosemann.

390.  The description of The Hamptons that Vogel gave Rosemann did not describe the true state of affairs of The Hamptons and The Hamptons project, as described by Vogel, was not what it appeared to be.

94

391. Vogel's superior knowledge and information was not knowledge and information that Rosemann would have discovered through ordinary diligence, and the truth about The Hamptons and Vogel's involvement in the Ponzi scheme with Sigillito was difficult, if not impossible, for Rosemann to ascertain.

392. Vogel's superior knowledge and information imposed a duty on Vogel to speak and to inform Rosemann of the true state of affairs.

393. Vogel's duty to speak converted his silence and nondisclosure of the true state of affairs concerning The Hamptons into fraudulent misrepresentations.

394. Vogel had knowledge of the fraudulent misrepresentations created by his silence and nondisclosure of the true state of affairs concerning the BLP and intended that Rosemann act on such false representations and agree to invest in The Hamptons.

395. Rosemann, ignorant of such false representations and the true state of affairs concerning The Hamptons, justifiably relied on Vogel's incomplete and inaccurate description of The Hamptons.

396. If Rosemann had known about the true state of affairs concerning The Hamptons and possessed Vogel's superior knowledge and information, he would not have agreed to invest or invested in The Hamptons.

397. Rosemann was damaged as a direct result of Vogel's silence, false representations, and fraudulent nondisclosures.

95

398.    Vogel's conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Rosemann prays for judgment against Defendant Vogel as follows:

(a).    For an award against Vogel for actual damages in an amount to be proven at trial in excess of $75,000;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in an amount equal to at least seven times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorney's fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT VIII
### (VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT, REV. STAT. MO. § 407.010)

Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, as Count VIII of their Complaint against Defendants for violations of the Missouri Merchandising Practices Act, § 407.010, *et seq.*, RSMo. ("the MMPA"), allege:

399.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

400.    The MMPA prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the

concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

401.   Vogel and Argos, acting by and through Vogel, knew that the BLP was a Ponzi scheme intended to defraud investors.

402.   Defendants as more fully alleged throughout the Complaint engaged in deceptive and unfair practices in connection with the sale of merchandise in trade or commerce as those terms are used and defined in the MMPA.

403.   The financial and investment services that Plaintiffs obtained from Defendants were acquired and purchased for personal purpose and use.

404.   Plaintiffs have suffered an ascertainable loss of money in an amount to be determined upon trial of this action, which amount exceeds One Million Five Hundred Thousand Dollars ($1,500,000), as a direct and proximate result of Defendants' engagement in, and use and employment of, unlawful practices in violation of the MMPA.

405.   By their conduct, Defendants used and employed unlawful practices in violation of the MMPA.

406.   Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs Northwest, Mr. and Mrs. Bernstein, Mark Bernstein, and Northwest 1973, pray this Court enter judgment against Defendants Vogel and Argos:

(a).   For an award of actual damages against Vogel and Argos, jointly and severally, in an amount to be proven at trial in excess of $75,000;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in an amount that equals at least seven times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorneys' fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT IX
### (CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d))

Plaintiffs, as Count IX of their Complaint against Defendants for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d), state as follows:

407.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

### CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(d)

408.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate" 18 U.S.C. § 1962(c). Hence, § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

409.    A conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) is established if the defendant *associated with an enterprise* which affected interstate commerce and the defendant objectively manifested an agreement to *participate in the affairs of the enterprise*.

410.    A conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d) is established if: (1) an enterprise existed; (2) the enterprise affected interstate or foreign commerce; (3) the defendant associated with the enterprise; and (4) the defendant objectively manifested an agreement to participate in the affairs of the enterprise.

411.    A tacit understanding between the conspirators shown wholly through the circumstantial evidence of each defendant's actions is sufficient. Proof of an express agreement is not required.

412.    A conspiracy to violate RICO may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense.

413.    Plaintiffs need not prove that each alleged conspirator agreed that he or she would be the one to commit the two predicate acts required under that statute.

414.    A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor.

415.    A violation of 18 U.S.C. § 1962(d) intentionally omits two elements necessary to prove a violation of § 1962(c): The requirement that the defendant participated, directly or indirectly, in the conduct of the affairs of the enterprise, and the requirement that the defendant participated in the enterprise through a pattern of racketeering activity by committing the two predicate acts required under that statute.

