# Case: Phil Rosemann, et al. v. St. Louis Bank

4:14-CV-00983-LRR

# Transcript of: Melba Aguilar

**Date:** July 17, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<www.goreperry.com>>

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                                    July 17, 2015

Page 1

PHIL ROSEMANN, ET AL.,


PLAINTIFFS,


VS.


ST. LOUIS BANK,


DEFENDANT.

DEPOSITION OF
MELBA AGUILAR


JULY 17, 2015

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                          July 17, 2015

Page 2

1                IN THE UNITED STATES DISTRICT COURT

2               FOR THE EASTERN DISTRICT OF MISSOURI

3                         EASTERN DIVISION

4

5     PHIL ROSEMANN, ET AL.,

6

7                    PLAINTIFFS,

8

9     vs.                          Case No. 4-14-CV-00983-LRR

10

11    ST. LOUIS BANK,

12

13                    DEFENDANT.

14

15         Deposition of MELBA AGUILAR, taken on behalf of

16    the Defendant, at Polsinelli, PC, 100 South Fourth

17    Street, Suite 1000, St. Louis, Missouri, 63102, on

18    July 17, 2015, between the hours of 3:48 p.m. and

19    4:17 p.m., before Tracey Aurelio, RDR, CRR, MO-CCR

20    #973, IL CSR #084.003465.

21

22

23

24

25

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                                    July 17, 2015

Page 15

1    would be secured by those assets?

2        **A**    Yes.  And I did check some of those on the

3    Internet.

4        **Q**    Okay.  And what did you check, or how did

5    that --

6        **A**    I looked up all of the names that I had, and

7    I found them all except for one, and they sounded

8    like they were very good.  But I don't know who

9    wrote up that.

10       **Q**    Other than Internet research, did you do any

11   other?

12       **A**    No.  That's it.

13       **Q**    You didn't attempt to contact anyone over

14   there?

15       **A**    No, I didn't.

16       **Q**    And you never asked for any references or

17   anything else or referrals for anyone else who were

18   investing in the BLP?

19       **A**    No, I didn't.

20       **Q**    Do you recall, other than that research,

21   reviewing any documents before you made your first

22   investment?

23       **A**    Just repeat that.

24       **Q**    In addition or outside of -- excluding the

25   research, do you recall looking at any other

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                    July 17, 2015

Page 16

1   documents or anything else before making that first

2   investment?

3       A   No.

4       Q   Did you think that the interest rate you

5   were going to receive seemed high?

6       A   It was compared to the CDs.  So, you know,

7   we thought, well, you know, that was going to be

8   good for us.

9       Q   Did you ask Marty how the interest rates

10  were so high?

11      A   Well, that's when he said that they couldn't

12  borrow money over there, and so 30 percent was a

13  good deal for them.

14      Q   And similar question to what I asked

15  Mr. Aguilar.  Did you know that there would be other

16  investors?

17      A   Not exactly.  He would say sometimes he had

18  received so much money to invest, but I really don't

19  know who gave it to him or exactly what it was for.

20      Q   Did you know that your money would be

21  grouped together with other customers?

22      A   No.

23      Q   Did -- how did your IRA funds get sent over?

24  Was it the same process with Mr. Aguilar?  Was that

25  what we discussed earlier?

Page 18

1      **Q**   It all went through Sigillito?

2      **A**   Yes.

3      **Q**   And similar to what I asked Mr. Aguilar, you

4   don't know -- you don't have any personal knowledge

5   that St. Louis Bank knew what happened to the money

6   that was supposed to go to the BLP?

7      **A**   No.  In fact, I didn't even know St. Louis

8   Bank had anything to do with it until recently.

9      **Q**   Okay.  So in an attempt to condense this,

10  you wouldn't have any personal knowledge that

11  St. Louis Bank knew of the Ponzi scheme?

12     **A**   No.

13     **Q**   You wouldn't have any knowledge that

14  St. Louis Bank knew that the BLP investments were

15  fraudulent?

16     **A**   No.

17     **Q**   You wouldn't have any reason to believe that

18  St. Louis Bank managed, directed, or operated the

19  BLP?

20     **A**   No.

21     **Q**   And the same thing.  You wouldn't know

22  that -- you wouldn't have any personal knowledge

23  that St. Louis Bank managed, operated, or directed

24  Martin Sigillito to -- in his operations of the BLP?

25     **A**   No.

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                      July 17, 2015

Page 19

1      **Q**   The same question.  You wouldn't know that
2   St. Louis Bank directed, managed, or instructed
3   Martin T. Sigillito and Associates in any of their
4   operations related to the BLP?
5      **A**   No.
6      **Q**   You would have never hired St. Louis Bank to
7   do any investing for you?
8      **A**   No.
9      **Q**   You never hired St. Louis Bank to manage any
10  of your investments?
11     **A**   No.
12     **Q**   You would have no reason to believe that
13  St. Louis Bank knew what investments you were
14  authorizing?
15     **A**   No.  I didn't authorize any, so ....
16     **Q**   Okay.  And you didn't authorize them.  How
17  were they authorized?
18     **A**   Pardon?
19     **Q**   How were your investments authorized if you
20  didn't authorize any?
21     **A**   Oh, I was just talking about St. Louis Bank.
22     **Q**   And you didn't ask -- Mr. Aguilar said he
23  didn't.  You didn't ask for any financial statements
24  for Derek Smith or his companies?
25     **A**   No, I didn't.

Page 20

1     Q   Or any tax returns?

2     A   No.

3     Q   Or any property tax records?

4     A   No.

5     Q   No title insurance policies?

6     A   No.

7     Q   And you never asked Mr. Sigillito to see any

8   cancelled checks, wire transfers, or any bank

9   statements?

10    A   No.

11    Q   And you never requested, before or during

12  your investments, any appraisals?

13    A   No.

14    Q   You never requested any certified financial

15  statements for Mr. Smith or any of his companies?

16    A   No.

17    Q   Outside of your research, you didn't do

18  anything to confirm land records or ownership of any

19  of those properties; is that correct?

20    A   No.

21    Q   And why didn't you think to ask for any of

22  these, or what was your reason for not asking for

23  any of this information?

24    A   Just because we simply trusted Marty.

25    Q   And then kind of the same question.  Do you

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                          July 17, 2015

Page 23

1    sound investment.

2       Q    And did you think to possibly have a

3    financial advisor or an accountant look at it?

4       A    No.  Because, again, we didn't think to do

5    that because we just trusted this man.  We just --

6    that's why we didn't do it.  Like I said, if it'd

7    have been somebody that came off the street, I would

8    have checked it out.

9       Q    And would these be the properties that you

10   looked at online when you were doing your research?

11      A    No.  These were different ones.

12      Q    So you may have been given different

13   properties to look at?

14      A    But I guess it was later years.

15      Q    Okay.  So you don't recall if you may have

16   done any research before that first investment?

17      A    No.  I know I didn't.

18      Q    Okay.  Did you ever think to have anyone go

19   and check over in England and investigate those

20   properties?

21      A    No.

22      Q    And outside of when you searched online and

23   looked up those properties, did you do any more or

24   any other Internet research throughout your

25   investment time?

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                                    July 17, 2015

Page 24

1      **A**    No.  Just those.

2      **Q**    Did you ever do any investigation of Derek

3   Smith when you were doing your research?

4      **A**    No.

5      **Q**    What about one of his companies, Distinctive

6   Properties, or any of the other companies that he

7   operated?  Did you get a chance to research those?

8      **A**    There was probably some.  I looked up that

9   nursery was one.  And there was a hotel, I guess,

10  where they were booked up where they had the

11  weddings there, you know.  That was kind of what

12  Vogel said, but I really had already done that.  And

13  it sounded like, man, they were just doing great.

14     **Q**    And so did you review the due diligence

15  letter that was prepared by Vogel?

16     **A**    Yes.  I read it.

17     **Q**    And what did you think from that letter?

18     **A**    That gave us more peace of mind, you know,

19  that everything was going well.

20     **Q**    Okay.  Did that help to assure you to

21  continue investing with the BLP?

22     **A**    I don't know if we invested any more after

23  that, anyway.  I don't think we had any more money

24  to invest.

25     **Q**    Do you recall ever asking for any status

Phil Rosemann, et al. v. St. Louis Bank

Melba Aguilar                                                    July 17, 2015

Page 25

1    reports or any type of written report as to the

2    properties?

3         A    No.

4         Q    You never asked for any updated financial

5    statements for the borrowers, did you?

6         A    No.

7         Q    And you never asked for any copies of

8    invoices, records, or expenses on the properties?

9         A    No.

10        Q    Nothing to show what the money was being

11   used for that was being invested?

12        A    No.

13        Q    After the FBI notified you of the scheme or

14   the Ponzi scheme, did you have any contact with

15   anyone else regarding that?  Excluding your

16   attorneys, did you have any contact with anyone else

17   regarding the scheme?

18        A    No.  Just Marty.

19        Q    You didn't contact St. Louis Bank or any of

20   the other banks that --

21        A    No.

22        Q    And would you happen to recall how much your

23   damages are that you are seeking in this lawsuit?

24        A    Well, I would at least like to get back the

25   amount we put in.  I would love to get the interest,

# Case: Phil Rosemann, et al. v. St. Louis Bank

4:14-CV-00983-LRR

# Transcript of: Richard Aguilar

**Date:** July 17, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<www.goreperry.com>>

Page 1

PHIL ROSEMANN, ET AL.,


PLAINTIFFS,


VS.


ST. LOUIS BANK,


DEFENDANT.

DEPOSITION OF

RICHARD AGUILAR


JULY 17, 2015

Page 2

1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE EASTERN DISTRICT OF MISSOURI

3                      EASTERN DIVISION

4

5     PHIL ROSEMANN, ET AL.,

6

7                  PLAINTIFFS,

8

9     vs.                      Case No. 4:14-CV-00983-LRR

10

11    ST. LOUIS BANK,

12

13                  DEFENDANT.

14

15        Deposition of RICHARD AGUILAR, taken on behalf

16    of the Defendant, at Polsinelli, PC, 100 South

17    Fourth Street, Suite 1000, St. Louis,

18    Missouri, 63102, on July 17, 2015, between the hours

19    of 1:28 p.m. and 3:47 p.m., before Tracey Aurelio,

20    RDR, CRR, MO-CCR #973, IL CSR #084.003465.

21

22

23

24

25

Case: 4:14-cv-00983-LRR   Doc. #:  97-1   Filed: 08/31/15   Page: 15 of 83 PageID #: 1883

Page 38

1     **Q**     Well, let's start with IRAs.

2     **A**     I expected the bank to do their contractual

3     fiduciary duty to send the money to where I had

4     requested for it to be done.

5     **Q**     And what about non-IRAs?

6     **A**     I never gave that a thought.

7     **Q**     Okay.  Now, you authorized Sigillito to make

8     these transfers for you from your IRA?

9     **A**     I believe that I signed something for him to

10    do that at that point.  I would -- I had gotten some

11    papers -- well, okay.  I did sign some papers that

12    did authorize him to do certain things.

