**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PHILLIP L. ROSEMANN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:14-cv-983-LRR |
| vs. | ) | |
| | ) | Judge: Honorable Linda R. Reade |
| ST. LOUIS BANK, | ) | (Chief Judge N. Dist. Iowa) |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STATEMENT OF UNCONTROVERTED MATERIAL FACTS**

COME NOW Plaintiffs and in Support of their Motion for Partial Summary Judgment file this Statement of Uncontroverted Facts pursuant to Fed. R. Civ. P. 56.

1.    BACKGROUND FACTS

Fact 1.1   Sigillito was a commercial customer of St. Louis Bank.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ohlms Depo. at p. 59

Fact 1.2   Craig Hingle was a Commercial Loan Officer at St. Louis Bank during 2006 to 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Hingle Depo. at 11.

Fact 1.3   Julie Ohlms was Assistant Vice President of Treasury Management at St. Louis Bank during 2006 to 2010.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Ohlms Depo. at p. 9, 10.

Fact 1.4   Kimberly Palmer testified as the corporate representative of St. Louis Bank.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Palmer Depo. at p. 143.

Fact 1.5   Plaintiff's Deposition Exhibit 103 is a personal financial statement dated April 8, 2009 that Sigillito provided to St. Louis Bank.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.6   Plaintiff's Deposition Exhibit 104 is a personal financial statement dated June 6, 2006 that Sigillito provided to St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.7   Sigillito was a guarantor of the 4316 Loan at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 1.8   Sigillito was a guarantor of the 4382 Loan at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 1.9   There is no evidence in the record that St. Louis Bank made any inquiry or investigation into the activity of any account maintained by Sigillito at St. Louis Bank during 2006 through 2010.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.10   There is no evidence in the record that St. Louis Bank made any inquiry or investigation into the activity of any account maintained by Martin T. Sigillito Associates Ltd. at St. Louis Bank during 2006 through 2010.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.11   There is no evidence in the record that St. Louis Bank made any inquiry into the diversion of any funds from the IOLTA account, the 5960 Account at St. Louis Bank during 2006 through 2010.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.12   There is no evidence in the record that during 2006 through 2010 Craig Hingle had any knowledge of the purpose of the IOLTA account, the 5960 Account at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.13   There is no evidence in the record that during 2006 through 2010 Julie Ohlms had any knowledge of the purpose of the IOLTA account, the 5960 Account at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.14    There is no evidence in the record that during 2006 through 2010 Craig Hingle had any training or supervision concerning IOLTA accounts at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 1.15    There is no evidence in the record that during 2006 through 2010 Julie Ohlms had any training or supervision concerning IOLTA accounts at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## 2.   2006 TRANSACTIONS

Fact 2.1   On August 1, 2006, the Martin T Sigillito Associates checking account, the 4828 Account, had a balance of $4,143.32.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 48

Fact 2.2   On August 17, 2006, check no.1005 to Martin T. Sigillito Associates for $55,000 and signed by Sigillito cleared Sigillito's IOLTA account, the 5960 Account, and the funds were deposited into the 4828 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 48 and 30-4

Fact 2.3   Sigillito's IOLTA account, the 5960 Account is named "Martin T. Sigillito Attorney At Law IOLTA Trust Account".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-4

Fact 2.4   Sigillito's IOLTA account, the 5960 Account, is a fiduciary account as such.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-4

Fact 2.5   Sigillito was a fiduciary as such of the IOLTA account, the 5960 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-4

Fact 2.6   The check memo on check no 1005 to Martin T. Sigillito Associates for $55,000 is blank. . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-4

Fact 2.7   On August 18, 2006, an electronic intra-bank transfer of $40,053.47 was made by St. Louis Bank at Sigillito's direction from the 4828 Account to St.

Louis Bank for payment on the Martin T. Sigillito & Associates line of credit with the bank, the 4316 Loan.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 48 and 30-1

Fact 2.8   The electronic intra-bank transfer of $40,053.47 into the 4828 Account was the only deposit made into that account between August 17, 2006 and August 18, 2001. . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 40 and 30-36

Fact 2.9   On September 1, 2006, Sigillito's MTSA checking account, the 4828 Account, had a balance of $5,324.99.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.10     On September 8, 2006, three checks to Martin T. Sigillito Associates – check no. 1013 for $14,350, check no. 1014 for $51,000, and check no. 1015 for $11,489.46 – totaling $76,839.46 and signed by Sigillito cleared Sigillito's IOLTA account, the 5960 Account and the funds were deposited into the 4828 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 49 and 30-5

Fact 2.11     The check memo reads "fees" on check no. 1013, "LOC Client Advances" on check no. 1014, and "cost reimbursement" on check no. 1015. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-5

Fact 2.12     On September 11, 2006, an electronic transfer of $51,099.65 was made by St. Louis Bank at Sigillito's direction from the 4828 Account to St. Louis Bank for payment on the Martin T. Sigillito & Associates line of credit with the bank, the 4316 Loan.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.13     The electronic intra-bank transfer of $51,099.65 into the 4828 Account was the only deposit made into that account between September 1, 2001 and September 8, 2001.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.14     On September 14, 2006, 21, Sigillito's MTSA checking account, the 4828 Account, had a balance of $8,064.80.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.15    On September 21, 2006, two checks to Martin T. Sigillito Associates –
check no. 1019 for $1,250 and check no. 1020 for $45,000 – totaling
$46,250 and signed by Sigillito cleared Sigillito's IOLTA Account, the
5960 Account, and the funds were deposited into the 4828 Account.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 49 and 30-5

Fact 2.16    The check memo reads "Norton Fees" on check no. 1019 and the check
memo is blank on check no. 1020.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-5

Fact 2.17    On September 22, 2006, an electronic transfer of $50,239.99 was made
by St. Louis Bank at Sigillito's direction from the 4828 Account to St.
Louis Bank for payment on the Martin T. Sigillito & Associates line of
credit with the bank, the 4316 Loan.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 49 and 30-1

Fact 2.18    The two checks to Martin T. Sigillito Associates – check no. 1019 for
$1,250 and check no. 1020 for $45,000  – totaling $46,250, and a
$55,000 wire transfer on September 22, 2001 from Sigillito's
accomplice, J. Scott Brown at J. Scott Brown Associates, were the only
deposits made into the 4828 Account between September 21, 2006 and
September 22, 2006.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.19    On September 30, 2006, Sigillito's MTSA checking account, the 4828
Account, had a balance of $32,019.85.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 49

Fact 2.20    On October 2, 2001, check  no. 1027 for $124,000 to Martin T. Sigillito
Associates and signed by Sigillito cleared Sigillito's IOLTA Account,
the 5960 Account, and the funds were deposited into the 4828 Account.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibits 51 and 30-6

Fact 2.21    The check memo on check no. 1027 for $124,000 reads "Bradgreen
cost." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 30-6

Fact 2.22     On October 13, 2006, an electronic transfer of $99,196.35 was made by St. Louis Bank at Sigillito's direction from the 4828 Account to St. Louis Bank for payment on the Martin T. Sigillito & Associates line of credit with the bank, the 4316 Loan.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 51and 30-1

Fact 2.23     The electronic transfer of $99,196.35 paid off the outstanding balance on the Martin T. Sigillito & Associates line of credit at St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 2.24     Check no. 1027 for $124,000 to Martin T. Sigillito Associates was the only deposit into the 4828 Account between October 2, 2006 and October 13, 2006.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Plaintiff's Exhibit 51

3.   2008 TRANSACTIONS

Fact 3.1   On or about January 2, 2008, plaintiff Phil Rosemann, on Sigillito's advice, transferred $460,706.66 by wire from his CDARS Account, the 9182 Account.

Fact 3.2   On or about January 3, 2008, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $460,706.66 and described the transaction as "Rosemann CDARS Withdrawal".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-21

Fact 3.3   On or about January 4, 2008, check no.1123 payable to Martin T. Sigillito Associates Ltd. in the amount of $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.4   On or about January 4, 2008, check no.1124 payable to Martin T. Sigillito Associates Ltd. in the amount of $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.5   On March 5, 2008, Sigillito's IOLTA Account, the 5960 Account had a balance of $13,855.99.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.6   On or about March 7, 2008, St. Louis Bank received advice of an incoming wire transfer in the amount of $1,000,000 originating from Theodore Ahrens to St. Louis Bank as beneficiary.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01132

Fact 3.7   On or about March 7, 2008, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $1,000,000 and described the transaction as "Wire-Theodore Ahrens".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-23

Fact 3.8   On or about March 7, 2008, Theodore Ahrens invested in the BLP by loaning $1,000,000 to the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Government Exhibit 101

Fact 3.9   On or about March 11, 2008, check no.1149 payable to Martin T. Sigillito Associates Ltd. in the amount of $100,00 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.10   On April 10, 2008, Sigillito's IOLTA Account, the 5960 Account had a balance of $802,160.77.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00450

Fact 3.11   On or about April 11, 2008, St. Louis Bank received advice of an incoming wire transfer in the amount of $500,000 originating from Theodore Ahrens to St. Louis Bank as beneficiary.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01132

Fact 3.12   On or about April 11, 2008, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $500,000 and described the transaction as "Wire-Theodore Ahrens".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165

Fact 3.13   On or about April 11, 2008, Theodore Ahrens invested in the BLP by loaning $500,000 to the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   Government Exhibit 101

Fact 3.14   On or about April 11, 2008, St. Louis Bank approved and extended a $600,000 line of credit to plaintiff Phil Rosemann, loan number 435923.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SLB000055, SLB000068

Fact 3.15   The loan officer for the $600,000 line of credit to plaintiff Phil Rosemann, loan number 435923, was Craig Hingle.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   SLB000055, SLB000068

Fact 3.16   Documents SLB000055 to SLB000056 are a St. Louis Bank Authorization Form signed by officers of St. Louis Bank related to the $600,000 line of credit from St. Louis Bank to plaintiff Phil Rosemann.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055–56.

Fact 3.17   Martin T. Sigilllito Associates, EIN 41-2038761, was guarantor of the $600,000 line of credit from St. Louis Bank to plaintiff Phil Rosemann.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055.

Fact 3.18   The purpose of the $600,000 line of credit from St. Louis Bank to plaintiff Phil Rosemann was to pay taxes in lieu of liquidating investments.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055.