## ASSOCIATION-IN-FACT RICO ENTERPRISE

416.    18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. RICO defines "enterprise" to include

99

any "group of individuals associated in fact." 18 U.S.C. 1961(4). "The essence of an 'association in fact' is that it is not a legitimate business or other entity operating in the public eye." *U.S. v. Lemm*, 680 F.2d 1193, 1200 n. 7 (8th Cir. 1982).

417.    The "RICO enterprise must exhibit three basic characteristics: (1) a common or shared purpose; (2) some continuity of structure and personnel; and (3) an ascertainable structure distinct from that inherent in a pattern of racketeering." *Atlas Pile Driving Co. v. DiCon Fin. Co.*, 886 F.2d 986, 995 (8th Cir. 1989).

418.    An association in-fact enterprise requires "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

419.    The RICO enterprise consists of the association-in-fact of Martin Sigillito and his company, Martin T. Sigillito & Associates Ltd., a Missouri corporation; Scott Brown and his companies, J. Scott Brown Associates and British American Group, Inc., Kansas corporations; Paul Vogel and his companies, Argos Partners, LLC, Brad-Green Development LLC and Cranmer Associates LLC, all Missouri limited liability companies; Hal Milsap and his company Retirement Benefit Solutions, an Arkansas fictitious business name; Bob Mack and his company, M&M Financial Investors, LLC, an Ohio limited liability company; and David Fazio, and his company Fountain Capital Management LLC, an Arizona limited liability company (the "RICO Enterprise").

420.    The RICO Enterprise had as its common purpose the operation and management of the BLP, and the RICO Enterprise was a group of persons associated together for the common purpose of engaging in solicitation of investors for the BLP and theft of investor funds in a pattern of racketeering acts.

421.    The RICO Enterprise may also be inferred here from the facts alleged herein that persons associated with the enterprise, including Defendants, engaged in a pattern of racketeering activity.

422.    Sigillito did business in connection with the BLP as an attorney and maintained attorney trust accounts that he used to divert fiduciary funds to Sigillito, Brown and the third-party brokers who recruited the victims. Sigillito also did business in connection with the BLP as Martin T. Sigillito and Associates, Ltd., a Missouri corporation, with Sigillito as the president and sole shareholder. Sigillito maintained corporate bank accounts at the above banks in the name of Martin T. Sigillito and Associates and used his corporate bank account to divert fiduciary funds.

423.    Scott Brown did business in connection with the BLP as an individual, also an attorney, and as a Kansas company, J. Scott Brown and Associates, and also did business as British American Group, Inc., a Kansas corporation, with Brown as the sole shareholder and president. Brown maintained bank accounts used to divert fiduciary funds in the name of J. Scott Brown Associates and British American Group.

424.    Third-party brokers who recruited the victims include Paul Vogel who did business in connection with the BLP as, and siphoned money from the the BLP through, Brad-

101

Green Development LLC, Cranmer Associates LLC, and Argos, all Missouri limited liability companies. Third-party broker Hal Milsap did business in connection with the BLP as Retirement Benefit Solutions, an Arkansas fictitious business name. Third-party broker Robert Mack did business in connection with the BLP as M&M Financial Investors, LLC, an Ohio limited liability company, in which he was the managing member. Third-party broker David Fazio did business in connection with the BLP as Fountain Capital Management LLC, an Arizona limited liability company, in which he was the managing member.

## RICO ENTERPRISE HAD THE OPERATION OF THE BLP AS ITS COMMON PURPOSE

425.     The RICO Enterprise had as its common purpose the operation of the BLP as a Ponzi scheme and fee-and-money-generating machine for Sigillito, Brown and the third-party brokers who recruited the victims. The RICO Enterprise also had a secondary purpose to conceal the diversion of loan funds from the lenders (victims), law enforcement and regulatory agencies.

426.     The RICO Enterprise marketed the BLP to lenders based upon a number of fraudulent material representations, leaving the victims with the belief that their loan funds were being used by an English borrower for real estate investment in England. However, loan funds pooled in Sigillito's attorney trust account were rarely sent to England for use in real estate projects as promised. Instead, loan funds were diverted to pay fees and divert money to Sigillito, Brown and third-party brokers who recruited the victims. When lenders requested interest payments on their loans, fiduciary funds from Sigillito's attorney trust account were diverted to Scott Brown's bank account in a classic Ponzi scheme where IOLTA payments to existing investors were being paid by IOLTA deposits from new investors.