13    **Q**     And with that authorization, your

14    instructions to Sigillito was to invest those funds

15    over in the BLP?

16    **A**     That is correct.  That never changed.  That

17    was always the -- my investments.

18    **Q**     So from that point, once you made that

19    investment, you gave him the authority to take money

20    and transfer it, it was your understanding that that

21    was gone.  It was over in the BLP being invested?

22    **A**     That was my understanding.

23    **Q**     And from your loan is where you would

24    receive your interest payments, and to your

25    knowledge, your money was always there and available

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                                    July 17, 2015

Page 39

1    for you to get at in the -- any loan period?

2        **A**    To my knowledge, it was, yes.

3        **Q**    Now, once your money was transferred to

4    Sigillito's accounts, there was no way for you to

5    track where it went or you had no clue where your

6    money went at that time other than just trusting

7    that he was sending it to the BLP?

8        **A**    Let's just say that I never tracked any of

9    it.  So I don't know any -- I don't have any idea

10   what happened in those bank transactions until after

11   the criminal trial.

12       **Q**    Did you have any signatory authority for any

13   of the BLP accounts?  Could you as an investor --

14   did you have any authority to sign or to do anything

15   with any accounts that were operated by the BLP?

16       **A**    No.  As far as it -- I had no authority.  I

17   had no authority.  The only thing we went by, we

18   went by whatever the terms of the contract were.

19       **Q**    Do you have any information that St. Louis

20   Bank knew what happened to the money after it was

21   supposed to go over to the BLP?

22       **A**    No.  I have no knowledge of that.

23       **Q**    Did you ever have any relationship or

24   contact with St. Louis Bank?

25       **A**    No.

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar

July 17, 2015

Page 42

1  Sigillito, you know, and I had no idea what their
2  relationship was other than I know that he banked
3  there, that he had his -- but, you know, what I came
4  to find out later after the criminal trial, that
5  there was an IOLTA bank account, and he had a
6  personal bank account.  I don't know anything about
7  how those transactions work.  And I'm sorry I can't
8  answer that question.  I don't know.
9      Q    That's a perfectly fine answer.
10            You just mentioned the IOLTA account.
11  Did you have any knowledge of Sigillito's IOLTA
12  account prior to the criminal trial?
13     A    No, I did not.
14     Q    You wouldn't have talked to anyone at
15  St. Louis Bank regarding any of your investments or
16  the BLP?
17     A    No.  I had no reason to contact them.
18     Q    Or any of Sigillito's accounts at St. Louis
19  Bank?
20     A    No.
21     Q    Since you had no reason to contact St. Louis
22  Bank and your only knowledge of them was that
23  Sigillito had a bank account there or had bank
24  accounts there, you wouldn't have relied on
25  St. Louis Bank to monitor what was going on with

Phil Rosemann, et al. v. St. Louis Bank

Page 43

1  your funds; is that correct?

2     **A**   Well, I had no -- you know, I had no

3  knowledge.  You know, everything that I'd say would

4  be just pure conjecture, so I don't know.

5     **Q**   Is it fair to say that you don't hold

6  St. Louis Bank responsible for your decision to make

7  your investment?

8     **A**   Well, I don't know what their relationship

9  is -- was between those individuals.  I can't answer

10  that question.

11     **Q**   Well, for your -- the reasons that you made

12  your investment, it wouldn't have been impacted at

13  all by St. Louis Bank?

14     **A**   Well, I wouldn't think so.  You know, I'd

15  say -- you know, I wouldn't think so unless there

16  was some, something that they did between them that

17  that was required, and I don't know what that would

18  be.

19     **Q**   When you made your investments and

20  throughout the time period where you did rollovers

21  and made additional investments, do you recall ever

22  asking to see financial statements for Mr. Smith or

23  for any of his companies?

24     **A**   No.

25     **Q**   No one stopped you from or prevented you

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                        July 17, 2015

Page 44

1    from asking for any additional information like
2    that; is that correct?
3        A    No.  I never -- I never had occasion for
4    that.
5        Q    And why didn't you ask for financial
6    statements or anything to support how successful the
7    borrower could be or was?
8        A    Well, as I suggested earlier, everything was
9    floating along pretty well.  We were getting our
10   interest as promised and under the contract.  And we
11   had no reason to question it at that time.
12       Q    How about before you made that first
13   investment?  Did you think to ask for any financial
14   statements or anything to support what Mr. Sigillito
15   was telling you about the --
16       A    No.  I did not ask.  I didn't ask anything
17   about that at that time.  I trusted him.
18       Q    If you could have seen a financial statement
19   and it would have shown that the BLP wasn't as
20   successful or either Derek Smith and his companies
21   weren't as profitable or successful as Sigillito was
22   representing, would you have still made your
23   investments?
24       A    Well, you know, that asks for a hypothetical
25   question.  I don't know what I would have done at

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                          July 17, 2015

Page 48

1   sense of security that your money was actually

2   somewhere?

3       **A**    Well, sure.

4       **Q**    You never received -- your statements didn't

5   just show -- your rollover statements didn't just

6   show only the interest gained.  They would always

7   show that principal amount, too?

8       **A**    Yes.  The best I recall, they all showed the

9   principal amount.

10      **Q**    Okay.  During your time -- and actually, any

11  period from your initial investment throughout, did

12  you ever receive or ask to see any tax returns for

13  Mr. Smith or any of his entities?

14      **A**    No.

15      **Q**    And now this additional information, you

16  never -- Sigillito or no one ever told you, hey, you

17  can't get any additional information regarding your

18  investments or regarding the BLP; is that --

19      **A**    There was never an occasion to.  There would

20  never have -- the occasion never arose that I had

21  asked that question.

22      **Q**    Is there a reason you never thought to

23  possibly ask for tax returns for the BLP entities?

24      **A**    No.  There is no reason.  There was no

25  reason to do that.

Case: 4:14-cv-00983-LRR   Doc. #: 97-1   Filed: 08/31/15   Page: 21 of 83 PageID #: 1889

1    **Q**    Do you believe that if you were able to see
2    tax returns, that they could give you some sort of
3    idea on the financial situation for the BLP
4    investment companies, I'll call them?
5        **A**    Well, reasonably, I would think so.  You
6    know, they would start to show some information that
7    I could hang onto if I saw those, yes.
8        **Q**    Did you receive any sort of -- throughout,
9    did you start receiving anything that showed any
10   kind of concrete financial numbers for Derek Smith
11   or any of his companies?
12       **A**    No.  I never -- there was no information
13   like that.
14       **Q**    And how we were just talking about the tax
15   returns and that being a way to possibly see how
16   profitable or how much money or what that company is
17   doing, if there appeared to be discrepancies between
18   that and what was represented to you, would that
19   have affected your future investments?
20       **A**    Well, you know, obviously, I would think it
21   would.  But you know, here again, I don't know what
22   it would do.  You know, we're talking about
23   something hypothetically here.
24       **Q**    The fact that you were still receiving
25   interest payments, if the tax returns or something

Page 50

1      would have come back showing that they are in the
2      red, the companies were in the red but you were
3      still receiving your interest payments, would that
4      have led to any hesitation in future investments?
5         A    I would think it would, obviously, you know,
6      if such a thing happened.  But again, here we are
7      talking about something hypothetical.  What I would
8      have done at that very instance, you know, I don't
9      know.  Obviously, the logical thing would be, yes,
10     it would present some sort of alarm.
11        Q    And I can be kind of completely
12     straightforward here.  Basically, what I'm looking
13     for is what factors kind of go into your thought
14     process in continuing your investments here?  What
15     of these items or what things would be red flags to
16     you?  What kind of triggered this may not be an
17     investment that I want to continue doing?
18            MR. VITULLO:  Objection as to form.
19     Compound question.  Lack of foundation.
20            MR. CARSWELL:  Off the record.
21                        (A discussion was held off the
22                        record.)
23        Q    (By Mr. Carswell) Property tax records, did
24     you -- property tax records --
25        A    Yes.

Page 51

1     Q    -- did you get any chance to request any of
2     those for any of the properties that were owned by
3     the BLP?
4          A    No, I did not.
5          Q    Did you ever think to ask for any property
6     records?
7          A    No, I didn't.
8          Q    Do you -- do you believe that -- did you
9     know any property records would have given you a
10    better idea on who actually owned the properties?
11         A    Well, obviously, it would to who, you
12    know -- it would have told me that, who owned the
13    properties.
14         Q    Would the fact -- would Derek Smith or his
15    entities not owning the properties, would that have
16    been a factor in your decision to continue investing
17    or to initially invest with them?
18         A    Obviously, I wouldn't -- you know,
19    obviously, that would have some effect on it.  I
20    would have to give that consideration, you know, if
21    such a thing were to happen.
22         Q    Just kind of a few more questions on the
23    same line.  How about appraisals?  Did you think to
24    at any point get appraisals on properties?
25         A    No, I didn't.

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                        July 17, 2015

Page 52

1       Q    Did you ever receive anything that showed

2    you the property values or the estimated property

3    values at any point?

4       A    No.

5       Q    Do you believe that would have given you a

6    better idea of whether or not Derek Smith or his

7    entities could repay the loans that you were making?

8       A    I would think that it would -- I think it

9    would certainly have some effect on it, yes.  On me.

10   Not on it.

11      Q    Okay.  If the properties were valued at less

12   than what was being represented to you, if they were

13   valued at much less than what was being represented

14   to you, would you have made your investment

15   regardless of the promise of the high interest

16   rates?

17      A    It would certainly, you know, certainly have

18   been a big factor in it, I would think.

19      Q    Did you ever ask to see any of the wire

20   transfers or any cancelled checks from any of the

21   payments that were supposed to be made from

22   Sigillito to the BLP?  Wire transfers?

23              When you would make your investments

24   with Sigillito, at some point those funds were

25   supposed to go over to the BLP.  Did you ever have

Page 53

1   the opportunity to ask for any copies of wire

2   transfers --

3       **A**   No.  I had no occasion to do that.

4       **Q**   -- or checks?  That's information that

5   you -- again, he didn't stop you or there was

6   nothing that prevented you from asking him for any

7   sort of confirmation that your funds were sent over

8   to the BLP?

9       **A**   No.  There was nothing -- you know, there

10  was nothing there to stop me to ask for them, but I

11  never had -- I never had a need for that.

12  Everything was, again, as I suggested earlier,

13  everything was just moving over like an oiled

14  machine.

15      **Q**   If you were able to see those actual

16  transfers that showed where your funds went to after

17  it was given to Sigillito, would that have caused

18  hesitation or stopped you from continuing your

19  investments?

20      **A**   Well, it just depends.  You know, it

21  certainly would -- you know, it certainly would give

22  me something to look at and something to think

23  about, and depending on what, you know, at the time,

24  obviously, it would have some effect.

25      **Q**   If you were able to see that those checks

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                          July 17, 2015

Page 54

1    were being sent to other investors, would that have

2    made you pull your investments or stop you from

3    investing?

4         **A**    Absolutely.  You know, I would, you know,

5    think so.  People weren't thinking that, obviously.