Fact 3.19   The sources of repayment of the $600,000 line of credit from St. Louis Bank to plaintiff Phil Rosemann identified in the St. Louis Bank Authorization Form signed by officers of St. Louis Bank were income from investments, collateral, and guarantor.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055.

Fact 3.20   The collateral for the $600,000 line of credit from St. Louis Bank to plaintiff Phil Rosemann was assignment of CDARS account of Martin T. Sigillito Associates in the amount of $327,556 and CDARS account of Martin T. Sigillito in the amount of $280,224.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055.

Fact 3.21     On April 11, 2008, $600,000 from the $600,000 line of credit to plaintiff
              Phil Rosemann, loan number 435923, was disbursed by St. Louis Bank
              by check payable to Phillip C. Rosemann.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . SLB000055, SLB000068–69.

Fact 3.22     On or about April 14, 2008, Julie Pruett a/k/a Julie Ohlms, informed
              Sigillito, "Please confirm that after cashier's check is deposited into the
              Trust account ending in 5960, $18,873,933.00 is to be transferred to the
              account of Phillip L. Rosemann. We will then issue a cashier's check
              from Mr. Rosemann's account to the United States in the amount of
              $1,873,933. Cashier's check is to show Phillip Rosemann as remitter and
              will also bear his SSN.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01490

Fact 3.23     On April 14, 2008, the $600,000 disbursed by St. Louis Bank by check
              payable to Phillip C. Rosemann from the $600,000 line of credit to
              plaintiff Phil Rosemann, loan number 435923, was deposited into
              Sigillito's IOLTA Account, the 5960 Account, at St. Louis Bank.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165.

Fact 3.24     On or about April 14, 2008, check no.1150 payable to Phillip L.
              Rosemann in the amount of $1,873,933 drawn on Sigillito's IOLTA
              Account, the 5960 Account, was paid by St. Louis Bank.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165

Fact 3.25     On or about April 14, 2008, St. Louis Bank credited plaintiff Phil
              Roseman's account, the 7821 Account, at St. Louis Bank $1,873,933.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165, SLB000214

Fact 3.26     On or about April 14, 2008, St. Louis Bank debited plaintiff Phil
              Roseman's xxxx7821 Account at St. Louis Bank $1,873,933 and issued
              an Official Check number 103886, the 3886 Check, drawn on St. Louis
              Bank in the amount of $1,873,933 payable to the United States Treasury.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.27     Instead of needing merely $600,000 to pay taxes, plaintiff Phil
              Rosemann needed over $1.8 million to pay taxes.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.28    The $1,873,933 used to fund the 3996 Check were funds drawn from Sigillito's IOLTA Account, the 5960 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.29    Some of the $1,273,933 of the funds that Sigillito transferred to plaintiff Phil Rosemann's account, the 7821 Account, from Sigillito's IOLTA Account, the 5960 Account, were funds received by wire transfer from Theodore Ahrens, an investor in the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.30    On or about April 16, 2008, an unnumbered check dated April 16, 2008 in the amount of $68,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.31    The unnumbered check dated April 16, 2008 in the amount of $68,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was made payable to St. Louis Bank and the check memo reads "Phillip Rosemann".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.32    St. Louis Bank, as payee and drawee bank, applied the $68,000 drawn on Sigillito's IOLTA Account, the 5960 Account, as payment on the $600,000 line of credit to plaintiff Phil Rosemann, loan number 435923.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01336

Fact 3.33    On or about April 30, 2008, check number 1153 dated April 29, 2008 in the amount of $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.34    Check number 1153 dated April 29, 2008 in the amount of $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was made payable to St. Louis Bank and the check memo reads "Phillip Rosemann".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165.

Fact 3.35    Handwritten about the check memo of Check number 1153 dated April 29, 2008 in the amount of $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, is the notation "#435923". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-165.

Fact 3.36    St. Louis Bank, as payee and drawee bank, applied the $100,000 drawn on Sigillito's IOLTA Account, the 5960 Account, as payment on the $600,000 line of credit to plaintiff Phil Rosemann, loan number 435923. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01337

Fact 3.37    On or about April 30, 2008, Sigillito informed Craig Hingle, "It appears that the expected wire, the proceeds of which are earmarked to pay off this note, will not be in until either very late today or, more probably, tomorrow. I will, therefore, plan on giving you a check tmorrow morning in the amount of $299,557.97 (please double check my math!) To pay of [sic] Phil's note. OK?"
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.38    On May 1, 2008, Sigillito's IOLTA Account, the 5960 Account, had a balance of $77,648.56.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.39    On or about May 2, 2008, plaintiff Rudolf Ouwens invested in the BLP by loaning $249,689 to the BLP from his IRA. Government Exhibit 101.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.40    On or about May 2, 2008, St. Louis Bank received advice of an incoming wire transfer in the amount of $249,689 originating from Millennium Trust Company's trust fund to St. Louis Bank as beneficiary and stating, in part, "Acct No. 130005960 Martin T Sigillito Atty at Law IOLTA Trust Acct FCT Millennium Trst Co LLC FBO Rudolf Ouwens IRA No 90B621010."
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.41    On or about May 2, 2008, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $249,689 and described the transaction as "Wire-Millennium Trust-Ouwens".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-107

Fact 3.42    On or about May 5, 2008, check number 1155 dated May 1, 2008 in the amount of $299,557.97 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.43    Check number 1155 dated May 1, 2008 in the amount of $299,557.97 drawn on Sigillito's IOLTA Account, the 5960 Account, was made payable to St. Louis Bank and the check memo reads "Smith/Rosemann".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.44    St. Louis Bank, as payee and drawee bank, applied the $299,557.97 drawn  on Sigillito's IOLTA Account, the 5960 Account, to pay off the $600,000 line of credit to plaintiff Phil Rosemann, loan number 435923.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_01338

Fact 3.45    On or about May 19, 2008, check number 1160 dated May 16, 2008 in the amount of $175,053.47 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.46    Check number 1160 dated May 16, 2008 in the amount of $175,053.47 drawn on Sigillito's IOLTA Account, the 5960 Account, was made payable to St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 3.47    St. Louis Bank, as payee and drawee bank, applied the $175,053.47 drawn  on Sigillito's IOLTA Account, the 5960 Account, to pay off the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

4.   2009 TRANSACTIONS

Fact 4.1   On March 3, 2009, Sigillito's MTSA checking account, the 4828 Account, had a balance of $21,874.89.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.2   On or about March 12, 2009, check no.1218 in the amount of $128,050 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.3   On March 12, 2009, $305,050, which included the $128,050 from the 5960 Account, was deposited into Sigillito's MTSA checking account, the 4828 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.4   On or about March 13, 2009, an electronic intra-bank transfer of $128,050 was made by St. Louis Bank at Sigillito's direction from the 4828 Account to St. Louis Bank for payment on the Martin T. Sigillito & Associates line of credit with the bank, the 4316 Loan.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.5   On March 31,2001, Sigillito's IOLTA Account, the 5960 Account, had a balance of $183,003.05.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.6   On or about April 1, 2009, St. Louis Bank received advice of an incoming wire transfer in the amount of $297,536 originating from Bonita L Cobb TTEE Bonita L Cobb Revocable Trust.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_001212

Fact 4.7   On or about April 1, 2009, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $297,536 and described the transaction as "Wire-Bonita Cobb".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00485

Fact 4.8   On or about April 1, 2008, plaintiff Bonita invested in the BLP by loaning $297,536 to the BLP.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Government Exhibit 101

Fact 4.9   On April 1, 2009, Sigillito's MTSA checking account, the 4828 Account, had a balance of $408,515.05.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00485

Fact 4.10   On April 8, 2009, Sigillito communicated to Julie Ohlms: "Call me when you can. Just need to know how to account for all this. Sorry for the trouble! Just confirmed 500k is on the way!"

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 39

Fact 4.11   Sigillito, at Ohlms' direction, wrote check number 1230 for $500,000 and check number 1231 for $350,000 from his IOLTA Account, the 5960 Account, teach made payable to St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.12   On or about April 8, 2009, Sigillito forwarded the following exchange between Sigillito and Della Moon at Enterprise Bank: "Martin: Cashier's check needs to be forwarded to Old Republic Title, 9645 Clayton Road (2nd Floor), Ladue, MO 63124 Atten: Lisa McCarthy. Thanks" to which Sigillito responded to Moon, "Thank you."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 37

Fact 4.13   On or about April 8, 2009, Sigillito forwarded the following exchange between Sigillito and Craig Hingle: "The remitter needs to be shown either as Phillip Rosemann or me, on behalf of P.R. Is this a problem? Thanks" to which Hingle responded, "Ok."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 38

Fact 4.14   On or about April 8, 2009, St. Louis Bank received advice of an incoming wire transfer in the amount of $500,000 originating from RBC Capital Markets Corporation to St. Louis Bank as beneficiary and stating, in part, "FFC Martin T Sigillito Atty at Law IOLTA Trust Acct 01300005960 FBO Angelina Block Rev Trust".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.15   On or about April 8, 2009, St. Louis Bank, as payee and drawee bank of checks number 1230 and 1231, issued Cashier's Check number 13186

for $850,000 payable to Old Republic Title and identifying "Martin Sigillito on behalf of Phillip Rosemann" as remitter.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.16    On or about April 9, 2009, check number 1230 dated April 8, 2009 in the amount of $500,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.17    On or about April 9, 2009, check number 1231 dated April 8, 2009 in the amount of $350,000 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.18    On or about April 9, 2009, Sigillito inquired of Julie Ohlms: "Just checking on status (hopefully, received) on wire Many thanks for all your help yesterday."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 40

Fact 4.19    On or about April 9, 2009, St. Louis Bank credited Sigillito's IOLTA Account, the 5960 Account, $500,000 and described the transaction as "Wire-RBC Capital Markets".