## RICO ENTERPRISE HAD WELL-DEFINED STRUCTURE

427.   The RICO Enterprise operated with an intricate and well-defined structure for decision-making. Sigillito had the most significant degree of control over the affairs of the RICO Enterprise. Sigillito selected the IRA custodian and IOLTA deposit bank. Sigillito, as the primary beneficiary of fees from the BLP, controlled the flow of the funds, including the misappropriation of fees to himself and others. Paul Vogel had direct contact with Sigillito, made in-person loan presentations at the direction and interest rate set by Sigillito.

428.   Scott Brown executed Sigillito's directives regarding fees and presided over the inner circle of third-party brokers (Paul Vogel, Hal Milsap, David Fazio, and Bob Mack). These brokers had direct contact with the lenders, made in-person loan presentations at the direction of Brown and at the interest rate set by Sigillito.

429.   Vogel and Argos were part of the RICO Enterprise's well-defined structure for decision-making. Vogel and Sigillito were in regular contact to coordinate the solicitation and direct the transfer of funds to the BLP and to coordinate and direct the subsequent siphoning of investor funds for the personal use and benefit of Vogel and Sigillito.

430.   Vogel, Argos, and Sigillito also coordinated efforts to lull investors in the BLP from acting on suspicions and concerns about their investments, all as part of a well-defined structure for decision making within the RICO Enterprise.

103

### RICO Enterprise had Continuity of Personnel

431. The RICO Enterprise operated with continuity-of-personnel. Sigillito and Brown, as the managers and operators of the BLP, remained constant throughout the endeavor, from inception until the BLP was shut down in May 2010.

432. The inner circle of Paul Vogel, Hal Milsap, David Fazio and Bob Mack secured loan approvals from the victims to invest in the BLP.

433. The brokers underwent some alteration without loss of the enterprise's identity as an enterprise. When Bob Mack died in 2007, his loans were transferred to Hal Milsap who took over the roll-over of those loans without alteration to the BLP.

434. Vogel and Argos had on-going ties with the RICO Enterprise. The relationships between Sigillito, Brown, Vogel, Hal Milsap, David Fazio, Bob Mack, and their companies demonstrate a sophisticated organizational pattern.

### RICO Enterprise has Ascertainable Structure Which Functioned Separate And Apart from the Pattern of Racketeering Activity Related to the BLP

435. The RICO Enterprise had an ascertainable structure which functioned separate and apart from the pattern of racketeering activity related to the BLP. Putting aside the predicate acts of mail fraud and money laundering, the RICO enterprise had an on-going structure and its members were not engaged in sporadic criminal activity.

436. Putting aside the predicate acts of mail fraud and money laundering, Sigillito, Brown and their companies had an ongoing structure that engaged in legitimate international business consulting independent of any predicate acts of racketeering.

104

437.  Sigillito and Brown, through their corporations worked as international business consultants who associated for legitimate loans outside of the loans for the BLP. Sigillito and his company, secured the lender Phil Rosemann, while Brown and his company secured the borrower, Metis, a Turkish corporation, for a $5 million loan. The Metis loan stated on the loan documents that Martin T. Sigillito and Associates, arranged the loan. Multiple memos and emails confirmed that Brown arranged the loan with Metis.

438.  Putting aside the predicate acts of mail fraud and money laundering, Vogel had an ongoing structure as an attorney, financial advisor, certified public accountant, and real estate developer, and his companies had an ongoing structure in wealth management, tax advice, and real estate investments.

439.  Putting aside the predicate acts of mail fraud and money laundering, Vogel and Sigillito had an ongoing association as business partners in The Hamptons and as members of the Racquet Club board, independent of any predicate acts of racketeering.

440.  Putting aside the predicate acts of mail fraud and money laundering, Milsap, Fazio and Mack and their companies had an ongoing structure as insurance agents and as investments brokers, independent of any predicate acts of racketeering.

441.  Sigillito, Brown, Vogel, Milsap, Fazio, Mack and their companies leased office space, purchased office equipment, maintained business bank accounts, and operated in their respective businesses (international business consulting, real estate development, insurance and investment brokerage) distinct from the commission of any predicate acts regarding the BLP.