6         **Q**    Did you ever have a chance to see any

7    recorded deeds, deeds of trust, or mortgages for any

8    of those BLP properties?

9         **A**    No.

10        **Q**    Did you ever get a chance to see any land

11   records or any records of ownership for any of those

12   BLP properties?

13        **A**    No.

14        **Q**    Is there a reason why you didn't ask for

15   anything that -- land records or anything that

16   showed who actually owned those properties?

17        **A**    No.  There was no reason for me to request

18   it.

19        **Q**    Did you ever ask Mr. Sigillito how he --

20   what information he had to support the investment?

21        **A**    No.

22        **Q**    You said there is no reason for you to ask

23   about land records concerning the ownership of the

24   properties.  Was that because you put your faith in

25   Mr. Sigillito?  Is that where we are at there?

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                          July 17, 2015

Page 61

1    want you to take a look at.

2                         (Exhibit 213 was marked for

3                          identification by the court

4                          reporter.)

5        Q    (By Mr. Carswell) And this document is

6    marked as Defendant's Exhibit 213.  And it's a

7    letter that looks like it's from you to Richard

8    Markow at Allegiant Trust Company.  Does this look

9    familiar to you?

10       A    Well, I see my signature on it.  But let me

11   read it.  I didn't type this letter.  That's for

12   sure.  I don't see a date on here on this letter.

13   That was typed by someone.  I didn't.  I know that

14   we didn't type this letter.  It was something that

15   was sent for me to sign, but why isn't there a date

16   on here?

17       Q    Does that appear to be your signature down

18   there?

19       A    That's my signature on there.

20       Q    You believe this was typed up and given to

21   you to sign?

22       A    Yeah.  That was typed up and given to me to

23   sign.  And I don't know -- I'm trying to see because

24   that wasn't typed by -- what's her name?

25            MRS. AGUILAR:  Liz.

```
 1      A    Liz Stajduhar -- Stajduhar.  I don't know
 2   who typed this letter, MMM.  And I signed it.  What
 3   I'm trying to figure out is if something was sent
 4   after the -- right before they got ready to boot him
 5   out.  And I don't recall the letter itself.  That's
 6   my signature, however.
 7      Q    (By Mr. Carswell) Okay.  I'm just going to
 8   briefly read through it.  This letter appears to
 9   give -- in the second paragraph regarding Martin T.
10   Sigillito, it asks that you, "To construe his
11   authority to direct those investments as broadly as
12   possible, including but not limited to" --
13                         (The court reporter asked for
14                         clarification.)
15           MR. CARSWELL:  Take all that out.  I'm going
16   to have to just read the whole thing, I guess, so
17   that you can -- strike that.
18                    "This letter will authorize you
19   and/or any designated member of your staff to
20   receive instructions concerning any of my monies
21   held by your institution from my attorney, Martin T.
22   Sigillito."
23                    And then goes further and says, "I
24   would ask you to construe his authority to direct
25   those investments as broadly as possible, including
```

Page 63

1   but not limited to the ordering of the transfer of

2   funds to any party, domestic or international, for

3   the purpose of entering into investments on behalf

4   of my IRA account or accounts."

5              Does that appear to be accurate?

6       A   Yeah.  That's accurate, but that's something

7   that -- I know for a fact this is something that I

8   did not sign in the beginning when Allegiant -- when

9   Allegiant became -- when I made my investments with

10  Allegiant and I authorized him to be -- authorized

11  them to be their trust bank.  Let's put it that way.

12              And this must have been something

13  after the fact, but how long ago because there's no

14  date on here, and you would think that Allegiant

15  would have stamped it in on a date, which makes me

16  suspect that this letter, which I signed -- I have

17  no compunction that it's not my signature.

18      Q   Is this your understanding of the authority

19  that was given to Sigillito to manage your funds?

20      A   Well, how can I answer that?  This letter

21  obviously says that.  And I signed it, but I would

22  have liked to know when the bank stamped it in, at

23  what point, which is not shown on here.  Then I

24  could more definitively talk about this.

25      Q   But at some point there was a broad

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar

July 17, 2015

Page 64

1    authority that would have been given to

2    Mr. Sigillito?  You just don't recall when that

3    would have been?

4         **A**    No.  I don't recall when that would have

5    been.

6              MR. VITULLO:  Objection as to form.  Lack of

7    foundation.  Off the record.

8                        (A discussion was held off the

9                         record.)

10        **A**    As suggested, I really don't recall the

11   letter, but I signed it.  There is no question about

12   that's my signature right there.

13        **Q**    (By Mr. Carswell) So you do recall -- or you

14   can say that that accurately depicts your signature

15   on this document?

16        **A**    Yes.

17        **Q**    You just don't recall when the document was

18   done, or do you not recall the document itself?

19        **A**    I don't recall the document itself, but you

20   know, obviously, I must have signed it.  The only

21   thing that I question about it is why there is not a

22   date on here, either stamped by Allegiant Bank which

23   normally all the banks do.  Anything from the mail

24   that comes in, you know, banks are notorious about

25   putting their stamps on it and, you know, when it

1    came about, but obviously I signed that.  That's all

2    I can tell you about that.

3        Q    What's your understanding of the level of

4    authority you gave to Mr. Sigillito to make

5    investments and to authorize him to make investments

6    on your behalf?

7        A    He was authorized to, what we understand

8    that we had, was that he was to take all our money

9    and invest it, take it and make sure that it got

10   invested, as in the BLP program in England.  That's

11   what our understanding was.

12       Q    Did he serve as a financial advisor for you?

13       A    Huh?

14       Q    Did Sigillito serve as a financial advisor

15   for you?

16       A    No.  He only served as -- I had no other

17   dealings with him other than this BLP program.

18   Nothing else.  Nor did I ever pay him for it and for

19   any services.  You know, whether or not he was -- my

20   understanding that for his services he was

21   getting -- he was collecting a fee from the

22   borrower, which is customary.

23       Q    All right.  We are all done with that one.

24                     (Exhibit 214 was marked for

25                      identification by the court

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar

July 17, 2015

Page 66

1              reporter.)

2      **Q**    (By Mr. Carswell) I'm going to show you what

3   is being marked as Defendant's Exhibit 214, and it's

4   a private placement investment direction that's

5   dated in 2004.  It appears to be May 9 of 2004.  And

6   if you can take a quick look at that.

7      **A**    It was a prefilled for me.  That printing

8   there was done by somebody else other than myself.

9   I'm talking about the filling in.  That's my

10  signature, however.  On 5/12, I signed it.

11     **Q**    So that's your signature?

12     **A**    Yes.

13     **Q**    But the other parts where it says account

14  owner's name and all that information, that was

15  filled in for you?

16     **A**    I didn't have to write that in at all.

17     **Q**    And the signature on the bottom of the page

18  appears to be your signature?

19     **A**    Yeah.  That's my signature.  There is no

20  question about that.

21     **Q**    Do you recall this document?

22     **A**    I vaguely recall this document, yes.

23     **Q**    And next to where it says, "Please read,

24  confirm, and initial the four following

25  representations," those would be your initials?

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar

July 17, 2015

Page 67

1    **A**    Those are my initials there.

2    **Q**    And on the second page -- or you can tell me

3    whenever you have had a chance to look through this.

4    On the second page, Paragraph H, where it lists out

5    Martin T. Sigillito and Associates Limited and it

6    has his address and then agent name, Martin T.

7    Sigillito, do you see that section?

8    **A**    Yes, I do.

9    **Q**    And right above that, it says, "I choose to

10   use the following service company or escrow agent to

11   service all aspects of this investment."  Does that

12   accurately depict what it says there?

13   **A**    Yes.  That's accurate.  Yes.

14   **Q**    So again, this would have been giving

15   authority for Martin Sigillito as an agent for

16   Martin T. Sigillito and Associates to manage your

17   investment with Millennium Trust?

18   **A**    Well, it just says here, "I choose to use

19   the following service company or escrow agent to

20   service all aspects of this investment.  (Do not

21   indicate Millennium Company, LLC.)  If I have not

22   completed this section, I understand that it is my

23   sole responsibility to service all aspects of this

24   investment."

25                    Yes.  I understand that I -- yes.  I

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                                    July 17, 2015

Page 68

1    understand that.

2        Q    And with that again, that would be giving

3    Martin T. Sigillito and Associates the ability to

4    manage and make those investments for you?

5        A    That would -- I would think that it would

6    indicate that.

7        Q    Do you understand that to mean that

8    Mr. Sigillito could take actions on your behalf

9    without you having to direct him to do so?

10       A    I wouldn't, you know, I wouldn't think it

11   was that.  I would think it has to come through me a

12   little bit to ask me, you know.  Not invest in BLP,

13   as an example.  If he is going to invest in XYZ

14   Company, that he would have to come to me.  And that

15   called for under the contract -- which Millennium

16   got -- specifies that this money went to the BLP

17   program and to Mr. Derek -- Mr. Smith, I should say.

18       Q    And that's a contract that was between who?

19       A    The contract was between -- it was signed by

20   Derek Smith, between Derek Smith and ourselves --

21   and myself.

22                        (Exhibit 215 was marked for

23                         identification by the court

24                         reporter.)

25       Q    (By Mr. Carswell) And I will show you one

Phil Rosemann, et al. v. St. Louis Bank

1    more document.  This one is marked as Defendant's

2    Exhibit 215, and it's a note servicing agent

3    agreement.  It looks to be between yourself and

4    Martin T. Sigillito and Associates, and it's dated

5    May 9 of 2004.  And if you to go to the bottom of

6    the second page --

7        A    Yeah.  This is --

8        Q    -- there appears to be your signature at the

9    bottom; is that --

10       A    Yes.  That's my signature.  And this was,

11   again, all filled out by somebody else other than

12   myself.  That's something, apparently, that he

13   mailed to me because I see my note up here that I

14   mailed it back to him on the 13th of May.

15       Q    And again, on this document, the -- for the

16   part you can see of it -- it's poorly copied -- it

17   again shows Martin T. Sigillito as your agent.  And

18   that's down on the bottom left-hand side.

19       A    Yes.  That is correct.

20       Q    Do you recall at any point revoking

21   Mr. Sigillito or prior to the end of the BLP program

22   revoking his authority as your agent to make any

23   investments on your behalf?

24       A    No.  I don't recall ever revoking it.

25   However, you have got to remember that these

Page 70

1   contracts ran from year to year.  This was -- here

2   is one here.  This one here was for the year -- the

3   one previous was on 2004.  And this one here, it's

4   the same one.  Oh, yeah.  Maturity date 2005.  I

5   think it died at the end of the contract year.

6       Q   But again, you --

7       A   But I did sign it.

8       Q   Okay.  You don't recall any point where you

9   limited or prevented Mr. Sigillito from taking

10  action on your behalf?

11      A   No.  I did not.  I never revoked this

12  contract, this particular authority.  I don't recall

13  ever revoking it, any of it.