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00485

Fact 4.20    On April 9, 2009, check no.1232 to Martin T. Sigillito Associates for $126,000 and signed by Sigillito cleared Sigillito's IOLTA account, the 5960 Account, and the funds were deposited into the 4828 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.21    On or about April 9, 2009, Sigillito informed Craig Hingle, "Craig: The documents with Margaret's signature will be with you soon. If you call me tomorrow, I will pay on or , more probably, pay off the line of credit's current balance. Thanks. [I would do it today, but am waiting to make deposits into the proper account!] Many thanks for all your help yesterday."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 21

Fact 4.22    Exhibit 21 is (cite 30b-6 testimony)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.23    On or about April 10, 2009, Julie Ohlms informed Sigillito: "I will be
             transferring $160,919.86 from the corporate money market to pay down
             the line of credit and bring the balance to zero. Please confirm."
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 4

Fact 4.24    On or about April 10, 2009, Sigillito responded to Julie Ohlms'
             statement that,  "I will be transferring $160,919.86 from the corporate
             money market to pay down the line of credit and bring the balance to
             zero. Please confirm" as follows: "Thanks."
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 4

Fact 4.25    Exhibit 30-78 is (cite 30b-6 testimony)
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.26    On or about April 10, 2009, a payment of $160,283.23 was made by Julie
             Ohlms and St. Louis Bank at Sigillito's direction from the 4828 Account
             to St. Louis Bank for payment on Sigillito's line of credit with the bank,
             the 4316 Loan. ¶ 79
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.27    On or about April 10, 2009, a payment of $160,283.23 was made at
             Sigillito's direction from the 4828 Account to St. Louis Bank for
             payment on the Martin T. Sigillito Associates line of credit with the
             bank, the 4316 Loan. ¶ 79
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.28    On April 13, 2009, Sigillito wrote check number 1234 for $288,200.25
             from his IOLTA Account, the 5960 Account.
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.29    On April 13, 2009, St. Louis Bank, at Sigillto's direction, transferred
             $288,200.25 from the Martin T Sigillito Associates line of credit, the
             431600 loan, to the Martin T Sigillito Associates checking account, the
             5739 Account.
             . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.30    On April 13, 2009, St. Louis Bank, at Sigillito's direction, transferred $288,200.25 from the Martin T Sigillito Associates checking account, the 5739 Account, to the Martin T Sigillito Associates checking account, the 4828 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.31    On or about April 13, 2009, St. Louis Bank credited the Martin T Sigillito Associates checking account, the 4828 Account, $288,200.25 transferred from the Martin T Sigillito Associates checking account, the 5739 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.32    On April 15, 2009, Sigillito's IOLTA Account, the 5960 Account, had a balance of $39,167.79

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00485

Fact 4.33    On or about April 20, 2009, check number 1234 dated April 13, 2009 in the amount of $288,200.25 drawn on Sigillito's IOLTA Account, the 5960 Account, was presented to St. Louis Bank for payment.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.34    Paying check number 1234 dated April 13, 2009 in the amount of $288,200.25 drawn on Sigillito's IOLTA Account, the 5960 Account, would have, in light of the approximately $39,167.79 balance in the account, created an overdraft.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.35    On or about April 20, 2009, check number 1234 dated April 13, 2009 in the amount of $288,200.25 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.36    On April 20, 2009, after check number 1234 was paid, Sigillito's IOLTA Account, the 5960 Account, was overdrawn in the amount of $249,032.46.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00485

Fact 4.37　　　On or about April 21, 2009, St. Louis Bank, at Sigillito's direction, transferred $288,200.25 from the Martin T Sigillito Associates checking account, the 4828 Account, to Sigillito's IOLTA Account, the 5960 Account, to cover the overdraft.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.38　　　On or about May 15, 2009, check no.1239 payable to St. Louis Bank in the amount of $1,537.72 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.39　　　St. Louis Bank, as payee and drawee bank, applied the $1,537.72 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.40　　　On May 15, 2009, Sigillito's IOLTA Account, the 5960 Account, had a balance of $6,176.88.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.41　　　On May 18, 2009, the Martin T Sigillito Associates checking account, the 5739 Account, had a balance of $6,821.37.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . STL_BANK_00628

Fact 4.42　　　On May 20, 2009, St. Louis Bank, at Sigillito's direction, sent a wire transfer of $141,000 from Sigillito's IOLTA Account, the 5960 Account, to J. Scott Brown's company, British American Group.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.43　　　The wire transfer of $141,000 from Sigillito's IOLTA Account, the 5960 Account, to J. Scott Brown's company, British American Group, created an overdraft in Sigillito's IOLTA Account, the 5960 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.44　　　On or about May 28, 2009, St. Louis Bank reversed the $141,000 debit in Sigillito's IOLTA Account, the 5960 Account, with a deposit of

$141,000 from the Martin T Sigillito Associates checking account, the 5739 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.45     St. Louis Bank made the following notation in the May 31, 2009 account statement for Sigillito's IOLTA Account, the 5960 Account for May 28, 2009: "Transfer from 5739 Wrong Acct Debt for Wire on 5/20/09."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.46     The notation "Transfer from 5739 Wrong Acct Debt for Wire on 5/20/09" was intended by St. Louis Bank to communicate that the wire transfer of $141,000 to J. Scott Brown's company, British American Group, on May 20, 2009 should have been transferred from the Martin T Sigillito Associates checking account, the 5739 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.47     If St. Louis Bank had transferred $141,000 by wire from the Martin T Sigillito Associates checking account, the 5739 Account, on May 20, 2009, the wire transfer would have created an overdraft in the 5739 Account.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.48     On May 20, 2009, the Martin T Sigillito Associates line of credit, Loan number 431600, was overdrawn.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.49     In or around May 2009, St. Louis Bank opened a second line of credit, the Martin T Sigillito Associates line of credit, Loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.50     According to St. Louis Bank's records, the first disbursement from the Martin T Sigillito Associates line of credit, Loan number 438278, was $150,000 disbursed by check number 3424 on May 20, 2009.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.51     Check number 3424 is dated May 20, 2009, payable to Martin T. Sigillito Associates Ltd., in the amount of $150,000 and signed by Craig Hingle.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.52    The May 31, 2009 account statement prepared by St. Louis Bank for the Martin T Sigillito Associates checking account, the 5739 Account, describes the deposit of check number 3424 into the 5739 Account, as "Customer Deposit" in the amount of $150,000.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.53    On or about May 23, 2009, Craig Hingle informed Sigillito: Sorry I didnt [sic] catch up with you yesterday. I wanted to let you know that we are fine with bumping the line of credit up to $300k per our discussion. Let me know your timeline on needing it done."

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit __.

Fact 4.54    On or about June 24, 2009, check no.1279 payable to St. Louis Bank in the amount of $1,600 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.55    St. Louis Bank, as payee and drawee bank, applied the $1,600 drawn  on Sigillito's IOLTA Account, the 5960 Account, to pay principal and interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.56    On or about July 17, 2009, check no.1284 payable to St. Louis Bank in the amount of $645.83 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.57    St. Louis Bank, as payee and drawee bank, applied the $645.83 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.58        On or about August 5, 2009, check no.1284 payable to St. Louis Bank in the amount of $625 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.59        St. Louis Bank, as payee and drawee bank, applied the $625 drawn  on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.60        On or about August 13, 2009, check no.1290 payable to St. Louis Bank in the amount of $1,408.85 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.61        St. Louis Bank, as payee and drawee bank, applied the $1,408.85 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.62        On or about August 13, 2009, check no.1291 payable to St. Louis Bank in the amount of $1,455.79 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.63        St. Louis Bank, as payee and drawee bank, applied the $1,455.79 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay principal and interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.64        On or about August 13, 2009, check no.1292 payable to St. Louis Bank in the amount of $645.84 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.65     St. Louis Bank, as payee and drawee bank, applied the $645.84 drawn
              on Sigillito's IOLTA Account, the 5960 Account, to pay principal and
              interest owed on the Martin T. Sigillito Associates line of credit, loan
              number 438278.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.66     On or about September 4, 2009, check no.1303 payable to St. Louis
              Bank in the amount of $176.94 drawn on Sigillito's IOLTA Account, the
              5960 Account, was paid by St. Louis Bank.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.67     St. Louis Bank, as payee and drawee bank, applied the $176,94 drawn
              on Sigillito's IOLTA Account, the 5960 Account, to pay interest and late
              fees owed on the Martin T. Sigillito Associates line of credit, loan
              number 438278.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.68     On or about October 20, 2009, check no.1316 payable to St. Louis Bank
              in the amount of $1,432.23 drawn on Sigillito's IOLTA Account, the
              5960 Account, was paid by St. Louis Bank.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.69     St. Louis Bank, as payee and drawee bank, applied the $1,432.23 drawn
              on Sigillito's IOLTA Account, the 5960 Account, to pay interest and late
              fees owed on the Martin T. Sigillito Associates line of credit, loan
              number 431600.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.70     On or about October 22, 2009, check no.1320 payable to St. Louis Bank
              in the amount of $624.39 drawn on Sigillito's IOLTA Account, the 5960
              Account, was paid by St. Louis Bank.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.71     St. Louis Bank, as payee and drawee bank, applied the $624.39 drawn
              on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed
              on the Martin T. Sigillito Associates line of credit, loan number 438278.
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 4.72     On or about December 31, 2009, check no.1372 payable to St. Louis Bank in the amount of $2,950.40 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 4.73     St. Louis Bank, as payee and drawee bank, applied the $1,450.40 of the $2,950.40 drawn  on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 4.74     St. Louis Bank, as payee and drawee bank, applied the $1,500 of the $2,950.40 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay principal and interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

5.    2010 TRANSACTIONS

Fact 5.1   On or about January 21, 2010, check no.1389 payable to St. Louis Bank in the amount of $1,290.94 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 5.2   St. Louis Bank, as payee and drawee bank, applied the $1,290.94 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 5.3   On or about January 21, 2010, check no.1390 payable to St. Louis Bank in the amount of $1,498.74 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 5.4   St. Louis Bank, as payee and drawee bank, applied the $1,498.74 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 5.5   On or about March 23, 2010, check no.1399 payable to St. Louis Bank in the amount of $1,165.69 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 5.6   St. Louis Bank, as payee and drawee bank, applied the $1,165.69 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 5.7   On or about April 19, 2010, check no.1407 payable to St. Louis Bank in the amount of $1,498.75 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 5.8   St. Louis Bank, as payee and drawee bank, applied the $1,498.75 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 431600.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-1

Fact 5.9   On or about April 19, 2010, check no.1408 payable to St. Louis Bank in the amount of $1,300 drawn on Sigillito's IOLTA Account, the 5960 Account, was paid by St. Louis Bank.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Fact 5.10   St. Louis Bank, as payee and drawee bank, applied the $1,300 drawn on Sigillito's IOLTA Account, the 5960 Account, to pay principal and interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

Fact 5.11   On or about May 25, 2010, after the FBI raided Sigillito's offices, St. Louis Bank applied $1,248.92 from Sigillito's IOLTA Account, the 5960 Account, to pay interest owed on the Martin T. Sigillito Associates line of credit, loan number 438278.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Exhibit 30-2

6.   CRAIG HINGLE TESTIMONY

Fact 6.1  On the subject of Sigillito, Craig Hingle, at page 18 of his deposition, testified:

Q. Do you recall that Martin Sigillito was a lawyer?
A. Yes.
Q. Do you recall that Martin Sigillito was a lawyer with offices here in Clayton?
A. Yes.
Q. Did you understand that his small commercial line of credit was for his law practice?
A. Yes.