442.   If the predicate acts ceased, Sigillito, Brown, Vogel, Milsap, Fazio, Mack and their companies remained intact. Martin T. Sigillito and Associates remained a viable entity after the BLP ended until it was administratively dissolved on August 29, 2012. British American Group remained a viable entity until its forfeiture on July 15, 2011. Brad-Green Development LLC and Cranmer Associates LLC remain legal entities in good standing as of the date of the filing this Complaint. Retirement Benefit Solutions, Fountain Capital Management LLC and M&M Financial Investors, LLC, remained legal entities in good standing as of the date of the filing this Complaint.

### NEXUS BETWEEN RICO ENTERPRISE AND INTERSTATE COMMERCE

443.   18 U.S.C. § 1962(c) requires that a RICO enterprise activities "affect, interstate or foreign commerce."

444.   The BLP loans to out-of-state lenders affected interstate commerce. The BLP loans to lenders in England affected foreign commerce and impacted the flow of electronic wire transfers to and from England and the United States. The loans also impacted the FDIC insurance as the banks receive insurance from the FDIC for the losses.

### RICO CONSPIRACY

445.   Sigillito, Brown, Vogel, and Argos communicated with, requested information from, and acted on instructions from each other and played some role in the conception, creation, or execution of the scheme.

106

446.   Sigillito, Brown, Vogel and Argos agreed to conduct or participate in the affairs of the RICO Enterprise and agreed to commit acts of mail fraud and money laundering, as their regular way of conducting the affairs of the RICO Enterprise.

447.   Sigillito, Brown, Vogel and Argos objectively manifested an agreement to commit substantive RICO violations and to commit two or more predicate acts of mail fraud and money laundering through their participation in the conduct of the affairs of the RICO Enterprise.

448.   Sigillito, Brown, Vogel and Argos knew that the predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. Their conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(d).

449.   Sigillito, Brown, Vogel and Argos agreed and combined with Sigillito, and with persons known and unknown, to do a criminal or unlawful act, or a lawful act by criminal or unlawful means.

450.   Sigillito, Brown, Vogel and Argos objectively manifested agreement to the commission of the substantive RICO violations and to the commission of two or more predicate acts through participation in the conduct of the affairs of the RICO Enterprise.

451.   Sigillito, Brown, Vogel and Argos engaged in a pattern of racketeering activity that can be reasonably inferred from their close professional relationship; their use of bank accounts and property; and the dependency of the fraudulent acts of each on the fraudulent acts of the others.

107

452.    At least one overt and wrongful act was done by one or more of the conspirators to achieve the purpose of the conspiracy. Those acts were done pursuant to the common schemes and in furtherance of the objects of the conspiracy and in concert.

**VOGEL AND ARGOS ASSOCIATED WITH THE RICO ENTERPRISE
AND AGREED TO PARTICIPATE IN THE AFFAIRS OF THE ENTERPRISE**

453.    Sigillito, Brown, Vogel, and Argos objectively manifested an agreement to participate and associate with the RICO Enterprise in a conspiracy of silence by agreeing to keep Sigillito's misappropriation of client fiduciary funds hidden from law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud.

454.    Sigillito, Brown, Vogel, and Argos objectively manifested an agreement to participate and associated with the RICO Enterprise in a conspiracy of silence by agreeing to keep Sigillito's misappropriation of fiduciary funds hidden from law enforcement, regulatory agencies, successor custodians, or the victims of Sigillito's fraud.

455.    Sigillito, Brown, Vogel, and Argos played an essential role in the Ponzi and embezzlement scheme and facilitated its continued existence.

456.    Vogel served for a period as a broker and solicited lenders to make loans for the benefit of the Ponzi scheme. In order to secure lenders, Vogel assured lenders that the BLP loans regularly paid extremely high returns. Vogel also directed the drafting of loan agreements and correspondence designed to perpetuate the Ponzi scheme and consented to having his name and his wife's name appear on the loan agreements as counsel for the lender.