14      Q   Moving on from this stuff, you mentioned a

15  little earlier that you did not pay Mr. Sigillito to

16  do any of this investment or to act as your

17  attorney, but he received a fee for each loan.  Do

18  you recall that?

19      A   There is no authority here -- there is no

20  authority under our contract anywhere where we

21  authorize any fee for my loan.  That was to be paid

22  by Derek Smith.

23      Q   So you were under the impression that any

24  fee that were to be deducted would be paid by Derek

25  Smith out of the loan proceeds you would send over?

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar

July 17, 2015

Page 74

1    Q    And did you receive any supporting
2    information or any other documentation to support
3    these numbers?
4    A    No.  There was no other -- I never got to
5    see any of the supporting documents.
6    Q    Did you have an accountant or a financial
7    advisor review this information?
8    A    No.
9    Q    Is there a reason why not?
10   A    No.  There's no reason for it.  There's no
11   reason for why not.  I didn't have any reason to get
12   one --
13   Q    Okay.
14   A    -- or not to get one, either.
15   Q    All right.  And you mentioned that shows the
16   amount of collateral.  Did you believe that your
17   loans were secured by this collateral?
18   A    Yes.
19   Q    And because this schedule is attached to
20   this loan agreement, you believe these one, two,
21   three, four, five, six properties were what was the
22   supporting collateral or the secured collateral for
23   your loan; is that correct?
24   A    Yes.  That's what they sold it on.  That's
25   also what they -- they sold it on, I guess.  They

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                           July 17, 2015

Page 76

1    liabilities for Derek Smith, that any of these
2    properties were actually owned by Derek Smith?  You
3    weren't given anything to show you that Magpie --
4        **A**    No.
5        **Q**    -- Magpie Cottage was actually owned by
6    Derek Smith?
7        **A**    No.  There was no information like that.
8        **Q**    Did you do any research or look into the
9    interest rate to see if that was a legal interest
10   rate?
11       **A**    No.  I didn't pursue that.  As I told you
12   before, we lend -- when I worked with BN, every
13   weekend -- at that time we carried $800 million in
14   cash.  And we would lend that out from -- for
15   Saturdays and Sundays, and I saw some rates, you
16   know, as high as 50 percent there.
17       **Q**    Moving along, so you don't need that one
18   anymore.
19       **A**    Okay.
20       **Q**    Do you personally have any information that
21   St. Louis Bank knew that Martin Sigillito was
22   operating a Ponzi scheme?
23       **A**    No.  I didn't know he was operating a Ponzi
24   scheme until the FBI knocked on my door in 2010.
25       **Q**    And you never paid -- I may have asked you

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                                July 17, 2015

Page 77

1    this.  I apologize if I did.  You never hired

2    St. Louis Bank to manage any of your investments?

3        **A**    No.

4        **Q**    Did you ever yourself go over to England to

5    view any of the properties?

6        **A**    No, I did not.

7        **Q**    Did you ever send anyone to go over and view

8    the properties?

9        **A**    No, I did not.

10       **Q**    Did you ever do any sort of investigations

11   as to the properties over in England?

12       **A**    No.  Until the only time that I found any

13   information about it is when we got the due

14   diligence report.

15       **Q**    The Vogel report?

16       **A**    The Vogel report.

17       **Q**    Before you would make each investment, you

18   wouldn't have done any other sorts of investigation

19   before rolling your investments over or putting in

20   new money?

21       **A**    No.  I did not do any of that.

22       **Q**    And you didn't do any investigations on

23   Derek Smith or any of his companies?

24       **A**    No, I did not.

25       **Q**    And that would be even when you would renew

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                    July 17, 2015

1    or roll over money, you still didn't do any

2    investigations at that point?

3        A    No, I did not.

4        Q    Now, you mentioned you received statements

5    from, I believe it would have been Enterprise Bank

6    back where you would get your IRA statements that

7    would show your investments and what you received,

8    and those were quarterly and yearly.  Did you ever

9    get any statements or anything from the BLP itself?

10       A    No.

11       Q    Did you ever get any statements from

12   Sigillito?

13       A    No.  I don't recall ever receiving any

14   statements from them.

15       Q    Do you ever recall asking for any statements

16   from Sigillito?

17       A    No, I did not.

18       Q    And how about from the BLP?  Do you recall

19   asking him to produce any statements from the BLP

20   itself?

21       A    No, I didn't.

22       Q    Did you do anything to monitor your

23   investments outside of reviewing your IRA

24   statements?

25       A    Well, you know, I keep track of everything

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                July 17, 2015

Page 79

1   that I -- you know, all of my investments.  And as

2   to their growth, obviously, and the interest that I

3   received, we, you know, kept track of those because,

4   you know, recorded those in the computer files.

5       Q   Did you ever get any bank statements from

6   Sigillito for the account that your money was going

7   through?

8       A   No.

9       Q   Do you think this is information you could

10  have asked for from Sigillito?

11      A   Well, I never gave that any thought.  I

12  never asked for it.  I assumed that if I wanted to,

13  I could have.

14      Q   Did you ever get any written reports or any

15  status reports for any of the hotels?

16      A   No, I did not.

17      Q   And you were given the impression that there

18  was going to be some remodeling and some

19  construction work for the hotels, correct?

20      A   Yes.  Either that or purchase of that hotel

21  in its entirety or the property, whichever the case

22  may be.

23      Q   From the period from 2001 to 2010, did you

24  get any updates on the successful purchase of any of

25  the hotel properties?

Phil Rosemann, et al. v. St. Louis Bank

1 any of the invoices or expenses for any of the

2 properties?

3     **A**   No.

4     **Q**   And I believe we established you've had no

5 loans or no accounts with St. Louis Bank?

6     **A**   No, I did not.

7     **Q**   And you would have never spoken to anyone at

8 St. Louis Bank regarding any of your BLP loans?

9     **A**   No.

10     **Q**   And you would have never asked St. Louis

11 Bank to confirm the particular use of any of your

12 investment funds that went through St. Louis Bank;

13 is that correct?

14     **A**   No. Yes, that's correct. No, I didn't ask.

15     **Q**   And you never asked St. Louis Bank to

16 provide you with any copies of the checks that

17 Sigillito was supposed to send for your money to the

18 BLP; is that correct?

19     **A**   That's correct.

20     **Q**   And you wouldn't have any information to

21 show that St. Louis Bank knew exactly what

22 investments at what time you approved. Would that

23 be fair?

24     **A**   Say that again.

25     **Q**   Bad question.

Phil Rosemann, et al. v. St. Louis Bank

Richard Aguilar                                        July 17, 2015

Page 83

1    fraudulent scheme.  Had you had any further contact
2    with Sigillito?
3        A    Yes.  I saw him afterwards.
4        Q    Did you have any communication with
5    Sigillito regarding the BLP after finding out?
6        A    Yes.  Casually.
7        Q    Did you express any concern in your
8    investments?
9        A    Certainly.  And yes, yes, yes, we did.
10       Q    And what was his response to those concerns?
11       A    That this was going to turn -- that this was
12   going to be okay.  That it was -- that he always
13   proclaimed his innocence, obviously, and that there
14   was no wrongdoing.
15       Q    You don't have any personal knowledge that
16   St. Louis Bank took any part in the Ponzi scheme, do
17   you?
18       A    No, I don't.
19       Q    You don't have any personal knowledge that
20   St. Louis Bank knew about the Ponzi scheme at all,
21   do you?
22            MR. VITULLO:  Objection as to form.
23                 You can answer.
24       A    I wouldn't have no -- you know, I would have
25   no idea.  I would have no idea anything about them

Page 84

1   knowing whatever.  I'm not privy to anything they

2   had.

3        Q   (By Mr. Carswell) You don't have any

4   personal knowledge that St. Louis Bank directed,

5   operated, or managed the British Lending Program?

6        A   No.  I don't have any idea.

7        Q   You have no personal knowledge that

8   St. Louis Bank directed, operated, or managed Martin

9   T. Sigillito and Associates, would you?

10       A   No.  No.  I don't have any idea.

11       Q   You wouldn't have any personal knowledge

12   that St. Louis Bank knew that the BLP loans were

13   fraudulent?

14       A   No.

15           MR. VITULLO:  Objection as to form.

16               You can answer.

17       Q   (By Mr. Carswell) Did you take any

18   additional steps after talking to Sigillito and him

19   assuring you that it would work out?  Did you take

20   any additional steps to try to secure your money?

21       A   Did I take any additional steps to try to

22   secure my money?

23       Q   Outside of telling him your concerns, was

24   there anything else that you did to try to get your

25   money?

ROSEMANN 000021

Mr. Richard E. Markow, President
Allegiant Trust Company
15061 Manchester Road
Ballwin, MO 63011

In Re: Any and All IRA Accounts

Dear Mr. Markow:

This letter will authorize you and/or any designated member of your staff to receive instructions concerning any of my monies held by your institution from my attorney, Martin T. Sigillito.

I would ask you to construe his authority to direct those investments as broadly as possible, including but not limited to the ordering of the transfer of funds to any party, domestic or international, for the purpose of entering into investments on behalf of my IRA account or accounts.

This authorization will remain in full force and effect until such time as I may notify you in writing that it has been withdrawn.

If you have nay questions at any time, please feel free to contact me.

Very truly yours,

Richard Aguilar

mmm/





ROSEMANN 000021

ROSEMANN 001534



MILLENNIUM TRUST
C O M P A N Y , LLC

820 Jorie Blv
Suite 4.
Oak Brook, IL 605Σ
Phone: 630.368.560
Fax: 630.368.569

www.mtrustcompany.cor

# PRIVATE PLACEMENT INVESTMENT DIRECTION

Account Owner's Name **Richard Aguilar**

Millennium Trust Company, LLC Account No. **90-B402-015**

Daytime Phone No. ( )

Date: **5/9/2004**   Specific Name of Investment to be Purchased: **Princess Hotel Promissory Due 5/8/05**

Type of Investment:
_____ Stock   _____ Limited Partnership   _____ Debenture
**X** Other – (Specify) **Promissory Notes**

Dollar Amount To Be Invested: $ **67,200.00**

IMPORTANT: ACCOUNT OWNER MUST COMPLETE ANY SUITABILITY QUESTIONS AND SIGN THE QUESTIONNAIRE, TI
SUBSCRIPTION AGREEMENT, AND ANY OTHER APPLICABLE DOCUMENTS BEFORE MILLENNIUM TRUST COMPAN
LLC CAN PROCESS THE INVESTMENT. ALSO SEE MILLENNIUM TRUST COMPANY, LLC REQUIREMENTS ON REVERS
IDE.

j Millennium Trust Company, LLC:

direct Millennium Trust Company, LLC (Millennium) to execute the purchase of the above-named investment for the benefit of my self-direc
IA account and in doing so; I hereby make the following representations:

a.   That I have read and understand all offering information pertaining to the purchase of the investment;

b.   That I have reviewed and approved all of the terms of the investment;

c.   That I understand that Millennium had not evaluated or given any advice with respect to the investment;

PLEASE READ, CONFIRM AND INITIAL THE FOUR FOLLOWING REPRESENTATIONS:

_Ra_
INITIAL
That I understand that certain transactions are prohibited for tax-exempt retirement arrangements under Intern
Revenue Code Section 4975 and ERISA. I further understand that the determination of whether the transacti
directed hereby is a prohibited transaction or "party in interest" transaction depends on the facts n
circumstances surrounding the purchase. I warrant and represent that I have consulted with such advisors ar
deem necessary and appropriate, and have determined among other things, that this investment does not constit
a prohibited transaction as defined in Internal Revenue Code 4975, and that the offering entity or any affili
thereof is neither a "disqualified person" (as defined in Section 4975(e)(2) of the Internal Revenue Code) nor
"party of interest" (as defined in Section 3(14) of ERISA);

_Ra_
INITIAL
That none of the principals/shareholders of the investment referenced above are my Broker, Agent, Investme
Advisor or paid consultant and that I understand that if in fact that was the case, that the transaction could in fa
be considered a prohibited transaction. I hereby hold Millennium harmless should the individual offering i
investment to me be considered to be any of the above classifications of "Investment Advisor" now or in the futur

_Ra_
INITIAL
That should the above referenced investment produce income subject to Unrelated Business Taxable Incor
(UBTI) that I understand and I must file a 990-T tax return and authorize my retirement account to pay the tax
such income. I hereby indemnify Millennium and hold Millennium harmless for production of the tax form and t
payment of said tax.