Fact 6.2  On the subject of his time working at Allegiant Bank, Craig Hingle, at pages 19, 20, and 21 of his deposition, testified:

Q.   When you were at Allegiant, did you ever hear of something called the British Lending Program?
A.   Yes.
Q.   How did you come to hear about the British Lending Program when you were at Allegiant?
A.   Through Martin Sigillito.
Q.   Did Martin Sigillito explain anything about the British Lending Program to you?
A.   Just in very general terms.
Q.   And in very general terms, did he inform you that it consisted of people loaning money to borrowers in England?
A.   Yes.
Q.   Did he tell you it consisted of people with IRAs, on occasion, taking money from their IRA to use to borrow--to lend to borrowers in England?
A.   I don't recall the IRA component.
Q.   I take it you understood that there would be cash loans? I mean, this was a loan of cash, right?

A.   My understanding was these were investments that these folks were making into the program.

Q.   They were making investments of loans into the British Lending Program, right?

A.   Not real clear on that. My understanding was that these folks were making investments into these, into these projects in England.

Q.   When you say "investments into these projects," do you mean putting money in as an investment?

A.   Yes.

Q.   Do you mean putting money in as an investment into projects overseas?

A.   Yes.

Fact 6.3   Craig Hingle, at page 22 of his deposition, testified:

Q.   Do you have a recollection that these were people that were clients, or people who knew Martin Sigillito?

A.   Yes.

Fact 6.4   On the subject of plaintiff Linda Givens and her late husband Doug Givens, Craig Hingle, at pages 22 and 23 of his deposition, testified:

Q.    Do you recall that people came to Allegiant Bank wanting to borrow money in order to make investments in these projects overseas?

A.   I don't recall that.

Q.    Do you recall that Doug Givens and his wife made an investment in this-- in this opportunity?

A.   Yes.

Q.   Did you have discussions with Doug Givens about the fact that he was invested in these projects overseas?

A.   I don't recall.

Q.   How did you come to find out that Doug Givens was invested in these projects?

A.   He was a client of Marty Sigillito's, and my 1 understanding was that he was a customer in that program.

Q.   Is that something you learned through Doug Givens?

A.   I don't recall.

Q.   Is that something you learned through Martin Sigillito?

A.   I don't recall. I mean presumably, it was one of the two. I don't recall which one it was.

Q.   Okay, so we can agree that one of the two of those people told you that Doug Givens was invested in these projects overseas that you've been talking about, right?

A.   Right.

Fact 6.5   On the subject of training at Allegiant Bank, Craig Hingle, ast page 40 of his deposition testified:

Q.   In your management training at Allegiant Bank, did you ever hear of anything called the Uniform Fiduciaries Law?

A.   I don't recall.

Q.   Do you recall ever hearing the term "Uniform Fiduciaries Law" at any time while you were working for Allegiant?

A.   I don't recall.

Q.   While you were at Allegiant, did you ever have any involvement with accounts by--that go by the name of IOLTA, or interest on lawyer's trust account?
       MR. CAMPBELL: I'll object to the form of the question as to the use of the word "involvement," vague and ambiguous, but go ahead.

A.   Not that I recall.
       BY MR. ANDRES:

Q.   Did you ever hear the term "IOLTA" or "interest on lawyer's trust account" while you were working at Allegiant?

A.   I don't recall.

Q.   Do you recall receiving any training that you understood was related or concerned the Uniform Fiduciaries Law while you were at Allegiant?
       MR. CAMPBELL: Object to the form of the question, the use of the word "related" as vague and ambiguous, go ahead.

A.   I don't recall.
       BY MR. ANDRES:

Q.   While you were at Allegiant, did you ever receive training in anything you understood to be pertaining to or involving the Uniform Fiduciaries Law?
       MR. CAMPBELL: Same objection as to "pertaining" or "involving," vague and ambiguous. Go ahead.

BY MR. ANDRES:

Q.   Do you understand the question?

A.   You are asking if I had training in Uniform Fiduciary--

Q.   Law, yes.

A.   And I don't recall.

Q.   Okay, did you have any training in IOLTA accounts, or interest on lawyer trust accounts, while you were at Allegiant?

A.   I don't recall.

Fact 6.6   On the subject of Sigillito and the BLP, Craig Hingle, at pages 45 and 46 of his deposition, testified:

Q.   I mean, did Martin Sigillito ever tell you that he was brokering these things in terms of this is how he was making a living?

A.   I was aware that he was getting some form of compensation from that program.

Q.   You understood that Martin Sigillito was getting some form of compensation from people investing in these projects overseas?

A.   Right.

Q.   And so to that extent, he was getting some money or he was getting some consideration in connection with people making these investments; is that your general understanding?

A.   Yes.

Q.   And did you understand that he was getting a fee for getting people involved in the investment program?

A.   I don't--I'm not aware of the specifics of how he was getting paid. Whether it was a fee, or, or based on the return, I don't know.

Q.   Sure.

A.   I don't recall.

Q.   And do you recall, when you considered his loan application or his credit line application, that this source of revenue was one of the things that he listed as something that evidenced his creditworthiness?

MR. CAMPBELL: Objection to the form of the question as best evidence, lacks foundation, calls for speculation. You may answer.

A.   We based our underwriting decision on the information in his corporate tax return.

Fact 6.7   On the subject of Sigillito helping Hingle set up his trust, Craig Hingle, at page 62 of his deposition testified:

Q.   While you were at Allegiant, did he ever do any legal work for you?
A.   Any legal work for me, personally?
Q.   Yes, sir.
A.   He assisted with a trust that I set up, personal trust, yes.
Q.   While you were at Allegiant, you retained Martin Sigillito as a lawyer to do some work for you?
A.   He helped set up my trust, yes.

Fact 6.8   On the subject of Sigillito helping Hingle set up his trust, Craig Hingle, at page 64 of his deposition testified:

Q.   So with that as background, let me just start by saying this. Was there any point in time when you were working at Allegiant that you considered Martin Sigillito to be your lawyer?
A.   I really had no need to have a personal attorney, other than to assist with providing a trust.
Q.   Would you say that providing you with a trust was something he did as a favor?
A.   He--that was something that he did as part of his law practice.
Q.   Okay, did he do that for compensation? I mean, did you pay him for it?
A.   I can't recall. I would assume that yes, he was paid for that service.
Q.   And this was a trust for you, personally, not for the bank?
A.   That's correct.

Fact 6.9   On the subject of Sigillito helping Hingle set up his trust, Craig Hingle, at page 64 of his deposition testified:

Q.   Do you remember approximately when Mr. Sigillito provided you with a trust that you asked him to prepare for you?
A.   It would have been in the early 2000s, after, after we had our first child or children.
Q.   When was your first child born?
A.   2000. My second one was born in 2002.

Fact 6.10     On the subject of Sigillito serving Hingle's lawyer, Craig Hingle, at
              pages 67 and 68 of his deposition, testified:

Q.   And when you went to St. Louis Bank, did you still consider him as your
     lawyer, doing legal work for you?
A.   I viewed Mr. Sigillito as someone who, as an attorney, prepared a trust for
     me.
Q.   Okay, and then when that preparation was done and over with, that ended
     the relationship in terms of attorney-client?
     MR. CAMPBELL: Object to the form of the question, but subject to that,
     you may answer.
A.   I viewed him as my attorney as it relates to trust and estate matters.

Fact 6.11     On the subject of training received at St. Louis Bank, Craig Hingle, at
              pages 71 and 72 of his deposition, testified:

Q.   When you came to St. Louis Bank, did you receive any type of what you
     would consider initial training, similar to what you had had at Allegiant?
A.   We did not have any initial training. The training that we would have had
     was annual training that all the employees go through, which is primarily
     the software. You know, I don't remember if it's called the BAI or
     something, but it was you take a course online and then take a test at the
     end.
Q.   Does that describe the extent of the training that you received at St. Louis
     Bank?
     MR. CAMPBELL: Objection to the form of the question; vague and
     ambiguous. Subject to that, you may answer.
A.   I don't recall if there was additional training to what I just mentioned.

Fact 6.12     On the subject of training at St. Louis Bank, Craig Hingle, at pages 74
              and 75 of his deposition, testified:

Q.   Do you recall any topics in this online training covering anything that you
     understood to be related to the Uniform Fiduciaries Law?
A.   I do not recall.
Q.   Do you recall any part of this training that you took online at St. Louis
     Bank to relate to IOLTA, or interest on lawyer trust accounts?

A.   I don't recall.

Q.   Do you recall receiving any type of training, when you were at St. Louis
     Bank, on Uniform Fiduciaries Law?

A.   I don't recall.

Q.   Do you recall receiving any type of training, while you were at St. Louis
     Bank, on IOLTA accounts or interest on lawyer trust accounts?

     MR. CAMPBELL: Objection; asked and answered. Go ahead.

A.   I don't recall.

Fact 6.13     On the subject of his understanding of the Uniform Fiduciaries Law,
              Craig Hingle, at pages 75, 76, and 77 of his deposition testified:

Q.   As you sit here today, do you have any understanding of what the Uniform
     Fiduciary Law is about?

A.   I do not have a comprehensive knowledge of uniform fiduciary obligations.
     My--my understanding, if that's what you are asking of that,--

Q.   Yes, that's what I'm asking.

A.   --is a fiduciary is acting on behalf of someone else. My experience with
     that has typically been more on the trust side of, of a bank or trust
     operation.

Q.   Did you have that general understanding about the Uniform Fiduciaries
     Law while you were working at St. Louis Bank?

A.   Yes.

Q.   How did you come to gain that understanding about the Uniform
     Fiduciaries Law while you were at St. Louis Bank?