108

457.    In an effort to lull existing lenders and persuade new lenders to invest in the BLP, Vogel drafted a due diligence report which was provided to several of the Plaintiffs and other victims. In the due diligence report, Vogel stated that he traveled to England to meet with Smith and inspected three of Smith's properties listed on Smith's Asset & Liabilities Statement provided with the loan agreements. Vogel assured lenders that the three properties he inspected were worth the same as, or considerably more than, the value listed on Smith's Asset & Liabilities Statement. However, the actual value of the properties was significantly less than that stated on the Asset & Liability Statement. Vogel's due diligence report convinced lenders to renew their loans, which allowed the Ponzi scheme to continue for several additional months.

458.    Defendants associated with the RICO Enterprise and agreed to participate in the affairs of the RICO Enterprise.

459.    Defendants also participated in the operation and management of the RICO Enterprise.

### PLAINTIFFS' RICO INJURY

460.    As a result of one or more acts predicate to the conspiracy, and the conduct and participation of Sigillito, Brown, Vogel, and Argos in the conduct of the RICO Enterprise's affairs through a pattern of racketeering activity, Plaintiffs have sustained direct and substantial injury, including loss of their investment funds.

461.    The acts or omissions detailed above were the direct, natural, and proximate cause of Plaintiffs' damages in an amount to be determined upon trial of this action, which amount exceeds $4 million.

462.    RICO permits plaintiffs in a civil action to recover treble damages for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Plaintiffs seek that any damages are duly trebled in accordance with § 1964(c).

463.    Defendants' conduct was malicious and corrupt, as well as either intentional or reckless, sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants Vogel and Argos as follows:

(a).    For damages against Vogel and Argos, jointly and severally, in an amount to be determined upon trial of this action, which amount exceeds $4 million, and the sum duly trebled in accordance with 18 U.S.C. § 1964(c);

(b).    For an award of punitive damages against Defendants Vogel and Argos in a amount that equals up to six times the amount of actual damages;

(c).    For costs of this suit, including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c); and

(d).    For such other and further relief as this Court may deem just and proper.

110

## COUNT X
### (CONSPIRACY)

Plaintiffs, as Count X of their Complaint against Defendants for conspiracy, state:

464.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

465.    Defendants had the unlawful objective of soliciting investors in the BLP for the purpose of misappropriating investment funds and perpetuating the Ponzi scheme.

466.    Defendants' conduct and acts alleged herein were intentional and knowingly committed.

467.    Defendants conspired to pursue their unlawful objective, and after a meeting of the minds, knowingly committed multiple acts and knowingly took action as alleged herein in furtherance of the conspiracy and to carry out the unlawful purposes of the conspiracy.

468.    Vogel, through The Hamptons Condominiums, LLC, had an independent personal stake in achieving the object of the conspiracy separate from his employment with, and membership in, Argos.

469.    Plaintiffs were damaged as a direct result of Defendants' conduct.

470.    Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Plaintiffs pray for judgment against Defendants Vogel and Argos as follows:

111

(a).    For an award against Vogel and Argos, jointly and severally, for actual damages in an amount to be proven at trial in excess of $75,000;

(b).    For an award of prejudgment interest at the applicable statutory rate;

(c).    For an award of punitive damages in an amount equal to at least seven times the amount of actual damages;

(d).    For costs of this suit, including reasonable attorney's fees; and

(e).    For such other and further relief as this Court may deem just and proper.

## COUNT XI
### (FRAUD)

Werner, as Count XI of his Complaint against Defendants his claim for Fraud, states:

471.    Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

472.    Vogel and Argos falsely represented to Werner in August 2009 that Smith and Distinctive had never defaulted on any loan obtained through the BLP. When he made that representation, Vogel knew that Smith and Distinctive had defaulted on the loan to Northwest 1973 a few months earlier and that Vogel was in the midst of a plan with Sigillito to lull the Bernsteins' concerns over that default.

473.    Vogel and Argos intended Werner to act on his false representation and invest in the BLP based, in part, on the assurance that Smith and Distinctive had never defaulted.

474.    Werner was unaware of Smith and Distinctive's default and justifiably relied on the truth of Vogel and Argos' representation.

112

475. If Werner had known the truth about Smith and Distinctive's default, he would not have invested in the BLP.

476. Werner was damaged as a direct result of Vogel and Argos' false representation.

477. Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Werner prays for judgment against Defendants Vogel and Argos as follows:

(a). For an award against Vogel and Argos, jointly and severally, for actual damages in an amount to be proven at trial in excess of $75,000;

(b). For an award of prejudgment interest at the applicable statutory rate;

(c). For an award of punitive damages in an amount equal to at least seven times the amount of actual damages;

(d). For costs of this suit, including reasonable attorney's fees; and

(e). For such other and further relief as this Court may deem just and proper.