_Ra_
INITIAL
That I have read and reviewed each representation made within the subscription agreement and/or relat
documents, which I have signed on behalf of the investment referenced above, and that I specifically he

ROSEMANN 001534



DEFENDANT'S
EXHIBIT
R. Aguilar 302
1-18-13 CW



DEFENDANT'S
EXHIBIT
214
1/17/15

ROSEMANN 001535

retirement plan(s) financial information which may be considered a part of the subscription agreement which I requesting that Millennium now sign as custodian on behalf of my self-directed retirement plan.

d.  That I have investigated the maker of the investment and have reasonably concluded that the maker is of sufficient financial strength repay the investment if this is required of this investment (e.g., promissory note, debenture, etc.);

e.  That I meet the suitability requirements of the offering indicated (if any);

f.  That I understand that Millennium shall be under no obligation to notify me in the event of a default in repayment of the note or obligati and that it shall be my sole responsibility, at my expense or at the expense of the plan, to obtain legal or other necessary services connection herewith. I agree to indemnify and hold Millennium harmless from any claim which may be made by reason of this investme

g.  That I acknowledge that any administrative review performed by Millennium on the above offering was solely to determine that investment is administratively feasible for Millennium under the above-referenced account. I further acknowledge that this review was a due diligence review, and that Millennium has not redered any investment advice, nor has Millennium expressed any opinion as to prudence or viability of the investment. I agree to hold Millennium harmless from any liability for any loss, damage, injury or expe which may occur as a result of the execution of this Investment Direction;

h.  I choose to use the following service company or escrow agent to service all aspects of this investment. (Do not indicate Millennium Tr Company, LLC) If I have not completed this section, I understand that it is my sole responsibility to service all aspects of this investmen

Name: _Martin T. Sigillito Associates, Ltd._

Address: _7710 Carondelet Ave, Suite 208 St. Louis, MO 6_

Phone Number: (_314_) _725-4175_   Agent Name: _Martin T. Sigillito_

A copy of this servicing agreement must be provided to Millennium Trust Company, LLC;

i.  That I agree that I will immediately notify Millennium in the event of any of the foregoing representation are no longer true.

MILLENNIUM TRUST COMPANY, LLC REQUIREMENTS:

*   The investment should be titled "Millennium Trust Company, LLC FBO (Insert Client's Name) Account Number (Insert Millennium Trust Company, LLC Account Number)." Millennium Trust Company, LLC's tax identification number which is 36-4400066, not the client's social security number, should be used.

*   Millennium Trust Company, LLC must be provided with the original note or corporate obligation and any endorsements.

*   If applicable, Millennium Trust Company, LLC must be supplied with an amortization schedule and, if other than a new note or obligation, must have a statement from the current trustee or servicing agent regarding the status of the payments.

*   A minimum of $500 of money market deposits must be kept in the Millennium Trust Company, LLC account at all times in addition to any private placement holdings.

*   A non-refundable administrative review fee of $175 (for stocks, bonds, limited partnerships, etc.) or $125 (for mortgage notes, promissory notes and real estate purchases) may apply depending on the nature of the offering.

ie undersigned hereby agrees to the above requirements and confirms the representations, including paragraphs a through i.

CCOUNT OWNER SIGNATURE _Richard Cgruber_   Date _5/18/07_

ROSEMANN 001535

ROSEMANN 001532

*Due 5/8/05*

820 Jorie Blvd
Suite 420
Oak Brook, IL 60523
Phone: 630.368.5600
Fax: 630.368.5699

MILLENNIUM TRUST
C O M P A N Y,  L L C

www.mtrustcompany.com

## NOTE SERVICING AGENT AGREEMENT

Account Owner's Name __Richard Aguilar__

Millennium Trust Company, LLC Account No. __90-B-402-015__

Daytime Phone No. ( )

good and valuable consideration, this Note Servicing Agent Agreement is hereby entered into by and between __Richard Aguila__
(hereinafter referred to as "Accountholder") and __Martin T. Sigillito Associates__ (hereinafter referred to as "Age
to agent is assigned, I understand that I must assign myself as agent.)

int hereby agrees to accept all responsibilities and duties necessary to effectively administer the following promissory note held for the benefit of
gnated Accountholder by Millennium Trust Company, LLC (Millennium).

Date of Note: __May 9, 2004__

Maker: __Princess Hotels Management, Ltd.__

Amount of Note: __$167,200.00__

Payment Frequency: __Annual__

Maturity Date: __May 8, 2005__          Interest Rate: __24.5%__

Note Servicing Agent, the undersigned shall perform all duties and exercise all discretions as permitted in the provisions of the Note in orc
tect the rights of the Accountholder and assure timely collection of payments. Specific duties of Agent shall include, but not be limited to
owing;

Production and maintenance of an amortization schedule for payments in accordance with the terms of the Note, a copy of which shall be furn
to Millennium;

Collect payments from Maker made payable to "Millennium Trust Company, LLC FBO __Richard Aguilar__
Account No. __90-B-402-015__";

Break down payment amounts into interest and principal reduction and communicate this information to Millennium;

Forward all payments to Millennium within two (2) working days to the following address: 820 Jorie Blvd Ste 420 Oak Brook IL 60523;

Confirm that Maker holds clear title to any collateral assigned under the Note; and then prepare and file any evidence of lien on collateral, inclu
the filing and proper registration of any deed of trust or other title to property securing the Note;

Preparation of any governmental reporting of interest paid by Maker which may have to be reported to the Internal Revenue Service on Form
After preparation, this form should be forwarded to Millennium for filing by the appropriate due date;

Collection and maintenance of any required escrow funds for the purpose of paying insurance and taxes on Note collateral;

Collection of any rents, royalties, or other sums assigned as security for the Note;

Promptly communicate in writing with Maker regarding all matters pertaining to the Note, including notice and collection of past due payment,
the amount of past due penalty, if any, and enforcement of any security therefor;

Initiate collection procedures upon notice of default by Maker, as defined in the Note, including the initiation of any necessary legal action req
to enforce any guarantees or otherwise assure Maker's performance on the Note;

Enforce all rights against Maker, following notice of and failure to timely cure any default (as provided in the Note), including, without limit
foreclosure of any mortgage or other legal proceedings in order to claim title to any collateral securing the Note, or initiate legal action to obt
judgment against Maker in the case of an unsecured Note; and

Keep complete and accurate records of all transactions, collection and enforcement efforts and other matters relating to the Agent's c
hereunder, and promptly provide copies of such records to Accountholder and Millennium upon request.

As consideration for the services provided herein, Accountholder agrees to pay fees to Agent as follows:

ROSEMANN 001532


DEFENDANT'S
EXHIBIT
R. Aguilar 33
1-18-13 CW


DEFENDANT'S
EXHIBIT
215
7/17/15 JA

ROSEMANN 001533

: above fee schedule may be amended by Agent from time to time upon prior written notice to Accountholder.

s Agreement shall be effective for a term not to exceed the life of the Note(s) to which it applies. The life of the Note shall be defined as the per : during which any amount of principal and/or interest remain unpaid under the terms of the Note, even if said period extends beyond the turity Date of the Note. This Agreement shall automatically terminate upon the final payment at maturity of the Note, or upon early prepaym : be provided in the Note.

ountholder, by signing this Agreement releases Millennium from all duties and responsibilities of administering the terms of the Note. All dutic :onsibilities for administration of the Note shall vest in the Agent. Said Agent shall be an agent for the benefit of Accountholder, and shall r med to be an agent or affiliate of Millennium.

:nt and Accountholder hereby indemnify and save harmless Millennium, its employees and assigns from all suits, actions, or claims of any char : or description brought or made for or on account of, arising out of, or occasioned by the acceptance of the Note as an investment of the Accou .he operations, performance, or negligent acts of Agent in the execution or performance of this Agreement.

lennium shall have no responsibility to question the actions of Agent in its performance of the duties outlined in this Agreement, nor shall Millen 'iable for any loss of any kind which may result by reason of any action taken by Agent, Accountholder, or both in regard to the performance e.

:nt shall not assign his rights and obligations hereunder. Subject to the foregoing, all of the terms and conditions of this Agreement shall be bi n and insure to the benefit of the heirs, successors, administrators, legal representatives and assigns as the case may be, of the parties hereto. reason, Agent is unable or unwilling to perform the duties outlined herein, then Accountholder shall assume responsibilities for said duties u essor Agent has been appointed.

:ountholder may terminate this Agreement immediately upon written notice at any time. Agent may terminate this Agreement upon not less :en (15) days prior written notice. Upon termination, Accountholder agrees to appoint a successor Agent within thirty (30) days. Until a succes ointed, Accountholder shall be responsible for the duties of administering the Note as provided herein. Following termination, Agent shall pr tten notice to Maker that all Note payments thereafter be paid directly to Accountholder or such substitute Agent as Accountholder may nominat :nt shall forward to Accountholder all payments received on account of Accountholder. Upon request of Accountholder, Agent shall forwa :ountholder all books, records, ledgers, correspondence, files and other materials in Agent's possession or control with respect to the Note o :ountholder.

s Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein, supersedes all prio temporaneous agreements. This Agreement may be amended upon the prior written consent of the parties.

SIGNING THIS AGREEMENT, ACCOUNTHOLDER UNDERSTANDS THAT MILLENNIUM SHALL NOT BE REQUIRED TO PRO AN SERVICING, INCOME OR RENT COLLECTION, VERIFICATION    OF INSURANCE COVERAGE OR TAX PAYMENTS LLATERAL, PURSUE COLLECTION, INSTIGATE LITIGATION, OR TAKE ANY OTHER ACTION WITH REGARD TO THE NOTE(S IICH THIS AGREEMENT APPLIES EXCEPT AT THE EXPRESS DIRECTION OF AGENT OR ACCOUNTHOLDER.

e of Note: _May 9, 2004_

:eed to by Agent and executed this _____ day of _____, 20_____.