A.   I believe just through my experience in banking since when I started in
     1995.

Q.   When you say just your experience, you mean just what you read in the
     trade literature?

A.   What I read, what I experienced dealing with--just dealing, you know,
     being involved in banking.

Q.   So did you understand generally that the Uniform Fiduciaries Law related
     to dealing with people that you understood to be fiduciaries?

     MR. CAMPBELL: Objection; calls for a legal conclusion and an opinion
     from the witness. Subject to that, you may answer.

A.   My limited experience in the fiduciary capacity of the bank was, you know, outside of what my day-to-day activities were. I was primarily focused on the commercial loan side, so that really didn't come into play.
BY MR. ANDRES:

Q.   So while you were at St. Louis Bank, you understood generally that there were such things as fiduciary accounts, right?
MR. CAMPBELL: Same objections. Go ahead.

A.   In general?
BY MR. ANDRES:

Q.   Yeah, in general.

A.   Yes.

Fact 6.14     On the subject of the term "fiduciary", Craig Hingle, at page 77 of his deposition, testified:

Q.   And while you were at St. Louis Bank, you understood generally what the concept, "fiduciary," meant, didn't you?

A.   In a very general sense, yes.

Q.   Sure. Did you have any understanding while you were at St. Louis Bank that IOLTA accounts were fiduciary accounts?
MR. CAMPBELL: Object to the form of the question; calls for a legal conclusion and opinion from the witness. Subject to that, you may answer.

A.   I really didn't have experience with the IOLTA account and didn't handle those.

Fact 6.15     On the subject of IOLTA accounts, Craig Hingle, at pages 77, 78, and 79 of his deposition, testified:

Q.   Well, when you came to St. Louis Bank, you had heard of IOLTAs, hadn't you?

A.   I don't recall.

Q.   While you were at St. Louis Bank, you came to hear about IOLTAs, didn't you?

A.   Yes.

Q.   And while you were at St. Louis Bank, and hearing about IOLTAs, and based on your banking experience, and knowledge, and education, did, at any point in time while you were at St. Louis Bank, did you come to

understand that IOLTAs were fiduciary accounts as you understand the term "fiduciary accounts"?

MR. CAMPBELL: Object to the form of the question; asked and answered, calls for a legal conclusion, and seeks an expert opinion from this witness. Subject to that, you may answer.

A.   I really had no involvement with IOLTA accounts, so I really didn't have any reason to dive into, you know, whether or not, you know, the bank had fiduciary responsibility for that account.

BY MR. ANDRES:

Q.   Well, that wasn't quite my question, so the question is, when you were at St. Louis Bank, did you come, at any point in time, to have an understanding, to whatever degree, that IOLTA accounts were fiduciary accounts? Whether you dove into it, whether you thought the bank had obligations, what have you, I'm just asking whether you had an understanding while you were at St. Louis Bank that IOLTA accounts were fiduciary accounts.

MR. CAMPBELL: Same objections.

A.   Don't--don't recall, since I didn't deal with them.

BY MR. ANDRES:

Q.   Okay, so since you didn't deal with them, you don't recall, sitting here today, having any understanding at St. Louis Bank that IOLTA accounts were fiduciary accounts; correct?

MR. CAMPBELL: Same objections, and now it's argumentative and badgering, but go ahead.

A.   Right.

Fact 6.16      On the subject of opening a line of credit at St. Louis Bank, Craig Hingle, at pages 81 and 82 of his deposition, testified:

Q.   What was the process at St. Louis Bank for opening a commercial line of credit that you went through in connection with Martin Sigillito?

A.   Similar to what I described previously for the Allegiant Bank line of credit as far as gathering financial information, tax returns from both the company and the guarantor.

Q.   Do you recall obtaining financial information on the borrower when you helped open up a line of credit for Martin Sigillito?

A.   Yes, we would have gathered his company tax returns.

Page 33 of 58

Q.   And by "company," do you mean Martin T. Sigillito & Associates, his law practice?

A.   His law practice. I don't remember which entity he used, but yes.

Q.   Sure. Did you also obtain personal financial statements from Martin Sigillito?

A.   I would imagine that we did. That's kind of a normal course of underwriting.

Q.   Sure, and when you said you obtained financial information from the guarantor, you mean Martin Sigillito individually?

A.   Correct.

Fact 6.17    On the subject of Allegiant's practice of obtaining a personal guaranty, Craig Hingle, at page 103 of his deposition, testified:

Q.   You said earlier that if Martin Sigillito's business took out a loan or a line of credit with the bank, you would have required his personal guarantee. Do you remember that?

A.   Yes. That's pretty standard practice.

Q.   Sure, and that was the standard practice at St. Louis Bank in 2006?

A.   Yes.

Fact 6.18    On the subject of Sigillito as a guarantor, Craig Hingle, at page 107 of his deposition, testified:

Q.   Okay. Fair to say that if you had followed the practice that you normally follow with commercial loans, that in fact, Mr. Martin Sigillito was a guarantor of the loans that he took out through Martin T. Sigillito Associates, Ltd.?

A.   Yes.

Fact 6.19    On the subject of being Sigillito's contact person at St. Louis Bank, Craig Hingle, at page 112 and 113 of his deposition, testified:

Q.   Were you the contact person at St. Louis Bank for Martin Sigillito and his law practice?

MR. CAMPBELL: I object to the form of the question as vague and overly broad. Subject to that, you can answer.

A.  I was his contact for his line of credit.
    BY MR. ANDRES:
Q.  So you were the contact person at St. Louis Bank for the line of credit
    taken out by Martin T. Sigillito & Associates, and so you were the point of
    contact for Martin Sigillito?
    MR. CAMPBELL: Same objection.
A.  As it related to his line of credit, yes.

Fact 6.20     On the subject of Sigillito's law practice, Craig Hingle, at pages 116
              and 117 of his deposition, testified:

Q.  What type of law practice did Mr. Sigillito have?
    MR. CAMPBELL: Objection; calls for speculation. Subject to that, you
    may answer.
A.  My understanding was that he did some corporate law, some estate
    planning, and then the British Lending Program.
    BY MR. ANDRES:
Q.  So you understood that as a lawyer, the three areas that Mr. Sigillito was
    involved with were corporate law, estate planning, and the British Lending
    Program?
    MR. CAMPBELL: Object to the form of the question, in the use of the
    word "as a lawyer" lacks foundation, calls for speculation. Subject to that,
    you may answer.
A.  Generally, yes, that's what I believed his practice was involved with.

Fact 6.21     On the subject of fees in the BLP, Craig Hingle at page 116 of his
              deposition testified:

Q.  While you were at St. Louis Bank, did you come to have an understanding
    that Mr. Sigillito was receiving fees as part of his involvement in the
    British Lending Program?
    MR. CAMPBELL: Object to the vague nature of the question, but subject
    to that, you may answer.
A.  I'm not--I didn't know the program well enough to understand the specific
    nature of how he was getting paid. I am aware that he did derive some of
    his corporate revenue from that program.

Fact 6.22       On the subject of fees received by Sigillito, Craig Hingle, at pages 286
                and 287 of his deposition, testified:

Q.   Now, "the fees that you have receivable currently" is a reference to the fees
     that he has receivable in the British Lending Program, isn't it?
     MR. CAMPBELL: Object; lack of foundation, calls for speculation. Go
     ahead.
A.   My understanding--
     MR. CAMPBELL: If you know.
A.   --of that would be the fees he's got for his law practice.
     BY MR. ANDRES:
Q.   You are certain that it's that and nothing else?
     MR. CAMPBELL: Objection; badgering, argumentative, asked and
     answered. Go ahead.
A.   No, I'm not certain what it refers to.
     BY MR. ANDRES:
Q.   Well, if you are not certain what it refers to, you don't know whether it
     refers to fees from his law practice or not. Would that be fair?
     MR. CAMPBELL: Objection; asked and answered, and argumentative, and
     badgering.
A.   Our borrowing entity was the law firm, so--
     BY MR. ANDRES:
Q.   Right.
A.   --I would, as I look at this e-mail, that is what I would presume that I was
     intending to get, the fees that his law firm has generated.

Fact 6.23       On the subject of overdrafts and IOLTA accounts at St. Louis Bank,
                Craig Hingle, at pages 364 to 367 of his deposition, testified:

Q.   From your experience as a banker and having worked at St. Louis Bank, if
     you are trying to get an overdraft approved--in other words, that's the
     objective--what does that mean?
A.   Well, generally, different officers have different levels of overdraft
     activity. My--I don't remember my specific overdraft limit, but I'm positive
     it was significantly less than the dollar amount referenced in here, $40,000.
     It may have been $5,000, so in order to get an overdraft of a similar, you

know, forty, say forty-thousand-dollar amount approved, it would have to
be approved by multiple people, including the president of the bank.

Q.   Okay, so when it says, here, in Exhibit 141 in your e-mail to Mr. Sigillito
on January 29, 2010, quote, "I was not able to get the overdraft approved
today," end quote, is it a fair reading that the overdraft approval exceeded
your personal ability to approve an overdraft?

MR. CAMPBELL: Objection; a lack of foundation, and calls for
speculation. Go ahead.

A.   I don't recall the context of this e-mail. I don't know if he was asking, or
asking about overdrawing his account in the future, or if he had an
overdraft and the check was returned. I just--I don't--I don't recall the
nature of what happened on that specific--you know, on this specific
request.

BY MR. ANDRES:

Q.   Okay. Do you have any recollection, as you sit here today, of money
coming into St. Louis Bank into the accounts of Martin Sigillito or Martin
T. Sigillito & Associates, Ltd., that were fees from the British Lending
Program?

MR. CAMPBELL: Objection; asked and answered repeatedly. Subject to
that, you can answer again if you can.

A.   No. I was never aware of the source of his deposits, what portion of his
business the deposits came from, who the deposits came from, didn't
regularly look at checking accounts, never saw the statements, would have
had no real way of knowing the source of his deposits, his deposited items.

BY MR. ANDRES:

Q.   Did you have a general understanding that money that he received from
clients that he put into his IOLTA account was--were funds that belonged
to those clients?

MR. CAMPBELL: Objection; asked and answered in various forms,
badgering and argumentative, but you may answer again if you can.

A.   Again, I did not deal with the IOLTA account. I don't know if the funds
that were in the IOLTA account were his investors, his law clients, his--I
would have no way of knowing the source of the funds that were in the
IOLTA account and who they belonged to.