## COUNT XII
### (FRAUDULENT MISREPRESENTATION)

Werner, as Count XII of his Complaint against Defendants for fraudulent misrepresentation, states:

478. Each of the other paragraphs of this Complaint is incorporated by reference as if fully set forth herein.

479.   Defendants at all times relevant had knowledge and information that:

(a).   Vogel and Argos in August 2009 were part of a scheme with Sigillito to string along and deceive the Bernsteins about Smith and Distinctive's default;

(b).   Vogel in the spring of 2009 had stolen Middleton's money and his dad's money intended for investment in the BLP and diverted it for use in The Hamptons;

(c).   Defendants, by August 2009, had engaged in acts of racketeering as alleged herein to improperly divert funds intended for the BLP to The Hamptons;

(d).   Vogel had invested family money in the BLP as part of an exit strategy designed to make Vogel look like a victim of the BLP in case the Ponzi scheme collapsed; and

(e).   Vogel, by August 2009, had received more than $700,000 from his participation in the BLP.

480.   Defendants' knowledge and information of the foregoing was superior to Werner's knowledge in that such knowledge and information was not reasonably available to Werner.

481.   The description of the BLP that Defendants gave Werner did not describe the true state of affairs of the BLP and the BLP, as described by Defendants, was not what it appeared to be.

114

482.   Defendants' superior knowledge and information was not knowledge and information that Werner would have discovered through ordinary diligence, and the truth about the BLP and Defendants' involvement was difficult, if not impossible, for Werner to ascertain.

483.   Defendants' superior knowledge and information imposed a duty on Vogel and Argos to speak and to inform Werner of the true state of affairs.

484.   Defendants' duty to speak converted their silence and nondisclosure of the true state of affairs concerning the BLP into fraudulent misrepresentations.

485.   Defendants had knowledge of the fraudulent misrepresentations created by their silence and nondisclosure of the true state of affairs concerning the BLP and intended that Werner to act on such false representations and invest in the BLP.

486.   Werner, ignorant of such false representations and the true state of affairs concerning the BLP, justifiably relied on Defendants' incomplete and inaccurate description of the BLP.

487.   If Werner had known about the true state of affairs concerning the BLP and possessed Defendants' superior knowledge and information, he would not have invested in the BLP.

488.   Werner was damaged as a direct result of Defendants' silence, false representations, and fraudulent nondisclosures.

489.   Defendants' conduct was malicious and corrupt, as well as intentional or reckless, to a degree sufficient to support an award of punitive damages.

WHEREFORE, Werner prays for judgment against Defendants Vogel and Argos as follows:

(a).   For an award against Vogel and Argos, jointly and severally, for actual damages in an amount to be proven at trial in excess of $75,000;

(b).   For an award of prejudgment interest at the applicable statutory rate;

(c).   For an award of punitive damages in an amount equal to at least seven times the amount of actual damages;

(d).   For costs of this suit, including reasonable attorney's fees; and

(e).   For such other and further relief as this Court may deem just and proper.

JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.

GREEN JACOBSON, P.C.

/s/ Jonathan F. Andres
Jonathan F. Andres (E.D. Mo. 39531MO)
7733 Forsyth Boulevard, Suite 700
St. Louis, MO 63105
Tel: (314) 862-6800
Fax: (314) 862-1606
Email: andres@stlouislaw.com
Attorney for Plaintiffs

LAW OFFICES OF SEBASTIAN RUCCI

/s/ Sebastian Rucci
Sebastian Rucci (E.D. Mo. 178114CA)
401 E. Ocean Blvd., Suite 1040
Long Beach, CA 90802
Tel: (330) 720-0398
Fax: (330) 954-0033
Email: SebRucci@gmail.com
Attorney for Plaintiffs

116

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2014 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's electronic filing system and parties may access this filing through the Court's Case management/Electronic Case Files (CM/ECF) found on the internet at https://ecf.moed.uscourts.gov.

/s/ Jonathan F. Andres

Jonathan F. Andres  (E.D. Mo. 39531MO)