:nt Name: _Martin T. Sigillito_

iling Address: _7710 Carondelet Ave., Suite 208_
_St. Louis, mo 63105_

:phone Number: _314 725-7175_

:nt Signature: _____

:eed to by Accountholder and executed this _____ day of _____, 20_____.

:ountholder Signature: _Richard Aguilar_

ROSEMANN 001533

# Case: Phil Rosemann, et al. v. St. Louis Bank

4:14-CV-00983

## Transcript of: Clark Amos

**Date:** July 29, 2015

This transcript is printed on 100% recycled paper



GorePerry
REPORTING & VIDEO

515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<www.goreperry.com>>

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 1

In the United States District Court

Eastern District of Missouri

Eastern Division

PHIL ROSEMANN, et al.,

PLAINTIFFS,

vs.                    Cause No. 4:14-CV-00983

ST. LOUIS BANK,

DEFENDANTS.

Deposition of CLARK AMOS

On behalf of DEFENDANT

JULY 29, 2015

Gore, Perry, Gateway & Lipa Reporting Co.

515 Olive St., Suite 300

St. Louis, Missouri  63101

314-241-6750

Page 2

1              In the United States District Court

2                  Eastern District of Missouri

3                       Eastern Division

4

5          PHIL ROSEMANN, et al.,

6

7                     PLAINTIFFS,

8

9          vs.              Cause No. 4:14-CV-00983

10

11         ST. LOUIS BANK,

12

13                    DEFENDANT.

14

15         Deposition of CLARK AMOS, taken on

16    behalf of the DEFENDANT, at Polsinelli, PC, 100

17    South Fourth Street, Suite 1000, St. Louis,

18    Missouri, on JULY 29, 2015, before Margaret M.

19    Clodius, Missouri CCR #948, and Notary Public

20    within and for the State of Missouri.

21

22

23

24

25

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 102

1     Q.   (By Mr. Campbell)  I'm showing you Exhibit

2   289, it is a set of stipulations that we have been

3   using in these depositions concerning some facts,

4   and what I want you to do is read through those and

5   tell me whether each of those are true, to your

6   knowledge.

7     A.   Do you want me to do them one at a time or

8   all together.

9     Q.   Either way.

10    A.   No. 1, I couldn't confirm or deny whether

11   they had knowledge of the Ponzi scheme.

12    Q.   So that would be correct, that statement

13   in No. 1, would that be accurate?

14    A.   Yes.  I don't like the way it's written.

15    Q.   I understand.  But it's still accurate,

16   correct?

17    A.   Yes.

18    Q.   And how about statement No. 2, stipulation

19   No. 2?

20    A.   Could we go off the record for a minute?

21    Q.   Certainly?

22              (Off the record)

23    Q.   (By Mr. Campbell)  Why don't you continue

24   through the stipulations and let us know.

25    A.   Just ask me the question again and I'll

Phil Rosemann, et al. v. St. Louis Bank

1    answer it.

2        **Q.**   Can you go through the stipulations in

3    Exhibit 289 and tell me which ones are correct as

4    to you?

5        **A.**   No. 1 is correct, No. 2 is correct, No. 3

6    is correct, 4 is correct, 5 is correct, 6 and 7 are

7    correct.

8        **Q.**   Thank you.  When you finally received, in

9    about October of 2009, the loan agreement that

10   contained the financial statement or Asset and

11   Liability Statement of Derek Smith, did you ask for

12   copies of any documents that would verify any of

13   the dollar amounts that appeared in that Asset &

14   Liability Statement?

15       **A.**   I did not.

16       **Q.**   When did you first discover that there was

17   a Ponzi scheme?

18       **A.**   I think it was the day his office was

19   raided by the FBI, I think, right around there.

20       **Q.**   How did that come to your attention?

21       **A.**   Mark Merlotti called me, I was in Arizona.

22       **Q.**   Did he tell you how he learned that?

23       **A.**   I don't recall that he did, it was

24   probably radio or newspaper, I guess, something

25   like that.

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 42

1    Q.    The loan agreement?

2    A.    The loan agreement, I said "where is it",

3    and as I see now, it was a bunch of lies, but he

4    said that it had to be prepared, it had to go to

5    England it had to be signed by Derek, it had to be

6    sent back and as we know now, he, I don't know

7    Lynn's name on here, she should know, I know she

8    knows it's on here because I told her it was, I

9    don't know whether it was prepared in his office or

10   Marty's office, but he got it back to Stajduhar.

11   Q.    Liz Stajduhar?

12   A.    Yes, she had e-mailed and said that it was

13   going to be forthcoming, but the money had already

14   gone to Marty's account.

15   Q.    Here's my question, though; at the time

16   you made your $250,000 investment, did you ask

17   Martin Sigillito to give you any wire transfer

18   confirmation or canceled checks showing what he did

19   with your money?

20   A.    No, I didn't.

21   Q.    And why did you not ask for that?

22   A.    It was clear what he was supposed to do

23   with it, I never -- let me answer it this way; I

24   never ask any lawyer that I've worked with to give

25   me wire confirmation of what they did with the

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 49

1 properties, would you have made the loan?

2    A.    Well, you asked me that before, I, it's

3 speculation, probably not, but you know, I don't

4 know for sure, you know, if they could have showed

5 me a statement that said they had 500 million

6 dollars cash and they're going to use this money to

7 speculate on something, I might, I could have done

8 it, I thought it would be repaid, I didn't think it

9 would be stolen.

10    Q.    Is it fair to say that at the time you

11 made the loan, you could have done some research to

12 determine who actually owned the properties?

13    A.    Yes.

14    Q.    And is it fair to say that -- strike that.

15 Tell me about the background check that you could

16 have ordered on Mr. Smith.

17    A.    Well, I would have probably hired a firm

18 that does background checks and I would have looked

19 at it and I don't know what it said, I never did

20 one, but it probably would have been positive

21 and/or negative and I would have made a decision on

22 whether this is worth the risk.

23    Q.    Have you ever used a firm that does

24 background checks before?

25    A.    Yes, I don't know the name, but I call one

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 50

```
1    of my lawyers and they contract with them and the
2    information comes back.
3        Q.   Before you made the loan, did you ask to
4    see any certified or audited financial statements
5    for Derek Smith?
6        A.   I don't think I asked for audited, I just
7    said I wanted financial statements.
8        Q.   Tell me about --
9        A.   Let me add this; sometimes there's an
10   implication when you look at statements if they
11   aren't audited or certified you might ask them to
12   be, you know, just depends, you know, this whole
13   situation was based on trust, it wasn't based on
14   common sense, but if I was running a corporation,
15   they would fire me.
16       Q.   Tell me about your discussions with Lynn
17   Whaley Vogel.
18       A.   It was very brief, I called her up, asked
19   her why her name was on this, I was shocked when I
20   saw her name was on this, and --
21       Q.   You're referring to the loan agreement?
22       A.   The loan agreement, I couldn't figure out
23   why she sent me back an e-mail that said she knew
24   absolutely nothing about it and she was going to
25   turn this information over to whoever handled
```

Case: 4:14-cv-00983-LRR   Doc. #: 97-1   Filed: 08/31/15   Page: 58 of 83 PageID #: 1926

Page 60

1    loan agreement that you received, there's a listing
2    for Hinton Grange Hotel at 3.2 million pounds, do
3    you see that?
4        A.   Yes.
5        Q.   And then there is a loan listed for one
6    million pounds.
7        A.   Right.
8        Q.   Did you ask before you made your loan for
9    any information about how much debt was secured by
10   the Hinton Grange property?
11       A.   I did not.
12       Q.   Why not?
13       A.   I think at that point I had just, like I
14   said, those last few moments, I just said "okay,
15   I'll do it".
16       Q.   Did you ask before you made your loan for
17   information concerning the total amount of loans
18   that had been placed into the British Lending
19   Program?
20       A.   No, I did not.
21       Q.   Had you asked for that information in 2009
22   and found out that there were tens of millions of
23   dollars that had been made in loans into the
24   British Lending Program, would that have given you
25   any concerns about making your loan?

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 92

1    something like this, you would want it two or three

2    to one.

3        Q.   Did you ask Mr. Sigillito or any of the

4    other people what the debt service coverage ratio

5    was for this --

6        A.   I did not.

7        Q.   And had you asked for that information and

8    it was provided to you and it showed that the debt

9    service coverage ratio was actually upside down, in

10   other words, that the loan to value ratio was

11   something more like two or 300 to 100 or two or

12   three to one or higher, would you have made the

13   loan?

14       A.   I probably would not have done it.

15       Q.   And is it -- strike that.  Did you ever

16   talk to anyone at St. Louis Bank before you made

17   the loan?

18       A.   No.

19       Q.   Did you ever tell --

20       A.   Let me take that back.  It's possible that

21   right before I made the loan, I might have talked

22   to Julie Ohms about --

23       Q.   What would you have talked to her about?

24       A.   About wire instructions, but as far as an

25   officer of the bank or something like that, no.

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos

July 29, 2015

Page 93

1     Q.    Do you remember talking to Julie Ohms?

2     A.    No, but I know that I had to wire the

3   money over and generally when I wire money, I talk

4   to someone and say "I'm sending a wire", you know,

5   "I want to get a receipt, confirmation", it came

6   through, because I know that I have an e-mail, I

7   have an e-mail from Julie Ohms.

8     Q.    Did you know Julie Ohms --

9     A.    No.

10    Q.    -- before you talked to her about a wire

11  transfer?

12    A.    No, I did not.

13    Q.    Do you specifically remember talking to

14  Julie Ohms about the wire transfer?

15    A.    No, I don't.

16    Q.    Did you tell Julie Ohms what the purpose

17  of your wire transfer was?

18    A.    No.

19    Q.    Did you give Julie Ohms or anyone at St.

20  Louis Bank any information about where you thought

21  your $250,000 investment was going to go?

22    A.    No.

23    Q.    And did you ever tell anyone at St. Louis

24  Bank to monitor your loans or loan in the IOLTA

25  account in any way?

Phil Rosemann, et al. v. St. Louis Bank

Clark Amos                                        July 29, 2015

Page 94

1      **A.**   No.

2      **Q.**   And did you expect St. Louis Bank or

3   anyone at St. Louis Bank to actually monitor your

4   loan proceeds in the IOLTA account to make sure

5   that it went to a specific purpose?

6      **A.**   Only to this extent, if they saw activity

7   in his account that was suspicious, you know, you

8   get money in a trust account, it's going out, money

9   in a trust account going out and it's always going,

10  I suspect, to Marty, maybe he's sending it

11  somewhere else, I don't know, I don't have an

12  answer to that, you know, they might want to say

13  "hey, what's going on", there's some responsibility

14  at that level.

15     **Q.**   Can you point to any information that St.

16  Louis Bank received that would tell St. Louis Bank

17  what your intended loan was going to be?