BY MR. ANDRES:

Q.   While you worked at St. Louis Bank as a commercial loan officer, did you
have any understanding whether or not Martin Sigillito, the lawyer, could

maintain his own personal funds or funds that belonged to him in his IOLTA account?

MR. CAMPBELL: Objection; calls for a legal conclusion and speculation. Subject to that, you may answer.

A.   I don't recall, since I didn't deal with the IOLTA account, I just didn't deal with it, so I don't know whose money was in there or what the source of the money that was in that account.

BY MR. ANDRES:

Q.   And since you didn't deal with the IOLTA, do I understand correctly that you did not have an understanding either way whether Martin Sigillito could, as an attorney, could keep his funds in an IOLTA account?

MR. CAMPBELL: Objection; calls for a legal conclusion, calls for opinion testimony, and it calls for speculation. Subject to that, you may answer.

A.   Again, I don't know the source of funds that are in the IOLTA account and who the funds belong to.


7.   JULIE OHLMS TESTIMONY

Fact 7.1   On the subject of the Uniform Fiduciaries Law, Julie Ohlms at page 25 of her deposition testified:

Q.   While you were working at Allegiant Bank, did you ever become aware of or learn about something called the Uniform Fiduciaries Law?
A.   No.
Q.   Do you recall ever receiving any training, while you were at Allegiant, in the Uniform Fiduciaries Law?
A.   No.

Fact 7.2   f

Fact 7.3   On the subject of IOLTA accounts, Julie Ohlms at pages 25 and 26 of her deposition testified:

Q.   While you were working for Allegiant, did you ever become aware that the bank offered interest on lawyers' trust accounts, or IOLTA accounts?
A.   Maybe.

Q.   Tell me why you think you might have heard about that.

A.   Well, I'm aware the accounts exist. I don't know exactly where in my banking career that I became aware of that, of those accounts.

Q.   Did there come a point in your banking career where you became aware of IOLTA accounts a someone working in New Accounts at banks?

A.   Yes.

Q.   What do you understand an IOLTA to be?

A.   It's an account where lawyers put client funds.

Q.   So it's an account where money that goes into it doesn't belong to the lawyer?

A.   It belongs to the client.

Q.   Sure, so by definition, it wouldn't belong to the lawyer.

A.   Right.

Fact 7.4   On the subject of training in IOLTA accounts, Julie Ohlms at page 28 of her deposition testified:

Q.   In your banking career, have you ever received any training or instruction in IOLTA accounts?

A.   No.

Q.   Have you ever heard of an entity known as the Missouri Supreme Court Foundation?

A.   No.

Q.   Do you know whether the Missouri Supreme Court Foundation has anything to do with IOLTA accounts in Missouri?

MR. CAMPBELL: Let me object to the form of the question as calling for a legal conclusion and speculation. You may answer.

A.   No.

Fact 7.5   On the subject of Treasury Management services at St. Louis Bank, Julie Ohlms at page 74 of her deposition testified:

Q.   Is one of the services provided at St. Louis Bank, within Treasury Management, assisting customers with transfer of money between accounts?

A.   Yes.

Fact 7.6   On the subject of trust accounts, Julie Ohlms at pages 77 and 78 of her
deposition testified:

> Q.   What is your understanding of the term, "trust account"?
> MR. CAMPBELL: Overly broad, objection, and calls for a legal
> conclusion. Go ahead.
> A.   It's a fiduciary account.
> BY MR. ANDRES:
> Q.   Do you consider IOLTA accounts to be trust accounts?
> MR. CAMPBELL: Same objections.
> A.   Yes, but not all trust accounts are IOLTA accounts.
> BY MR. ANDRES:
> Q.   In other words, IOLTA accounts are not the only form of trust accounts,
> right?
> A.   Exactly.
> Q.   There are other forms of trust accounts besides IOLTA accounts, right?
> A.   Yes.

Fact 7.7   On the subject of Sigillito, Julie Ohlms at pages 78, 79, and 80 of her
deposition testified:

> Q.   Did Martin Sigillito have an IOLTA account at St. Louis Bank at any time,
> to your knowledge?
> A.   Yes.
> Q.   Did you understand that by having an IOLTA account, Martin Sigillito held
> the position of trustee, as opposed to beneficiary, as you used those terms?
> MR. CAMPBELL: Objection to the form of the question as calling for a
> legal conclusion. Go ahead.
> A.   Yes.
> BY MR. ANDRES:
> Q.   You understood that the beneficiary, as you used that term, would be the
> clients whose money was put into the account?
> MR. CAMPBELL: Objection to the form of the question as calling for a
> legal conclusion and calling for facts that are not necessarily in issue.
> A.   Yes.
> BY MR. ANDRES:

Q.  Did you have an understanding, during the time that Martin Sigillito had an
     IOLTA account at St. Louis Bank, that he had responsibilities for the
     monies that were placed in that account?
     MR. CAMPBELL: Objection to the form of the question as calling for a
     legal conclusion and as being overly broad and vague. Go ahead.
A.  Yes.
     BY MR. ANDRES:
Q.  What responsibilities did you understand he had towards that money--
     MR. CAMPBELL: Same objection.
     BY MR. ANDRES:
Q.  --placed in his IOLTA account?
     MR. CAMPBELL: Same objections.
A.  I--to his--his responsibilities were to his clients, not to me.
     BY MR. ANDRES:
Q.  Sure. His responsibilities were to safeguard the money for his clients?
     MR. CAMPBELL: Same objections.
A.  Yes.
     BY MR. ANDRES:
Q.  That was your understanding, wasn't it?
A.  Yes.

Fact 7.8  On the subject of IOLTA accounts, Julie Ohlm, at pages 80, 81, and 82 of
          her deposition testified:

Q.  Did you have an understanding, during the time that Martin Sigillito had an
     IOLTA account at St. Louis Bank, that he had responsibilities for the
     monies that were placed in that account?
     MR. CAMPBELL: Objection to the form of the question as calling for a
     legal conclusion and as being overly broad and vague. Go ahead.

A.  Yes.
     BY MR. ANDRES:
Q.  What responsibilities did you understand he had towards that money--
     MR. CAMPBELL: Same objection.
     BY MR. ANDRES:
Q.  --placed in his IOLTA account?
     MR. CAMPBELL: Same objections.

A.   I--to his--his responsibilities were to his clients, not to me.
     BY MR. ANDRES:
Q.   Sure. His responsibilities were to safeguard the money for his clients?
     MR. CAMPBELL: Same objections.
A.   Yes.
     BY MR. ANDRES:
Q.   That was your understanding, wasn't it?
A.   Yes.
Q.   His responsibilities were to not steal the money?
     MR. CAMPBELL: Same objections.
A.   Yes.
     BY MR. ANDRES:
Q.   You understood that?
A.   Yes.
Q.   His responsibilities included not using the money for other people other
     than the client. You understood that?
     MR. CAMPBELL: Same objections, and also calling for facts not in issue,
     and go ahead.
A.   Yes.
     BY MR. ANDRES:
Q.   You understood that he had to act as a fiduciary towards the money that
     was in his IOLTA account on behalf of the clients that he had; correct?
A.   Yes.

Fact 7.9   On the subject of training in IOLTA accounts at St. Louis Bank, Julie
           Ohlms at page 81 of her deposition testified:

Q.   During your time at St. Louis Bank, did you ever receive any instruction or
     training on IOLTA accounts and the responsibilities that it imposed on the
     people that held those accounts, like a lawyer, like Martin Sigillito?
     MR. CAMPBELL: Same objections. Go ahead.
A.   No.

Fact 7.10      On the subject of regulations related to IOLTA accounts, Julie Ohlms
               at page 82 and 83 of her deposition testified:

Q.  Sure. While you were working at Allegiant Bank, did you have any understanding that there were any regulations that the bank had to follow that related to IOLTA accounts?
MR. CAMPBELL: Objection; calls for a legal conclusion, overbroad and vague, and lacks a time period for those regulations throughout that period of time at which she was at St. Louis Bank. You may answer.

A.  The only thing I was aware of was that there's a specific tax ID number that goes on IOLTA accounts, and the tax goes to that fund, or the interest. It's an interest-bearing account. That's all I know.

Q.  The only regulatory issue that you are aware of relating to IOLTA accounts while you worked at St. Louis Bank was that there was a tax ID number that had to be used in connection with IOLTA accounts. Is that right?
MR. CAMPBELL: Same objections.

A.  And the interest was sent to an entity at the State of Missouri, and that's where the interest was reported.
BY MR. ANDRES:

Q.  While you worked at St. Louis Bank, the only regulatory issues that related to IOLTA accounts that you were aware of had to do with the tax ID number that had to be used and where the interest went that was earned on the account. Is that right?
MR. CAMPBELL: Same objections.

A.  That is correct.
BY MR. ANDRES:

Q.  And beyond, that you didn't have any understanding of any regulatory issues or obligations that related to IOLTA accounts; is that right?
MR. CAMPBELL: Same objection, and I'll add that the question is vague because it doesn't say who had those obligations. Go ahead.

A.  Correct.

Fact 7.11     On the subject of diverting funds held in trust, Julie Ohlms at pages 112 and 113 of her deposition testified:

Q.  In your view, is it ever proper for someone in a fiduciary position to divert funds for which they have an obligation to hold in trust?
MR. CAMPBELL: Objection. Objection to the form of the question on multiple grounds; vague, ambiguous, calls for a legal conclusion, calls for speculation as to the use of the word "divert," whether or not it's authorized, whether or not it's

under certain circumstances, a host numerous issues. Subject to that, you may
answer.

A.   I don't understand the question.
     BY MR. ANDRES:
Q.   Do you think it's right for someone to steal money?
     MR. CAMPBELL: Objection to the form of the question; argumentative,
     vague, ambiguous. Go ahead.
A.   No.
     BY MR. ANDRES:
Q.   And as a banker, do you view yourself as anybody with responsibility to
     see that stealing doesn't occur within the bank?
     MR. CAMPBELL: Objection to the form of the question; argumentative,
     vague, ambiguous, and calls for a legal conclusion and legal duty, but go
     ahead.
A.   Yes.
Q.   Okay, why is that? Tell us why that is.
     MR. CAMPBELL: Same objections.
A.   Stealing is wrong.