18     **A.**   I don't think so.

19     **Q.**   In other words, did you say anything to

20  Julie Ohms at all?

21     **A.**   No, I didn't.

22     **Q.**   And did you provide them with any

23  documents --

24     **A.**   Well, I sent --

25     **Q.**   -- other than the wire transfer?

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

PHIL ROSEMANN, et al.,                )
                                       )
      Plaintiffs,                     )   Case No. 4:14-cv-00983-LRR
                                       )
      v.                              )   Judge: Honorable Linda R. Reade
                                       )   (Chief Judge Dist. Ct. N. Dist. Iowa)
ST. LOUIS BANK,                        )
                                       )
      Defendant.                      )
                                       )
                                       )

## STIPULATIONS

1.  Plaintiff Clark Amos has no personal knowledge or evidence that St. Louis Bank had any knowledge whatsoever of the Ponzi scheme that was operated by Martin Sigillito, MTSA, or the British Lending Program.

2.  Plaintiff Clark Amos has no evidence or personal knowledge of St. Louis Bank being aware of any facts whatsoever that would have put St. Louis Bank on notice to the fraudulent nature of the British Lending Program, the British Lending Program loans, or the Ponzi scheme operated by Martin Sigillito, MTSA, or any participants in the British Lending Program.

3.  Plaintiff Clark Amos never had any contact whatsoever with St. Louis Bank or any employees of St. Louis Bank, including regarding Plaintiffs' investments in the British Lending Program or any accounts held by Plaintiff, and therefore has no personal knowledge of St. Louis Bank being aware of any actions that were to be taken with Plaintiffs' investments and/or funds.

4.  Plaintiff Clark Amos never requested or received relating to the British Lending Program, British Lending Program investments, Derek Smith, Distinctive Properties (UK) Limited, any Financial Statements, tax returns, property tax records, title insurance policies, title reports, cancelled checks, wire transfers, bank account statements, appraisals, property records including Deeds of Trust, or Mortgages, and did not request or receive a closing by a title company for his loan.

5.  Plaintiff Clark Amos has no personal knowledge that St. Louis Bank directed, operated, or managed the BLP.

6.  Plaintiff Clark Amos has no personal knowledge that St. Louis Bank directed, operated or managed British American Group.



DEFENDANT'S DEPOSITION
EXHIBIT
28
7.29.15 nwL

7.    Plaintiff Clark Amos has no personal knowledge that St. Louis Bank directed, operated or managed the Martin Sigilitto, MTSA, Derek Smith.

50794878.1

# Case: Phil Rosemann, et al. v. St. Louis Bank

4:14-CV-00983-LRR

# Transcript of: Preston Amos

**Date:** July 22, 2015

This transcript is printed on 100% recycled paper



515 Olive Street, Suite 300
St. Louis, MO  63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<www.goreperry.com>>

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                                    July 22, 2015

Page 1

In the United States District Court

Eastern District of Missouri

Eastern Division


PHIL ROSEMANN, et al.,


            PLAINTIFFS,


vs.              Cause No. 4:14-CV-00983-LRR


ST. LOUIS BANK,


            DEFENDANTS.



        Deposition of PRESTON AMOS

        On behalf of DEFENDANT

        JULY 22, 2015


Gore, Perry, Gateway & Lipa Reporting Co.

        515 Olive St., Suite 300

        St. Louis, Missouri  63101

            314-241-6750

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos

July 22, 2015

Page 2

1              In the United States District Court

2                 Eastern District of Missouri

3                       Eastern Division

4

5          PHIL ROSEMANN, et al.,

6

7                       PLAINTIFFS,

8

9          vs.              Cause No. 4:14-CV-00983-LRR

10

11         ST. LOUIS BANK,

12

13                      DEFENDANT.

14

15         Deposition of PRESTON AMOS, taken on

16  behalf of the DEFENDANT, at Polsinelli, PC, 100

17  South Fourth Street, Suite 1000, St. Louis,

18  Missouri, on JULY 22, 2015, before Margaret M.

19  Clodius, Missouri CCR #948, and Notary Public

20  within and for the State of Missouri.

21

22

23

24

25

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                    July 22, 2015

Page 54

1      **Q.**   Did you ever obtain any other loan
2   agreements?

3      **A.**   No.

4      **Q.**   You did not receive any title reports or
5   title commitments before you made your investment,
6   if you had received a title report or title
7   commitment that showed that the properties for
8   which you were making your investment in the
9   British Lending Program were not actually owned by
10  Derek Smith or Distinctive Properties, would you
11  have made your investment?

12     **A.**   I don't know, and the reason I say it is,
13  if I remember correctly, some of the funds were to
14  be used to acquire properties, so some of the
15  properties may already have been held by
16  Distinctive Properties and Derek and others may be
17  going to be purchased.

18     **Q.**   Did you ask for or receive any sale
19  contracts for any of these properties that would
20  show that the properties were under contract to be
21  purchased?

22     **A.**   No.

23     **Q.**   So you had no way of knowing whether or
24  not the money you were loaning would actually be
25  used for the purchase of those properties if you

Case: 4:14-cv-00983-LRR   Doc. #: 97-1   Filed: 08/31/15   Page: 68 of 83 PageID #: 1936

Page 45

1    have a lot of contact with him, that he was kind of

2    a Jack of all trades of intellectual capabilities,

3    I can't remember what his faith was, but he was a

4    church member, that he was an attorney, that he had

5    the ability to speak multiple languages, et cetera,

6    et cetera.

7        Q.   Did you obtain any financial statements

8    concerning Martin Sigillito before you made your

9    investment?

10       A.   No.

11       Q.   Did you obtain any financial statements of

12   Derek Smith before you made your investment?

13       A.   I'm trying to remember if the agreement I

14   signed included a financial statement, it may have,

15   I can't remember.

16       Q.   Now, the agreement that you're referring

17   to, would that be a loan agreement that you

18   obtained from Mr. Sigillito?

19       A.   Yes.

20       Q.   Did you obtain that loan agreement after

21   you made your investment or before?

22       A.   It was after.

23       Q.   So if the loan agreement contained a

24   financial statement for Derek Smith, you did not

25   see it until after you made your investment, is

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                            July 22, 2015

Page 46

1    that correct?

2        A.    Correct.

3        Q.    So before you made your investment, did

4    you ask for any financial statements on Derek

5    Smith?

6        A.    I don't think so.

7        Q.    Before you made your investment, did you

8    receive any financial statements at all on Derek

9    Smith or his company?

10       A.    No, but I did discuss with Marty the

11   financial capabilities of him.

12       Q.    What did Marty tell you about the

13   financial capabilities of Derek Smith before you

14   made your investment?

15       A.    That he was a wealthy guy, a successful

16   developer, but in terms of net worth and financial

17   statement.

18       Q.    What net worth did he tell you Derek Smith

19   had?

20       A.    I don't remember.

21       Q.    So if I understand you correctly, you made

22   your investment on the basis of Martin Sigillito

23   telling you that this wealthy guy was going to

24   develop a piece of property or properties in

25   England and that he either owned them or was going

Page 48

```
 1      A.    No.
 2      Q.    Did it occur to you before you made your
 3  investment that what Mr. Sigillito was telling you
 4  might not be true?
 5      A.    No, it didn't.
 6      Q.    Looking back on it today, do you wish you
 7  would have looked into this further before you made
 8  your investment?
 9      A.    Absolutely.
10      Q.    Did you ever ask for any appraisals of the
11  properties in England before you made your
12  investment?
13      A.    No.
14            MR. VITULLO:  We'll stipulate to this line
15  of questioning, that's one of the stipulations.  I
16  think it's the last one.
17            MR. CAMPBELL:  Actually the stipulation is
18  that he never requested or received -- well, I
19  guess that would be sufficient.  Let's mark that as
20  Exhibit 235.
21            (Defendant's Exhibit 235 marked for
22                    identification)
23      Q.    (By Mr. Campbell)  I'll let you look it
24  over first, if you need to take a break, please
25  feel free to do so.
```

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                                July 22, 2015

Page 49

```
 1      A.    Okay.
 2            WITNESS:  Am I reading all of this or?
 3            MR. VITULLO:  No. 6, No. 6.
 4            WITNESS:  Okay.
 5            MR. CAMPBELL:  Let's go off the record.
 6                        (Recess)
 7      Q.    (By Mr. Campbell)  I'm showing you Exhibit
 8   235, this is a set of stipulations that we've
 9   prepared concerning various facts on which you
10   would testify and we prepared it for the purpose of
11   helping to speed the process of taking your
12   deposition.  You've read these stipulations off the
13   record, can you and your attorney both tell me that
14   these stipulations are accurate and you can agree
15   to those?
16      A.    They are accurate and I agree to them.
17            MR. VITULLO:  So stipulated.
18      Q.    (By Mr. Campbell)  Thank you.  With regard
19   to stipulation No. 6, you stipulated, of course,
20   that you did not request appraisals concerning the
21   property before you made your investment, looking
22   back on it, do you wish you would have requested
23   appraisals?
24      A.    I can't, I can't say, I'm not sure it
25   would have had --
```

Case: 4:14-cv-00983-LRR   Doc. #: 97-1   Filed: 08/31/15   Page: 72 of 83 PageID #: 1940

Page 51

1    securing your loan at the time you made the

2    investment?

3         A.    I don't know, I believe Derek Smith was

4    going to be securing the loan.

5         Q.    When you say Derek Smith was going to

6    secure the loan, you mean he was guaranteeing it?

7         A.    Yes.

8         Q.    And did you ask Katherine Winter any --

9    strike that.  You stipulated that you did not

10   request any financial statement or receive them for

11   Derek Smith before you made your investment?

12        A.    Yes.

13        Q.    If you had obtained an audited or

14   certified financial statement from Derek Smith

15   before you made your investment and if it had shown

16   that his net worth was drastically lower than what

17   was represented to you, would you have made your

18   investment?

19        A.    I don't know.

20        Q.    And why don't you know?

21        A.    Because I was investing my equity.

22        Q.    What does that mean?

23        A.    Meaning I wasn't borrowing debt to give it

24   to someone else, so the return on that investment

25   could be variable, but I don't know, I don't know

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos

July 22, 2015

Page 54

1      **Q.**   Did you ever obtain any other loan

2   agreements?

3      **A.**   No.

4      **Q.**   You did not receive any title reports or

5   title commitments before you made your investment,

6   if you had received a title report or title

7   commitment that showed that the properties for

8   which you were making your investment in the

9   British Lending Program were not actually owned by

10  Derek Smith or Distinctive Properties, would you

11  have made your investment?

12     **A.**   I don't know, and the reason I say it is,

13  if I remember correctly, some of the funds were to

14  be used to acquire properties, so some of the

15  properties may already have been held by

16  Distinctive Properties and Derek and others may be

17  going to be purchased.

18     **Q.**   Did you ask for or receive any sale

19  contracts for any of these properties that would

20  show that the properties were under contract to be

21  purchased?

22     **A.**   No.