Fact 7.12      On the subject of Treasury Management services at St. Louis Bank,
               Julie Ohlms at page 147 of her deposition testified:


Q.   Do you recall instances where Martin Sigillito asked you to transfer money
     between his accounts at St. Louis Bank?
A.   I don't recall specific instances, but that's something that would happen in
     my job.
Q.   That's something that you would do as someone in Treasury Management?
A.   Just as--yes.


Fact 7.13      On the subject in intra–bank transfers between accounts at St. Lois
               Bank, Julie Ohlms at pages 206 and 207 of her deposition testified:


Q.   Okay. During the period 2006 to 2010, did you, as someone working in
     Treasury Management, receive from time to time a request from customers
     to transfer money between their accounts at the bank?
A.   Yes.

Q.   In those instances, what are the steps that you had to take in order to transfer money between accounts of a customer?

MR. CAMPBELL: Objection to the form of the question; vague and ambiguous, both in the use of the word "accounts" and the use of the word "transfers," because there are different kinds, but go ahead.

A.   We have to check and make sure funds are available, make sure the person making the request is an authorized signer on the account.

Fact 7.14      On the subject of intra-bank transfers between accounts at St. Louis Bank, Julie Ohlms at page 211of her deposition testified:

Q.   All right. After determining whether the current available funds were sufficient to make the transfer, what is the next step in the transfer?

A.   Go to a different area of CBS and create a BTE.

Q.   What is a BTE?

A.   Batch transfer entry.

Q.   What information is needed to create a BTE, or batch transfer entry?

A.   The type of account, checking or savings, account number, transaction code for debit or credit, and the amount.

Fact 7.15      On the subject of intra-bank transfers between accounts at St. Louis Bank, Julie Ohlms at pages 214 and 215 of her deposition testified:

Q.   Well, I'm now--let me take a step back, and I want to cover the whole process from beginning to end in terms of is there any point in the process where you are making a transfer from one account to the other where information comes up on the screen that tells you that one of the accounts involved is either the receiving account or the transferring account is, for example, an IOLTA account?

MR. CAMPBELL: Objection to the form of the question as vague and confusing, and the use of the word "process," because there are multiple separate processes she's testified to, but go ahead.

A.   It's on the account title, but the account title is not part of the consideration, you know. It's is the person making the request an authorized signer on the account that the funds are being requested transfer from.

BY MR. ANDRES:

Q.  So when you call up this information, the name of the account is on the screen?

A.  Yes, over on the right.

Q.  So when you call up this information, you can see that it's--

A.  Yes.

Q.  Okay, so for instance, if the account was the Martin T. Sigillito IOLTA account, that, if that was the name of the account, that information would appear on the screen?

MR. CAMPBELL: Objection; calls for speculation, lack of foundation. Go ahead.

A.  Yes.


8.   TESTIMONY OF ST. LOUIS BANK CORPORATE REPRESENTATIVE

Fact 8.1  On the subject of Plaintiff's Deposition Exhibit 103, Kimberly Palmer at pages 106, 107 and 108 of her deposition testified:

Q.  Let me show you a document that I've marked as Exhibit 103. This document comes from St. Louis Bank's records. Would you describe this document, please?

A.  This says it's a personal financial statement.

Q.  This is a personal financial statement from the bank's records?

A.  Yes.

Q.  This is a personal financial statement that is signed?

A.  Yes.

Q.  What is the date of this personal financial statement?

A.  4/8 of '09.

Q.  Whose personal financial statement is this?

A.  On the front page of the personal financial statement form, it says "Martin T. Sigillito and Margaret A. Finan." Am I pronouncing her name right?

Q.  That's how I pronounce it.

A.  Okay.

Q.  This personal financial statement is a document created by the bank or used by the bank?

A.  It's--yeah, it's not an official document or anything, but it is a document that we collect information for.

Q. The personal financial statement marked as Exhibit 103 has sections 1, 2, 3, 4 on the first page?

A. Yes.

Q. On the second page of Exhibit 103 are Schedules A, B, C, D, E and F?

A. Yes.

Q. And then there's room for a signature at the bottom?

A. Yes.

Q. Is this--does this personal financial statement appear to be signed by Martin Sigillito and Margaret Finan?

A. Yes, I guess.

Q. At the top of the first page, do you see where it says, "IMPORTANT: Read these directions before completing this statement"?

A. Yes.

Q. It's got four boxes with four different paragraphs or sentences?

A. Okay.

Q. Yes?

A. Yes.

Q. What does the sentence after the fourth box say, if you'll read that into the record, please?

A. "If this statement relates to your guarantee of the indebtedness of other person(s), firm(s) or 18 corporation(s), complete Sections 1, 3 and 4."

Q. Are Sections 1, 3, and 4 completed on Exhibit 103?

A. Yes.

Fact 8.2   On the subject of Plaintiff's Deposition Exhibit 104, Kimberly Palmer at pages 108, 109 and 110 of her deposition testified:

Q. Let me hand you a document that I've marked as Exhibit 104, please. I'll represent that this document comes from the bank's records. Would you describe what this document is, please?

A. This says, "Personal Financial Statement."

Q. The first two pages of Exhibit 104 are a personal financial statement?

A. Yes.

Q. Have you seen the last two pages of Exhibit 104 before?

A. No.

Q. Focusing your attention to just the first two pages of Exhibit 104, does this financial statement appear to be signed?

A.   Yes.

Q.   What is the date of this personal financial statement shown in Exhibit 104?

A.   The date on the second page of the financial statement says 6/1/06, two thousand--well, '06.

Q.   Fair to read that date as June 1st, 2006?

A.   Yes.

Q.   Whose personal financial statement is this shown in Exhibit 104?

A.   The names on the front of the personal financial statement, Section 1 says Martin T. Sigillito.

Q.   Does it also show the other party being Margaret A. Finan?

A.   Yes.

Q.   Does this financial statement in Exhibit 104 appear to be signed by Martin Sigillito and Margaret Finan?

A.   Yes.

Q.   Does Exhibit 104 have a financial statement that on the first page has sections 1, 2, 3 and 4?

A.   Yes.

Q.   What does the last sentence read under the header, "IMPORTANT: Read these directions before completing this statement" on the first page of Exhibit 104?

A.   "If this statement relates to your guarantee of the indebtedness of other person(s), firm(s), corporation(s), complete Sections 1, 3, and 4."

Q.   Are Sections 1, 3, and 4 completed on the personal financial statement shown in Exhibit 104?

A.   Yes.

Fact 8.3   On the subject of IOLTA accounts, Kimberly Palmer at page 125 of her deposition testified:

Q.   During the 2006 to 2010 time period, at least, St. Louis Bank offered interest on lawyer trust account or IOLTA accounts?

A.   Yes.

Q.   The bank understood that those were lawyer trust accounts?

A.   Yes.

Q.   The bank understood that those were accounts that were set up through the Missouri Supreme Court Foundation as part of something that the Missouri Supreme Court had set up for lawyers to have?

A.   Yes.

Fact 8.4   On the subject of employee training at St. Louis Bank on handling IOLTA accounts, Kimberly Palmer at pages 129 and 130 of her deposition testified:

Q.   What training during this period did the bank provide its employees on handling IOLTA accounts?

A.   The majority of what happens in an IOLTA in our company would happen in the front, when the account is opened. It needs to be titled a certain way because it's the--Missouri, you know, has a--a-- the way they want it titled, the Missouri court system, and then--and then the other training would be with the operations people who actually do the reporting to the State to--for the interest, so that's the majority of the training, and then--yeah.

BY MR. ANDRES:

Q.   During this time, did St. Louis Bank provide any training or education on identifying or determining whether these accounts had any fiduciary aspects to them?

MR. CAMPBELL: Objection; calls for a legal conclusion that is not transaction-specific, but go ahead.

A.   Our training was really about the account, and how to handle the transactions, and what to do with the reporting.

BY MR. ANDRES:

Q.   Was there any training to determine the nature of the funds being deposited into an account, depending on what transaction was involved?

MR. CAMPBELL: Objection; calls for a legal conclusion and assumes a legal duty that does not exist. Go ahead.

A.   Our training was about how to open the account, and how to do transactions, and how to report the interest.

Fact 8.5   On the subject of employee training at St. Louis Bank on handling IOLTA accounts, Kimberly Palmer at page 133 of her deposition testified:

Q.   Okay. Well, let's just start with something as, really, basis as I can think. What training did St. Louis Bank provide during the 2006-2010

time period that discussed or considered IOLTA accounts, interest on lawyer trust accounts, in any way?

MR. CAMPBELL: Objection: Vague and ambiguous and asked and answered, but go ahead.

A.　　Yeah, I mean the only training we would have had would have been when we first started opening IOLTA accounts, which was way before this period, and you know, again, it would have concentrated on what? Opening the account, titling it correctly, reporting it correctly.

BY MR. ANDRES:

Q.　Opening, titling, and reporting? Is that what you said?

A.　Yes; reporting the interest.

Q.　And reporting the interest.

A.　Yes.


Fact 8.6　On the subject of employee training at St. Louis Bank on handling IOLTA accounts, Kimberly Palmer at pages 133 and 134 of her deposition testified:


Q.　What other training was provided by St. Louis Bank concerning the opening of IOLTA accounts other than what you've already told us?

A.　For a new accounts person, that's all that they would really need to know.

Q.　　Have you now described for us all of the training that St. Louis Bank provided when opening an IOLTA account during the 2006-2010 time period?

MR. CAMPBELL: Object to the form of the question as being vague, in that it's not clear whether you are referencing only the IOLTA nature of the account or checking accounts in general. Subject to that, you may answer.

A.　　Yeah, I don't know.

BY MR. ANDRES:

Q.　　Do you understand the question?

A.　　No. Say it one more time.

Q.　　You said with respect to IOLTA accounts, you have provided training on the opening, the titling, and the reporting of interest on those accounts, right?

A.　Mm-hmm.

Q.　Is that correct?

A.   Yes.

Fact 8.7   On the subject of employee training at St. Louis Bank on handling IOLTA accounts, Kimberly Palmer at pages 137, 138, and 139 of her deposition testified:

Q.     Are there any differences in opening an IOLTA account versus opening any other DDA account at St. Louis Bank during 2006 and 2010?