23     **Q.**   So you had no way of knowing whether or

24  not the money you were loaning would actually be

25  used for the purchase of those properties if you

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                      July 22, 2015

Page 55

1   had not seen sale contracts, is that correct?

2       A.   I did not.

3       Q.   Is that correct?

4       A.   That is correct.

5       Q.   So when you made your investment, you did

6   not ask for or receive any wire transfers showing

7   where your money had gone, if you had requested

8   wire transfer confirmations or canceled checks, for

9   instance, that showed where your money was going

10  and if it would have shown that it was going to

11  uses other than Distinctive Properties and Derek

12  Smith, would you have made your investment?

13      A.   Can I clarify?

14      Q.   Certainly.

15      A.   I, if I remember, I don't know if you have

16  a copy of the check that was provided, but I think

17  it was made out to Martin Sigillito, so there was,

18  it was assumed that the funds, I won't say

19  "assumed", it was my understanding that they would

20  be used for the purposes explained to me, but if I

21  remember, Marty would hold the funds and then he

22  would send them to Distinctive Properties or Derek.

23           MR. CAMPBELL:  Let me have this marked as

24  Exhibit 237, if I may.

25           (Defendant's Exhibit 237 marked for

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                                July 22, 2015

Page 60

1              identification)

2       Q.    (By Mr. Campbell)   I'm showing you what

3   has been marked as Exhibit 238, it is the identical

4   agreement that your attorneys produced to us as the

5   agreement that we marked as Exhibit 236 with the

6   exception that Exhibit 236 had the Government

7   Exhibit label, if you will, from the criminal trial

8   of Mr. Sigillito, and Exhibit 238, which you

9   produced through your attorneys, does have the

10  Asset & Liability Statement of Derek Smith attached

11  to it, do you see that?

12      A.    I'm getting to it.  Yes.

13      Q.    And now you've stipulated that you did not

14  request any certified or audited financial

15  statements for Derek Smith, did you ever ask to see

16  any information that would back up the Asset and

17  Liability statement for Derek Smith that you

18  received after you made your investment?

19      A.    No, I didn't.

20      Q.    And you did not do so before you made your

21  investment, correct?

22      A.    Correct.

23      Q.    So when you made your investment, you did

24  not know that Derek Smith actually was worth 30

25  million pounds or whether he was worth 100 pounds,

Phil Rosemann, et al. v. St. Louis Bank

Preston Amos                                          July 22, 2015

Page 69

1      Q.    Where did you think he was going to
2   disburse those funds?
3      A.    To Distinctive Properties or Derek Smith
4   or both, I guess, I thought of them as the same
5   person.
6      Q.    After you made this $50,000 investment,
7   did you ever ask Mr. Sigillito to provide you with
8   any information that would confirm that Derek Smith
9   or Distinctive Properties actually received this
10  money?
11     A.    I did not.
12     Q.    Did you ever talk to Derek Smith?
13     A.    No.
14     Q.    Did you ever contact anyone in England
15  before you made this investment?
16     A.    No.
17     Q.    Did you ever talk to anyone other than
18  Martin Sigillito before you made the decision to
19  invest?
20     A.    I talked to my father.
21     Q.    And did your father think that this was a
22  good investment?
23     A.    He did.
24     Q.    And was it on the same basis, to your
25  understanding, as you thought it was a good

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

PHIL ROSEMANN, et al.,      )
                                )
     Plaintiffs,       )   Case No. 4:14-cv-00983-LRR
                                )
      v.              )   Judge: Honorable Linda R. Reade
                                )   (Chief Judge Dist. Ct. N. Dist. Iowa)
ST. LOUIS BANK,        )
                                )
     Defendant.      )
                                )
                                )

DEFENDANT'S DEPOSITION EXHIBIT

235

7·22·15 mmk

**STIPULATIONS**

1.    Plaintiff Preston Amos has no personal knowledge or evidence that St. Louis Bank had any knowledge whatsoever of the Ponzi scheme that was operated by Martin Sigillito, MTSA, or the British Lending Program.

2.    Plaintiff Preston Amos has no evidence or personal knowledge of St. Louis Bank being aware of any facts whatsoever that would have put St. Louis Bank on notice to the fraudulent nature of the British Lending Program, the British Lending Program loans, or the Ponzi scheme operated by Martin Sigillito, MTSA, or any participants in the British Lending Program.

3.    Plaintiff Preston Amos never had any contact whatsoever with St. Louis Bank or any employees of St. Louis Bank, including regarding Plaintiffs' investments in the British Lending Program or any accounts held by Plaintiff, and therefore has no personal knowledge of St. Louis Bank being aware of any actions that were to be taken with Plaintiffs' investments and/or funds.

4.    Plaintiff Preston Amos never relied on St. Louis Bank to monitor or investigate his investments in the British Lending Program.

5.    Plaintiff Preston Amos provided Martin Sigillito full authority to make investments and transfer funds on his behalf, and never revoked that authority throughout the operation of the British Lending Program.

6.    Plaintiff Preston Amos never requested or received relating to the British Lending Program, British Lending Program investments, Derek Smith, Distinctive Properties (UK) Limited, any Financial Statements, tax returns, property tax records, title insurance policies, title reports, cancelled checks, wire transfers, bank account statements, appraisals, property records including Deeds of Trust, or Mortgages, and did not request or receive a closing by a title company for his loan.

# Case: Phil Rosemann, et al. v. St. Louis Bank

4:14-CV-00983-LRR

# Transcript of: Henry Barthel

## Date: July 10, 2015

This transcript is printed on 100% recycled paper



GOREPERRY

REPORTING & VIDEO

515 Olive Street, Suite 300
St. Louis, MO 63101
(314) 241-6750
1-800-878-6750
Fax: (314) 241-5070
Email: schedule@goreperry.com
Internet: <<www.goreperry.com>>

Phil Rosemann, et al. v. St. Louis Bank

Henry Barthel

July 10, 2015

Page 34

1       **A**    January.  It might have been in January.  We

2   couldn't get in to see him.

3            MRS. BARTHEL:  That was 2010.

4       **A**    He was always busy.  We couldn't get to see

5   him.

6       **Q**    (By Mr. Campbell) So before you made your

7   investment, did you obtain any information at all

8   from St. Louis Bank?

9       **A**    From St. Louis Bank?  No.  I never heard of

10  St. Louis Bank.

11      **Q**    So when is the first time you heard the

12  words "St. Louis Bank"?

13      **A**    Through the course of these procedures.

14      **Q**    This lawsuit?

15      **A**    Yeah.

16      **Q**    And can you tell me in your own words, if

17  you know, why it is that you think St. Louis Bank

18  caused you harm?

19      **A**    I don't know.  I mean, I don't know.

20  That's --

21      **Q**    Are you relying on your attorneys for that?

22      **A**    I'm relying on the attorneys and you to

23  prove it.  And the judge has to decide what's right,

24  I guess.

25      **Q**    So as you sit here today, you don't know of

Phil Rosemann, et al. v. St. Louis Bank

Henry Barthel                                             July 10, 2015

Page 43

1      A    No, we didn't.  Can I ask what for?

2      Q    (By Mr. Campbell) Well, it is my

3   understanding, but it may not be correct, that he

4   had a charge related to serving alcohol in an

5   establishment called Go Go Cabaret in Ohio, but I do

6   not know anything more than what appears in -- if

7   you Google search it then you'll find it, but you

8   did not know that; is that correct?

9      A    No.

10          MRS. BARTHEL:  No.  He is in jail now?

11          MR. CAMPBELL:  He's in jail now for 30 days.

12          THE WITNESS:  He needs a lawyer.

13          MRS. BARTHEL:  I thought that was over with.

14          MR. CAMPBELL:  I couldn't tell you anything

15   about it, ma'am.  But nevertheless, we need to

16   understand where we are.

17          THE WITNESS:  All right.

18      Q    (By Mr. Campbell) Have you ever had any

19   communications at all with St. Louis Bank or anyone

20   there?

21      A    No, sir.

22      Q    Have you ever seen a report that was written

23   by Paul Vogel?

24      A    A report?  Yes.

25      Q    You did?

Phil Rosemann, et al. v. St. Louis Bank

Henry Barthel                                        July 10, 2015

Page 20

1     Q    Have you ever talked to anyone at St. Louis
2   Bank?
3     A    No.
4     Q    Did anybody at St. Louis Bank ever provide
5   you with any information that led you to make the
6   investment?
7     A    No.
8     Q    Before you made the investment, did you ask
9   to see pictures of the properties?
10    A    No.
11    Q    Before you made the investment, did you ask
12  to see any title insurance or title reports showing
13  who owns the properties?
14    A    No.
15    Q    Do you understand when you made the
16  investments that there was a man named Derek
17  Smith --
18    A    No.
19    Q    -- who was involved?
20    A    No.
21    Q    Now, when you made the investment, before
22  you made the investment if you had found out that
23  the borrower didn't really own the properties that
24  were involved, would you have made the investment?
25             MR. VITULLO:  Objection.

Phil Rosemann, et al. v. St. Louis Bank

July 10, 2015

1      **A**   In 2009.  And we were really worried about

2   handing it -- we handed a check over to a stranger

3   at our door, a courier, you know.

4      **Q**   So why did you decide to invest in the

5   British Lending Program if you didn't have all that

6   much information about it?

7      **A**   What made me decide?  I think based upon the

8   Aguilars' personal feelings were of the thing, their

9   personal experience with it, that they have been

10  getting this money on a regular basis.

11     **Q**   So when you made the decision to invest the

12  $50,000, did you ask to see any documents that would

13  describe the program?

14     **A**   No.  He said a contract will be coming.  And

15  that contract did come sometime about two months

16  later.

17     **Q**   Let me ask this:  When you made your

18  investment, before you made your investment, did you

19  ask to see any appraisals for any properties that

20  might be involved?

21     **A**   No.

22     **Q**   Before you made your investment, did you ask

23  to see any tax returns for the borrower?

24     **A**   No.

25     **Q**   Before you made the investment, did you ask

Case: 4:14-cv-00983-LRR   Doc. #:  97-1   Filed: 08/31/15   Page: 83 of 83 PageID #: 1951

```
 1      A    Would you repeat that, please?
 2      Q    (By Mr. Campbell) Sure.  If you had found
 3   out before you made your $50,000 investment that
 4   Derek Smith and his company, Distinctive Properties,
 5   did not own these properties, would you have made
 6   the investment?
 7      A    Well, I don't know, because I never heard of
 8   Derek Smith before.
 9      Q    Understood.  Did you understand that you
10   were making a loan when you made the investment, or
11   did you understand it to be some sort of investment?
12      A    I think it was an investment is the word I
13   would use.  I didn't figure it was a loan.  It was
14   an investment.
15      Q    And it was an investment that would pay
16   13 percent interest per year?
17      A    Yes.
18      Q    Now, if -- strike that.
19                When you made your investment, did
20   you ask to see any cancelled checks or wire transfer
21   confirmations that showed where your money actually
22   went?
23      A    No.
24      Q    Before you made your investment, did you ask
25   to see any reports or documents concerning the
```