A.     For the person opening the account, no.

Q.     So am I correct in understanding that as far as training at St. Louis Bank concerning IOLTA accounts, there was nothing specific or particular that was provided by way of training on opening an IOLTA account that differed in any way from opening any other demand deposit account; is that right?
       MR. CAMPBELL: Objection; asked and answered. Do you mean other than what she already testified to? But subject to that, go ahead.

A.     Yeah, I don't know. I mean, IOLTAs are not a new concept. We have a lot of seasoned, experienced bankers. It's a checking account that has transactions on it. It needs to be titled a certain way. We train the people who have to report the interest.
       BY MR. ANDRES:

Q.     What training did you provide to the people who had to report the interest?

A.     We gave them the fax number of the place where we have to report the interest to and showed them how to print the report. That happened in Deposit Operations. They print the report every month and then fax it to the phone number that we were given.

Q.     Did St. Louis Bank provide any other training concerning IOLTA accounts and the reporting of interest other than what you've described?

A.     Not that I'm aware.

Q.     Have you now told us all of the training that St. Louis Bank provided its personnel concerning the reporting of interest as it relates to IOLTA accounts during 2006 to 2010?

A.     There could be other that I'm not aware.

Q.     Well, so you are just saying there could be others, but you are not aware of any?

A.     No.

Q.     You have now told me everything that you are aware of?

A.     Yes.

Q.     You've now told me everything that you are aware of concerning reporting interest on IOLTA accounts that was provided by way of training?

A.     Yes.

Fact 8.8   On the subject of the term "fiduciary" and training related to fiduciary accounts, Kimberly Palmer at pages 141 and 142 of her deposition testified:

Q.     The bank's familiar with the term "fiduciary," right?

A.     I'm sure certain employees are.

Q.     Sure, and those are employees of the bank, right?

A.     Sure.

Q.     Okay, so the bank is aware generally of what the term "fiduciary" means, correct?
       MR. CAMPBELL: Objection to the form of the question as mischaracterizing her testimony, but go ahead.

A.     I'm sure some are, yes.
       BY MR. ANDRES:

Q.     Sure, and some personnel of the bank were aware of the term "fiduciary" during 2006-2010; correct?

A.     It's possible.

Q.     Did the bank, during that time period, provide any training to its employees about anything having to do with the fiduciary nature, if any fiduciary nature, related to IOLTA accounts?
       MR. CAMPBELL: Objection to legal conclusion, but go ahead.

A.     I am not aware.
       BY MR. ANDRES:

Q.     The bank is not aware of any training that it provided to its employees during 2006 to 2010 that related to the fiduciary nature of IOLTA accounts; is that correct?
       MR. CAMPBELL: Same objection.

A.        I'm not aware of that.

Fact 8.9  On the subject of training at St. Louis Bank on deposits into an IOLTA account, Kimberly Palmer at page 143 of her deposition testified:

Q.        During 2006 to 2010, did St. Louis Bank provide its personnel with any training on the nature or character of deposits that went into an IOLTA account, whether they were fiduciary funds, things of that sort?
MR. CAMPBELL: Objection. It calls for a legal conclusion and assumes a duty. Go ahead.
A.        No. In taking deposits for an IOLTA, just like every customer, you take deposits. You don't know the nature of the deposit, you just know that you   are taking a deposit.

Fact 8.10    On the subject of St. Louis Bank's understanding on the money deposited into an IOLTA account, Kimberly Palmer at page 152 of her deposition testified:

Q.        The bank also understood during 2006 to 2010 that it was possible that client money or money belonging to clients would be deposited into an IOLTA account, correct? MR. CAMPBELL: Objection; calls for speculation. Go ahead.
A.  It's possible.

Fact 8.11    On the topic of the Uniform Fiduciaries Law, Kimberly Palmer at pages 153 and 154 of her deposition testified:

Q.  During 2006 to 2010, did the bank provide

any training to its personnel on the Uniform
Fiduciaries Law?
A.  Not that I'm aware.
Q.  During 2006 to 2010, what was the bank's understanding as to whether it had any obligation under the Uniform Fiduciary Law?

MR. CAMPBELL: Objection to the form of the question as calling for a legal conclusion, speculation, overly broad and vague, and not transaction specific. Subject to that, you may answer if you know.

A.   I don't know.

9.   TESTIMONY OF ELIZABETH ("LIZ") STADJUHAR

Fact 9.1  On the subject of Sigillito's law practice, Liz Stajduhar at page 240 of her deposition testified:

Q.      And did Mr. Sigillito do any other work in the law practice, other than estate planning?

A.      Early, like really early, he had a couple other clients, but not really.

Q.      On what kinds of matters?

A.      I don't know. Like -- I'm not sure. I can't remember. It was like really early.

Fact 9.2  On the subject of the BLP Loan Agreement Master - Initial marked as Exhibit 97 at her deposition, Liz Stajduhar at pates 135 and 136 of her deposition testified:

Q.      Now, take a look at Exhibit 97. It is a BLP Loan Agreement Master - Initial, correct?

A.      Yes.

Q.      And it's also marked as Government Exhibit 100 in the criminal trial, correct?

A.      Yeah.

Q.      And it has a list. Are you familiar with what that list is?

A.      Yes.

Q.      And what is it?

A.      It's a list of the investors and their loan amounts and dates.

Q.      So basically it lists all of the investments into the British Lending Program from January of 2000 all the way through April of 2010?

A.      Yes.

Fact 9.3  On the subject of working for Sigillito, Liz Stajduhar at pages 179, 180, 181, and 182 of her deposition testified:

Q.   Very good. When you were working with Martin Sigillito, what was your position, would you say?

A.   An assistant, just like an executive assistant is what he called it.

Q.   Okay. Executive assistant. Were you the only person that worked in that position with Martin Sigillito while you were there?

A.   Yes.

Q.   So it was just you and Martin Sigillito at the office?

A.   Yes.

Q.   Did you in any way serve as office manager?

A.   I kind of did everything he didn't do, so yeah.

Q.   Okay. Sort of a shared responsibility, and anything he didn't want to do in terms of managing the office fell to you?

A.   Yes.

Q.   While you worked for Martin Sigillito, were you generally familiar with where the documents and records were kept as far as his business and practice?

A.   Yes.

Q.   Were some of those records kept on your computer?

A.   Yes.

Q.   Where else were some of those records kept?

A.   So on my computer and then in the file cabinets and -- do you want me to go on?

Q.   You had a file cabinet there in the office?

A.   Yeah, and he would keep some of them on his desk or his couch or wherever.

Q.   Did you from time to time get copied on e-mails that Martin Sigillito would send to various people?

A.   Yes.

Q.   What would you do with those e-mails when you got copied on them?

A.   Sometimes I would just -- I would read them, just glance over them. They would stay on my e-mail and --

Q.   Did you ever print them out, put them in a file?

A.   Sometimes, but most of the time they were just kept on the -- you know, in the e-mail folders.

Q.   Were they kept in the e-mail folders on your computer?

A.   Yes.

Q.      Were they kept in the e-mail folders in your computer at the office?

A.      Yes.

Q.      Would it be fair to say that all the documents that were on your computer and kept in these various folders that you received from Martin Sigillito or other people e-mailing you were part of your -- the Martin T. Sigillito & Associates' business?

A.      Yes.

Q.      Okay. These are not trick questions. I'm just trying to figure out whether the documents that you had, that we got from the government, whether you would characterize those as business records.

A.      Yes.


Fact 9.4   On the subject of Julie Ohlms, Liz Stajduhar at pages 34 and 35 of her deposition testified:

Q.      And Julie, who is Julie, if you know?

A.      Julie Ohms. She worked at the bank. Somehow Marty made her his personal banker, and so she would be contacted any time.

Q.      So was she an administrative person at the bank who simply handled the transactions?

A.      Yes.

Q.      And did them at your instructions or Mr. Sigillito's instructions?

A.      Yes.

Q.      And did -- do you know if Julie ever made any transactions without you telling her or without Mr. Sigillito telling her?

A.      No, not that I know of.

Q.      Okay. So everything was done at either Mr. Sigillito's instruction or your instruction?

A.      Yes.

Q.      And how often would you have a need to call Julie at the bank to make a transfer or do something?

A.      Quite regularly. I mean, yeah. So as money was coming in and he wanted to transfer it out.

Q.      So when you were making these calls on these transfers, was it just a call in which you said, "Will you please make this transfer? This needs to be done," something like that?

A.      So if it was between accounts, it would be a call, "Please transfer this." If it was a wire transfer, then we had to fax -- he would sign it and I would fax it to her, and then I would call and make sure she got it.

Fact 9.5    On the subject of Julie Ohlms, Liz Stajduhar at pages 39 and 40 of her deposition testified

Q.      How often would Mr. Sigillito become involved in that process of contacting the bank to make a transfer?

A.      So for the most part, not very involved. But at the end, as he was more desperate for money, he was on the phone like, "When can we get this cleared? When" -- I mean, he would even have me drive down there and, like, hand the check to Julie, and then he would be on the phone with her saying, "How quickly can I" -- you know, so at the end he was very involved because he wanted funds and he wanted them right – right away.

Q.      So when you were driving down and handing a check to the bank and -- was it with a teller, for instance?

A.      Oh, no, it had to be to Julie. Like somehow he turned her into his personal banker and

Q.      Because she wired the money, here's where it goes kind of person?

A.      Right, yeah, yes. I mean, because, like, she got it done. I don't know. And he trusted her. I don't know.


Respectfully submitted,                     Respectfully submitted,

JONATHAN F. ANDRES P.C.                     LAW OFFICES OF SEBASTIAN RUCCI

/s/ *Jonathan Andres*                       /s/ *Sebastian Rucci*
Jonathan F. Andres (E.D. Mo. 39531MO)       Sebastian Rucci (E.D. Mo. 178114CA)
7733 Forsyth Boulevard, Suite 700           16400 Pacific Coast Hwy, Suite 212
St. Louis, MO 63105                         Huntington Beach, CA 92649
Tel: (314) 862-6800                         Tel: (330) 720-0398
Fax: (314) 862-1606                         Fax: (330) 954-0033
Email: andres@andreslawpc.com               Email: SebRucci@gmail.com

Attorneys for Plaintiffs                    Attorneys for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2015 a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties via the Court's electronic filing system and parties may access this filing through the Court's Case management/Electronic Case Files (CM/ECF) found on the internet at https://ecf.moed.uscourts.gov.

*/s/ Sebastian Rucci* _____

Sebastian Rucci (E.D. Mo. 178114CA)